**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

STEPHEN TREIBER,               )

                           )  No. 1:16-cv-52

           Petitioner,      )

                           )

       v.                  )  Judge Robert J. Colville

                           )

JOHN E. WETZEL, et al.,      )

                           )

          Respondents,    )

## <u>OPINION</u>

Robert J. Colville, United States District Judge

      Before the Court is the Petition for a Writ of Habeas Corpus (ECF Nos. 10, 18) filed by state prisoner Stephen Treiber under 28 U.S.C. § 2254. For the reasons set forth below, the Court will deny the Petition, grant a certificate of appealability on Claim IV(c), and deny a certificate of appealability as to all other claims.

## I.    Relevant Background[1]

      On March 9, 2001, Treiber's two-year-old daughter, Jessica, died from injuries she sustained during a fire at Treiber's home located at 329 Blackstone Drive, Millcreek Township, Pennsylvania. Treiber, Denise Riddle (his live-in girlfriend), and two of their dogs escaped the fire by going out onto the deck attached to their bedroom and climbing down a chain ladder that Treiber had recently tethered to the home. The firefighters who responded to the scene eventually retrieved

---

[1]      The parties filed much of the relevant state court record in the voluminous appendices attached to their pleadings. These records will be cited by referencing their ECF and page numbers. Respondents have also submitted a hardcopy of the original state court record, which includes all relevant transcripts.

Jessica from the crib in her bedroom, but it was too late to save her. She died from smoke inhalation with associated carbon monoxide toxicity.

It soon became apparent that the fire, which began around 11:00 p.m., was an intentional, gasoline-fueled act of arson. Suspicion soon fell on Treiber because the fire was started at two locations inside the home using delay devices comprised of components (straw, gasoline and gasoline cans) that he had recently purchased; the only individuals in the home during the relevant time were Treiber, Jessica, and Riddle; Treiber had uncharacteristically urged Riddle to go out earlier that evening; and, Treiber had told Riddle before she went to bed at around 10:30 p.m. that he set the fire and burglar alarm system. Contrary to this assertion, the system had been disabled and that was a fact that Treiber would have known if he actually had set the system.[2] (*See* 3/11/01 Criminal Complaint and Affidavit of Probable Cause.)

Additionally, some witnesses at the scene observed that Treiber was unusually calm during the fire. They also thought he showed a troubling lack of concern for his young daughter, and made suspiciously little effort to save her even though her bedroom was only approximately 11 feet from the one he shared with Riddle. (*Id.*)

---

[2]      Investigators also knew that the March 9, 2001, fire was just the most recent in a series of fires that had occurred between 1995 through 2001 in properties owned by or associated with Treiber. This included a 1995 fire that destroyed the home previously located at 329 Blackstone Drive. Although investigators of the 1995 fire suspected that Treiber may have started it, he was never charged with any crime related to that fire.
      Prior to Treiber's trial, the Commonwealth moved for an order permitting it to introduce evidence of the 1995 fire to show Treiber's motive (among other things, to collective insurance proceeds), intent, and common plan, scheme or design. Treiber opposed this motion. In an opinion and order dated October 17, 2001, the trial court concluded that evidence of the 1995 fire was not admissible at trial.

Treiber was arrested two days after the fire, on March 11, 2001, and charged with criminal homicide, arson and related offenses. By the end of March 2001, Riddle's son, Erik Keith,[3] and his friend, Jaime Pianta, had given statements to investigators that incriminated Treiber.[4] (*See* 3/11/01 Criminal Complaint and 3/28/01 Affidavit of Probable Cause.)

In April 2001, the Commonwealth filed a notice of its intent to seek the death penalty if Treiber was convicted of first-degree murder. Treiber hired two experienced criminal defense attorneys, Timothy Lucas and Timothy George, to represent him. Attorney Lucas was principally responsible for the guilt phase of the trial, and he also represented Treiber in the post-sentence proceeding and on direct appeal. Attorney George was principally responsible for handling the penalty phase of the trial. Given the nature of the case, counsels' work and responsibilities "overlap[ped]." (Post Conviction Relief Act ("PCRA") Hr'g Tr., 8/10/09, at p. 14.) When it is not necessary to distinguish between Attorney Lucas and Attorney George, the Court will refer to one or both of them, as did the parties and the state courts, as "trial counsel."

Treiber's eight-day trial was held in the Court of Common Pleas of Erie County[5] from September 30, 2002 through October 8, 2002. That court summarized the evidence introduced as the trial as follows:

---

[3]     Erik Keith was a co-defendant in the case and charged at separate criminal informations. As explained in the Court's discussion of Claim V, Keith invoked his Fifth Amendment right not to testify at Treiber's trial. Keith originally pleaded guilty to the crimes of conspiracy to commit murder and arson. He later withdrew that plea and then pleaded guilty only to the charge of hindering apprehension of a witness.

[4]     Treiber was approximately 31 years old at the time of the fire. Keith and Pianta were approximately 22 years old. Keith and Pianta were friends who met in high school when they attended special education classes together. They worked for Treiber and in exchange Treiber let them live rent free in one of his properties.

[5]     References to the Court of Common Pleas of Erie County will be to "trial court" when referring to any proceeding held in that court before the direct appeal, and to the "PCRA court" when referring to any proceeding held after direct appeal.

3

Between 10:00 p.m. and 11:00 p.m. on the date of the fire, [Treiber's] neighbor, Kathleen Roemer, smelled and saw smoke coming from [his] house. She went to that location and tried to assist the occupants of [Treiber's] home who were attempting to exit the residence. N.T. Trial (Day 1) 09/30/02, at 56-59. Present in the home at the time of the fire were [Treiber], his girlfriend, Denise Riddle, and Jessica.

Ms. Roemer noticed that the garage door was closed and the basement and front doors to the home were locked. *Id.*, at 67 *et seq.*, 123. She saw [Treiber] and Denise Riddle on a second story deck. Ms. Riddle screamed for help. [Treiber] was calmly standing at a rail of the deck with his arms folded. He suggested to her that she use the basement door to gain entry. However, she could not. *Id.*, at 76 *et seq.* Ms. Roemer held a chain ladder which had been tethered to the premise to assist their escape. *Id.* at 81-82. During this time, [Treiber] specifically asked about his dogs (there were three at the residence) but made no reference to Jessica. At one point, Ms. Roemer attempted to climb the ladder to rescue the child in spite of the fact that she had an injured arm and was asthmatic. She was not able to do so. *Id.* at 85-89. [Treiber], in her estimation, did not seem anxious to help in the rescue efforts. Referring to Jessica, he said, "The [firefighters] will get her. She's probably dead anyway." *Id.* at 97. In spite of Ms. Roemer's efforts and those of firefighters and police, the child could not be saved.[2]

[2] Mr. Michael McDonald also testified to his observations and attempts to save the occupants. N.T. Trial (Day 1), 09/30/02, at 124 *et seq.* He also described [Treiber] as "really laid back." *Id.*, at 136.

Beside Ms. Roemer, a number of witnesses testified to the conditions extant at the time of the fire. West Ridge Assistant Fire Chief, John Sorge, described the rescue efforts in detail. He and Mr. Brian Keinath entered the residence and located Jessica in her bedroom. Significantly, he noted that the door to her bedroom was open. *Id.*, at 165.[3] He handed [Jessica] out to other fire fighters. *Id.*, at 170. George Hanks of the West Lake Fire Department saw flames in the garage area (*Id.*, at 189) and smelled gasoline emanating from the residence. *Id.*, at 199. Mr. Michael Little of the Millcreek Police Department observed [Treiber] at the scene. He corroborated Ms. Roemer's account that [Treiber] was primarily concerned for his dogs and was unusually calm. *Id.*, at 213, 219. Officer David Parmeter of the Millcreek Police Department also heard [Treiber] inquire about his dogs. Concerning Jessica, [Treiber] told him that: "It was probably too late." *Id.* at 240-243.

[3] After the fire, [Treiber] told Officer Gary Rogers that he closed Jessica's door and set the fire alarm. N.T. Trial (Day 4), 10/03/02, at 193-194.

Trooper Paul McGuire, a fire marshal of the Pennsylvania State Police, arrived at the scene on March 10, 2001, shortly after midnight. N.T. Trial (Day 2), 10/01/02, at 3-21. During his investigation, he saw the chain ladder tethered to the residence. He further observed that there was no rust on the ladder, implying that it

had not been exposed to the elements for very long. *Id.*, at 26-27. He did not note any fire damage near the sliding glass door leading from [Treiber's] bedroom to the deck. *Id.* He did not find any evidence of an external electrical fire. *Id.*, at 29-30. He, too, noted that the victim's bedroom door was open. *Id.*, at 46-47-56-57. His investigation established that there were two points of origin (*Id.*, at 74), one in the garage (in a truck), and one in the basement. *Id.*, at 112-114. The fire had been started using gasoline, clothing, straw and candles. *Id.*, at 72-114. He also noted that the security system which served the house had been disabled. *Id.*, at 84-86.[4]

> [4] With respect to the security system, Mr. Clifford Bell of Guardian Protection examined the system and found that it was unplugged and that one wire had been cut. N.T. Trial (Day 2), 10/01/02, at 165-167. (The system had been operable at least through February 28, 2001 (about a week before the fire) according to the testimony of another Guardian employee, Joseph Colosimo.) *Id.*, at 170 et seq. The parties stipulated that the wire had been cut with a sharp object. *Id.*, at 181. With respect to the points of origin, the Pennsylvania State Police forensic laboratory supervisor, Leonard McCoy, also testified that based upon trace evidence analysis, gasoline was found on various items and areas where the fire originated. *Id.*, at 182 *et seq*. The only fingerprints taken from the sliding glass door providing an entry point to the house were [Treiber's]. *Id.*, at 210. This is significant because [Treiber] implied that someone else started the fire, *i.e.*, Erik Keith and Jamie Pianta. Their fingerprints were not found in this area.

At trial, the Commonwealth introduced evidence of [Treiber's] motive and intent. One aspect of [his] motive was his unwillingness to pay child support. The victim's mother [and Treiber's ex-wife], Jodie Treiber, testified that [Treiber] was upset when he learned that [she] was pregnant with Jessica because he wanted a boy. N.T. Trial (Day 3), 10/02/02, at 11. After Jessica's birth, the couple's relationship became strained. *Id.*, at 12. Eventually they separated and Ms. Treiber moved to Pittsburgh. *Id.* at 19. She and [Treiber] entered into a written settlement agreement upon the dissolution of their marriage. [Treiber] orally agreed to pay $250.00 monthly in child support for Jessica. Although he made these payments on a regular basis, he never wanted them to appear in the agreement. *Id.*, at 18-19. Child visitation was amicably determined between the parties. (Other witnesses testified that throughout Jessica's life [Treiber] sought and obtained increased visitation through the Erie County Custody Conciliation Office with Ms. Treiber's consent.)

Ms. Treiber testified that prior to his March 9th visitation weekend with Jessica, [Treiber] contacted her and insisted on taking Jessica on Tuesday, March 6th. This was in spite of the fact that the child had been experiencing seizures. He refused to take any pamphlets or information related to these seizures. When he picked up Jessica, Erik Keith (Ms. Riddle's son) and Jamie Pianta were with him. *Id.*, at 26-269. At that time, Ms. Treiber informed [Treiber] that she was going to seek an increase in the support payments through the court. *Id.*, at 29.

The Commonwealth's theory of the case was that [Treiber] had taken a number of steps to make it appear that someone else started the fire. These preparatory activities, as well as [Treiber's] behavioral changes, occurred within a month and one-half period preceding the fire. In this regard, Denise Riddle testified. *Id.*, at 41 *et. seq.* She began dating him in 2000 and moved in with him in July of that year. *Id.*, at 42. She described [Treiber] as very controlling. One example was his obsession with not wearing shoes in the house. He insisted that no one (including himself) wear them in the house. *Id.*, at 50-51. (Other witnesses also testified to this trait). This was significant because on the night of the fire he kept his shoes in the bedroom.

Further, [Treiber] strongly objected to Ms. Riddle going out with her sister on Friday nights. [He] also instead that when Sheila Lee (his other daughter) and/or Jessica stayed at the home, their bedroom doors had to be closed and locked. *Id.*, at 57. (On the day of the fire Jessica's door was open.)

Until shortly before the fire, Ms. Riddle and [Treiber] engaged in sex daily. (From July, 2000 into March, 2001.) They never went two days in a row without sexual relations until the time immediately preceding the fire. *Id.*, at 58.

She also described [Treiber's] relationship with her son, Erik Keith (age 22), who was originally charged as a co-defendant in the case at separate docket numbers. Keith was a special education student who was befriended by [Treiber] after he met Ms. Riddle. He allowed Mr. Keith to live in one of his apartments. ([Treiber] owned a number of low rent properties.) Mr. Keith worked for him in lieu of paying rent. *Id.*, at 41-76. [Treiber] was very controlling of Keith. *Id.*, at 67.

[Treiber] was extremely jealous of Ms. Riddle. In January, 2001, on one of her Friday night outings with her sister, Ms. Riddle met a former boyfriend at the Gaslight, a bar located in Erie, Pennsylvania. [Treiber] discovered this when he found a message on her cell phone. Upon discovering the message, he kept her secluded for an hour while he determined how to retrieve the number. When she finally told him whom she had seen, he became extremely upset and forbade her to go out any further. *Id.*, at 52-53, 55, 69-81. He was so upset that he told her if she went to the Gaslight again he would burn it down. *Id.*, at 71 et seq.

After this incident, (later in January, 2001), [Treiber] called Ms. Riddle at work, which he often did. He told her to be careful because someone was lurking around the house. *Id.*, at 82-84. When she arrived home, he insisted that they go to his parents' home to meet an exchange student. She did not want to go, but relented. *Id.*, at 85-86. Exiting [Treiber's] residence, she saw an envelope taped to the mailbox. She and [Treiber] read the note which stated: "Get rid of the dogs or I'll kill them and burn you out again." *Id.*, at 87-89.[5] [Treiber] did not immediately call the police, but rather made copies of the note. *Id.*, at 91. Subsequently, he called the Millcreek Police Department. On January 30, 2001, Officer Brian Fiorelli responded to [Treiber's] call, and [Treiber] gave him the note and envelope. [Treiber] told him that the doorbell rang around 7:00 p.m. and no one was there. It rang again and it was then that he saw the envelope. N.T. Trial (Day 4), 10/03/02, at 41-42. (In spite of the fact that [Treiber] told Officer Fiorelli that he noticed the

note when the doorbell rang, he never retrieved the note until he made sure that Ms. Riddle had seen it.)

     5.   This is the "threat note[.]"

After this incident, [Treiber] became consumed with fire safety. N.T. Trial (Day 3), 10/02/02, at 92 *et seq.* He purchased the chain ladder, which was eventually placed outside the premise for easier egress. (It also allowed easier ingress.) He made Ms. Riddle, Mr. Keith and Mr. Pianta practice escape routes and fire evacuation procedure. (Ms. Riddle refused to descend the ladder.) *Id.*, at 97-98. With respect to Jessica's possible evacuation, [Treiber], a carpenter by trade, told Ms. Riddle that it would be easy to get to Jessica's room because he could break down a wall in an unfinished bathroom which separated the two rooms. *Id.*, at 92-93. The distance between the two bedrooms was 11.4 feet. ([Treiber] never made any effort to rescue Jessica by that route.)

[Treiber's] behavior became even more suspect the week of the fire. Because he wanted extra security, he insisted that Erik Keith stay at the residence. Mr. Keith did so. However, he had Mr. Keith leave on March 9th, the day of the fire. *Id.*, at 101-102. (*See also*, the testimony of Kimberly O'Toole, infra.)

A few days before the fire, [Treiber] changed his attitude concerning Ms. Riddle frequenting the Gaslight. During that week he hounded her, insisting that she go to the Gaslight with her sister on Friday night, (March 9th). On March 9th, he called her at work at least ten times urging her to go out. *Id.*, at 108 *et seq.* He offered to babysit her sister's daughter so she could go. *Id.*, at 109. (The clear inference here was that he did not want her at the house while he prepared to commit the arson.)

On the day of the fire, [Treiber] insisted on filling Ms. Riddle's car with gasoline. *Id.*, at 137. That night Ms. Riddle and her sister went out, but not to the Gaslight. They took the children, including Jessica, to dinner at the Warsaw Cafè. Ms. Riddle returned home with Jessica at approximately 9:00 p.m. [Treiber] was alone during this time period. *Id.*, at 115. Later, [Treiber] put Jessica to bed. Ms. Riddle fell asleep at approximately 10:30 p.m. *Id.*, at 116.

Subsequently, she awoke at [Treiber's] urging. *Id.*, at 163. Two dogs were tied to the bed that night and one was located in the basement. (This was unusual because only her dog would stay in the bedroom.) She noted that [Treiber] was dressed in jeans and sneakers. *Id.*, at 123. (This was also unusual. Because of his obsession with shoes, he did not keep them in the bedroom.)

Upon awakening, [Treiber] ushered her and the dogs onto the deck. [Treiber] was not able to rescue Jessica because—as he told Ms. Riddle—"the smoke was too bad." *Id.*, at 124-125. However, when Ms. Riddle awoke, she did not observe much smoke. *Id.*, at 118. Although she was in panic, [Treiber] was very calm. *Id.*, at 129-130.

Once they had been evacuated, they went to the hospital where Jessica was pronounced dead. *Id.*, at 129 *et seq.* Shortly after the fire, [the] police interviewed them., *Id.*, at 131 *et seq.* [Treiber] instructed [Ms. Riddle] not to talk to the police.

N.T. Trial (Day 7), 10/07/02, at 27-28. Furthermore, immediately after the fire, she could not get away from him. N.T. Trial (Day 3), 10/02/02, at 135. Also, in spite of their recent sexual hiatus, he wanted to have sexual relations to "make another Jessica." *Id.*, at 136.

Mr. Jamie Pianta testified that on two occasions during the one-month period before the fire, he accompanied [Treiber] and Erik Keith on the trips to pick up Jessica in Pittsburgh. On both trips, [Treiber] discussed his plans to commit murder. During the March 6th trip, [Treiber]—in Keith's and Pianta's presence—said they would purchase rope, hay, gas and candles to start the fire. He generally discussed the time that it would occur and said that he would kill Jessica to avoid support payments. He also stated that he wanted to kill his other daughter, 14- year-old Sheila Lee. *Id.*, at 207 et seq.

> 6 Ms. Riddle testified that Sheila Lee stayed with them every other weekend. (Ms. Lee did not get along very well with [Treiber].) Ms. Lee testified that [Treiber] called her to stay with him the weekend of the fire, although this was not her normal weekend visit. She did not want to stay with him that weekend, never told her mother and, therefore, was able to avoid the visit. N.T. Trial (Day 3), 10/02/02, at 178, 185-187. (This evidence became significant in light of [Treiber's] statements that it was his intent to kill both Jessica and Ms. Lee. *See* the summary of Mr. Pianta's testimony above.

On the Tuesday before the fire, Pianta, Keith and [Treiber] tethered the chain ladder to the residence to make it easier to exit the residence. N.T. Trial (Day 3), 10/02/02, at 211. (Pianta was not present during the fire, but learned of it at approximately 1:00 a.m. to 2:00 a.m. the next day.)

Detective Michael Dugan of the Millcreek Police Department testified about the "threat note" [that had been taped to Treiber's mailbox]. During his investigation, he found hair stuck to the glue in the envelope. N.T. Trial (Day 4), 10/03/02, at 83-84. Subsequently, the Commonwealth retained the services of DNA experts Joy Halverson and Doctor Christopher Basten. They determined that one of the hairs stuck in the envelope was a dog hair. Comparing that hair to hair belonging to one of the dogs killed in the fire (Janie), they concluded that the hair was 1,100 times more likely to have come from Janie as opposed to any other dog. *Id.*, at 128, 130, 141-142, *et seq*. This connected the note to [Treiber].

The Commonwealth introduced evidence of [Treiber's] behavior after the fire. Mr. Kenneth Merritt, a local funeral director, testified that, during meeting(s) with [Treiber] for Jessica's funeral arrangements, [Treiber] did not show any emotion and repeatedly referred to Jessica as "It." Mr. Merrit became so upset that he had to leave the room during the course of those discussions. *Id.*, at 155, 161, 165-66.

To further establish its theory that [Treiber] had the means to start the fire, the Commonwealth presented the testimony of Nicholas Ferraro, a local gas station attendant. He testified (with receipts) that [Treiber] purchased gas (the accelerant) on two occasions on the day of the fire. *Id.*, at 169-176. Moreover, Lt. Richard

Figaski of the Millcreek Police Department testified that a search resulted in the recovery of various documents belonging to [Treiber]. Specifically, Commonwealth trial exhibits 111 through 116 showed that during the month of February, 2001, [Treiber] purchased straw on four separate occasions. He also purchased two 5-gallon gas cans. Two such cans were recovered during the course of the investigation at the points of origin. (These purchases were made after [Treiber's] first conversation with Pianta and Keith concerning his intention to start the fire and kill his daughters.) *Id.*, at 179-188. All of these items were incendiary components.

Ms. Kimberly O'Toole testified that in March, 2001, she worked for ADT Security Services Company selling home and business security systems. Based upon [Treiber's] call, she met with him on March 5, 2001 (four days before the fire). N.T. Trial (Day 5), 10/04/02, at 52-56. [Treiber] wanted a security camera system because he had received a "threat note" delivered by a young boy.[7] *Id.*, at 59.

> [7] This was the first time [Treiber] had indicated that he had seen anyone bring the note to the house.

Ms. O'Toole observed the control panel of the security system located in the basement of the house. [Treiber] was aware of how the system could be disabled. *Id.*, at 63. Prophetically, [Treiber] told her that something would happen within the next few days. *Id.*, at 68. He also pointed to an area where the fire might start. *Id.*, at 68-69. (This was later determined to be a point of origin). *See*, Trooper McGuire's testimony, N.T. Trial (Day 2), 10/01/02). Because of his apparent concern and her impression that a sale of the system was imminent, she offered to immediately supply [Treiber] with the equipment. In spite of his urgency, he refused. *Id.*, at 69-71.[8] She never heard from [him] after the March 5th meeting. *Id.*, at 75.

> [8] [Treiber] told Ms. O'Toole that he had an annual income of $300,000.00. *Id.*, at 66. This statement is significant when compared to the testimony of other Commonwealth witnesses who testified about [his] financial activities prior to the fire.

Other witnesses testified about [Treiber's] financial motive for the killing. This evidence focused on a series of events that occurred just prior to the fire. Mr. Roy Traub, of First USA Bank, testified that [Treiber] attempted to increase the credit limit on one of his credit cards. His request was declined. *Id.*, at 83. Mr. James Ball testified similarly as to [Treiber's] Discover Card. *Id.*, at 90. Mr. Robert Young, of Marquette Savings Bank, testified that on February 27, 2001, [Treiber] applied for a loan in the amount of $40,800.00. *Id.*, at 96.[9] (It appears that [Treiber] misstated his assets and the application was denied because of his obligations. *Id.*, at 101-108). Moreover, Mr. David Spinks testified that on February 5, 2001 [Treiber] attempted to increase his homeowners' insurance coverage. *Id.*, at 150. Mr. Kenneth Wisniewski, another insurance agent, testified

that on February 12, 2001, [Treiber] changed his automobile policy for Jessica, naming him as beneficiary. This request was denied. *Id.*, at 170-186.

> [9] *See also*, the testimony of Aaron Hanks and Ella Alloway (N.T. Trial (Day 5), 10/04/02) regarding [Treiber's] financial situation.

(PCRA Ct. Op. 3/27/12, ECF No. 11-1 at pp. 47-50; ECF No. 11-2 at pp. 1-8.)

Treiber testified in his own defense at the trial. He maintained his innocence and offered explanations for his suspicious actions. He also described his financial status before the fire as well as his state of mind before, during and after the fire to counter the Commonwealth's evidence of premeditation and intent. (Trial Tr., Day 6, at pp. 9-62.)

Treiber testified that Riddle found the threat note taped to his mailbox and that he immediately reported it to the police after Riddle showed it to him. (*Id.* at pp. 36-37.) He said that he told the reporting officer that he thought the threat note may have been from a neighbor who did not like his dogs and with whom he did not get along.[6] (*Id.* at pp. 36-39; *see also* Trial Tr., Day 4, at pp. 44.)

Treiber also testified that he loved Jessica, did not plan or set the fire that killed her, and grieved her death. (*Id.* at pp. 49-51, 59-62.) He stated that during the fire he "opened the hallway door to run down the hallway and get Jessica," but that it was too hot and he "couldn't see a centimeter" and "figured firemen…should be there by then…[a]nd they could go down the hallway because they had" the equipment necessary to rescue her. (*Id.* at pp. 56-58.)

Treiber also testified that he "remember[ed] asking at least one or two people about [his] dogs" because they had been on the deck with him (*id.* at p. 61); he was "frantic" during the rescue

---

[6]    Attorney Lucas would later testify during the PCRA proceeding that "when Mr. Treiber first hired me, I believe he was of the belief that his backyard neighbor may have been—she was an older lady with whom he had, evidently, problems over fences or whatnot. He was of the thought she may have been responsible for the fire. I don't remember if she wasn't home or what, but, in any event, early on she was ruled out." (PCRA Hr'g Tr., 8/10/09, at 93-94.)

process and "was not happy about" how long it took for the firefighter to "start[] to climb the ladder" to enter the home (*id.*); and, he was in a "flustered and enraged" state of mind when making funeral arrangements for Jessica and did not recall referring to her as "it" (*id.* at p. 50). Treiber also stated that he asked about a life insurance policy on Jessica because he believed it was a college savings account. (*Id.* at pp. 46-48). He purchased and possessed a lot of straw, he explained, because his backyard was muddy and it helped to prevent his dogs from tracking dirt into the house (*id.* at pp. 48-49).

The defense also presented testimony from several other individuals, including three of the first responders; a private investigator retained by the defense; and, an attorney who handled some landlord/tenant work for Treiber. It also presented testimony from Attorney Kelly Mroz, whom he had retained in October 2000 to modify his custody order so that his time with Jessica could be increased. (Trial Tr., Day 5, at pp. 202-05.) Attorney Mroz testified that Treiber never asked her to attempt to reduce the amount of child support he paid for Jessica. (*Id.* at p. 213.)

Additionally, the defense presented testimony from Riddle to try to cast suspicion onto her son, Erik Keith, and suggest that he had a motive to start the fire. Riddle acknowledged that she had a life insurance policy in the amount of $250,000 in effect at the time of the fire and that Keith was the beneficiary. (Trial Tr., Day 7, at pp. 26-27.)

Finally, to counter testimony given by some of the prosecution's witnesses who had described Treiber's seemingly emotionless demeanor during the fire, Treiber's mother, Edith, testified that members of her family "are pretty cold emotionally" and "flat." (*Id.* at p. 33.) She added that Treiber "had a head injury some years ago so he might even be flatter." (*Id.*) She said, "I don't think I've ever seen [Treiber] cry. Even when he was a child he didn't cry. But then I

don't either." (*Id.*) Edith also said that Treiber "keeps everything inside and goes through the motions which is, you know, good in a stress situation because [he is] able to function where some other people wouldn't be." (*Id.*)

At the end of the guilt phase of the trial, the jury convicted Treiber of first-degree murder in the death of Jessica and two counts of arson. Because the Commonwealth was seeking the death penalty, the jury remained empaneled for the sentencing phase of the trial.

Under Pennsylvania law, the Commonwealth had the burden of proving at least one statutorily-defined aggravating circumstance accompanied the murder. 42 Pa. C.S. § 9711(c)(1)(iii), (d). The jury could find an aggravating circumstance to be present only if all members agreed that it was. *Id.* § 9711(c)(1)(iv). The defense could introduce, and the jury could consider, mitigating evidence. *Id.* § 9711(e). The Commonwealth had to prove aggravating circumstances beyond a reasonable doubt, but the defense had to prove mitigating circumstances by only a preponderance of the evidence. *Id.* § 9711(c)(1)(iii). Unlike the finding of aggravating circumstances, each juror was free to regard a particular mitigating circumstance as present despite what other jurors believed. The jury could impose the death penalty only if it unanimously found that the statutorily-defined aggravating circumstances proven by the Commonwealth outweighed any mitigating circumstance proven by the defense. *Id.* § 9711(c)(1)(iv). The verdict had to be a sentence of life imprisonment in all other cases. *Id.*

At the beginning of the sentencing phase, the trial court granted the Commonwealth's motion to incorporate the testimony introduced during the guilt phase. (Trial Tr., Day 8, at p. 66.) The Commonwealth also presented victim impact testimony from Jessica's mother, Jodie. (*Id.* at pp. 66-68.)

12

The defense presented testimony from Gerald Niebauer, who had supervised Treiber at work from December 1991 until April 1999. He stated that Treiber was a good and trustworthy employee. (*Id.* at pp. 69-73.) Deborah and Jack Harford testified that Treiber was a good, kind landlord. (*Id.* at pp. 74-82.)

Treiber's mother, Edith, testified about his work history and strong work ethic. (*Id.* at pp. 83-87, 90-93.) She also explained that Treiber suffered severe injuries in a car accident in 1991 that caused him to be in a medically induced coma for two weeks. Edith described Treiber's cognitive abilities following this accident as being "strained." (*Id.* at pp. 87-88.) She also testified, as she did during the guilt phase, that Treiber's emotionlessness, which was observed by some witnesses during the fire, was a family trait that Treiber had exhibited since childhood. (*Id.* at p. 89.)

Treiber's father, Kenneth, testified about Treiber's childhood, friendships and interests. He also said that he could not recall Treiber ever getting into a fight with anyone. (*Id.* at pp. 94-101.)

At the end of the testimony, the parties stipulated that Treiber had no prior criminal history. (*Id.* at p. 102.) The defense also introduced into evidence medical records that documented Treiber's care and treatment following his 1991 car accident; Treiber's school transcripts, which included his grades and comments by his teachers; and, Treiber's prison records, which summarized his good conduct in the Erie County prison since his arrest. (*Id.* at pp. 101-02.)

The Commonwealth pursued three aggravating circumstances: (1) Treiber committed the killing of Jessica while in the perpetration of a felony (arson), 42 Pa.C.S. § 9711(d)(6); (2) he knowingly created a grave risk of death to another person (Riddle) other than the victim of the murder, *id.*, § 9711(d)(7); and (3) the victim was a child under 12 years old, *id.*, § 9711(d)(16).

13

As for mitigating factors, the trial court instructed the jury that it *must* consider the mitigating circumstance that Treiber had no significant history of prior criminal convictions (the mitigating factor at § 9711(e)(1)), since the parties had stipulated as to that fact. Treiber also asked jurors to find the following additional mitigating circumstances, which fell within § 9711(e)(8) (commonly referred to as the "catch-all" mitigating factor): (1) he had a positive work history; (2) he has adapted well to prison and cooperates with prison personnel; (3) he has a history of showing compassion and mercy to others; and, (4) he has a history of neurological impairment and brain damage.

In announcing the verdict, the jurors reported that they unanimously found beyond a reasonable doubt that the Commonwealth had proven the three aggravating factors asserted by the Commonwealth. As for the mitigating factors, the jurors found, as instructed by the trial court, that Treiber had no significant history of prior criminal convictions. One or more of the jurors also found that Treiber had positive work history. The jurors concluded that the aggravating circumstances outweighed the mitigating circumstances and returned a unanimous sentence of death on the first-degree murder conviction.

The Pennsylvania Supreme Court affirmed Treiber's convictions and death sentence in *Commonwealth v. Treiber*, 874 A.2d 26 (Pa. 2006) ("*Treiber I*"). The United States Supreme Court denied his petition for a writ of certiorari on April 17, 2006. Thus, his convictions and sentences became final on that date. *See, e.g.*, *Griffith v. Kentucky*, 479 U.S. 314 (1987).

Treiber then challenged the validity of his convictions and sentence in state court in a PCRA proceeding. Treiber's current counsel, the Federal Community Defender Office for the Eastern District of Pennsylvania, represented him pro bono during the PCRA proceeding.

14

Treiber, through counsel, filed extensive motions for discovery in his PCRA proceeding. The PCRA court granted in part and denied in part these requests. (*See* PCRA Ct. Op. 3/27/12, ECF No. 11-2 at pp. 12-18 (summarizing Treiber's discovery requests and the PCRA court's disposition of them); *see also* PCRA Ct. Op. 9/16/08, ECF No. 85-9 at pp. 34-44; PCRA Ct. Op. 7/10/09, ECF No. 85-9 at pp. 45-47; PCRA Ct. Op. 12/30/10, ECF No. 85-10 at pp. 3-6.)

Over the course of around two years, the PCRA court held ten evidentiary hearings at which many witnesses testified. Many depositions were also taken and introduced into the record. (*Id.* at p. 12.)

After the close of evidence, the PCRA court issued a 103-page opinion and order in which it denied Treiber collateral relief from his convictions and capital sentence. (PCRA Ct. Op. 3/27/12, ECF No. 11-1 at pp. 47-50; ECF No. 11-2 at pp. 1-50; ECF No. 11-3 at pp. 1-50.) After Treiber appealed to the Pennsylvania Supreme Court, the PCRA court issued its Appellate Rule 1925(a) Opinion in which it addressed additional issues he raised in his Appellate Rule 1925(b) statement. (ECF No. 11-4 at pp. 1-6.)

The Pennsylvania Supreme Court affirmed the PCRA court's decision in *Commonwealth v. Treiber*, 121 A.3d 435 (Pa. 2015) ("*Treiber II*").

After Treiber's PCRA proceeding concluded, he filed in this Court the pending counseled Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (ECF Nos. 10, 18) and Brief in Support (ECF Nos. 47, 48).[7] Treiber raises eleven claims for relief[8] and contends that he is entitled

---

[7]      This case was originally assigned to the late Honorable Kim R. Gibson. It was reassigned to this judge in April 2025.

[8]      Treiber originally raised thirteen claims for relief. (*See* ECF No. 10 at pp. 3-6.) He later withdrew Claims XII and XIII. (*See* ECF No. 47 at pp. 2-3.)

to a new trial or, at a minimum, a new sentencing hearing. He raised each of his claims during the PCRA proceeding. The PCRA court and then the Pennsylvania Supreme Court denied each of them for the reasons discussed below.

The Commonwealth[9] filed the Answer (ECF No. 69) and the state court record. Treiber then filed his Reply (ECF No. 83) and the Commonwealth filed its Sur-reply (ECF No. 92.) More recently, Treiber filed a notice of new authority (ECF No. 105).

Treiber also filed a motion for discovery (ECF No. 85), which the Court denied (ECF No. 99.)[10]

## II.    Legal Standards

### A.    Governing Federal Habeas Statute

This Court has jurisdiction under 28 U.S.C. § 2254, the federal habeas statute applicable to prisoners, such as Treiber, who are in custody pursuant to a state-court judgment. Section 2254 permits a federal court to grant a state prisoner a writ of habeas corpus "on the ground that he or she is in custody in violation of the Constitution…of the United States." 28 U.S.C. § 2254(a).

Errors of state law are not cognizable under § 2254. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). And, importantly, "[f]ederal courts reviewing habeas claims cannot 'reexamine

---

[9]    Going forward, the Court will refer to Respondents as the "Commonwealth."

[10]    The law pertaining to evidentiary development in federal habeas proceedings has changed considerably since the Court decided Treiber's motion for discovery. It is now even more difficult for a habeas petitioner to establish that he is entitled to discovery and an evidentiary hearing in a federal habeas case. *Shinn v. Ramirez*, 596 U.S. 366 (2022); *Shoop v. Twyford*, 596 U.S. 811, 820 (2022); *Taylor v. Comm'r of Pennsylvania Dep't of Corr.*, — F.4th —, 2025 WL 2328349, at *5 (3d Cir. Aug. 13, 2025); *Johnson v. Mahanoy*, 144 F.4th 178, 193-94 (3d Cir. 2025); *Williams v. Sup't Mahanoy SCI*, 45 F.4th 713 (3d. Cir. 2022).

state court determinations on state-law questions.'" *Priester v. Vaughn*, 382 F.3d 394, 402 (3d Cir.

2004) (quoting *Estelle*, 502 U.S. at 67-68).[11]

> In describing the role of federal habeas proceedings, the Supreme Court noted:

> [I]t must be remembered that direct appeal is the primary avenue for review of a conviction or sentence.... The role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited. *Federal courts are not forums in which to relitigate state trials.*

*Barefoot v. Estelle*, 463 U.S. 880, 887 (1983) (emphasis added).

It is Treiber's burden to prove that he is entitled to the writ. *See, e.g.*, *Vickers v. Sup't Graterford SCI*, 858 F.3d 841, 848-49 (3d Cir. 2017). There are other prerequisites that he must satisfy before he can receive habeas relief on a claim (for example, he must overcome the burden imposed on him by the standard of review enacted by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which is codified at 28 U.S.C. § 2254(d) and is discussed below), but, ultimately, Treiber cannot receive federal habeas relief unless he shows that he is in custody in violation of his federal constitutional rights. 28 U.S.C. § 2254(a); *see, e.g.*, *Vickers*, 858 F.3d at 849.

If a constitutional error is found in a habeas case, the petitioner is not entitled to relief if the error was harmless. In habeas cases, the harmless error analysis is what is set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993). Under *Brecht*, an error is harmless unless it had a "substantial and injurious effect or influence in determining the jury's verdict." 507 U.S. at 638 (quoting

---

[11]    The Third Circuit Court has elaborated: "A federal court may re-examine a state court's interpretation of its own law only where this interpretation appears to be an obvious subterfuge to evade consideration of a federal issue." *Real v. Shannon*, 600 F.3d 302, 309-10 (3d Cir. 2010). There is nothing in this case to suggest that the trial/PCRA court or the Pennsylvania Supreme Court was attempting to evade consideration of a federal issue when it denied any of Treiber's claims in whole or in part for state-law reasons. Therefore, this Court must accept all determinations of state law made by the state courts.

*Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). Importantly, the *Brecht* harmless error analysis is not necessary when it is subsumed in the substantive constitutional test at issue, as it is with claims of ineffective assistance of counsel and also *Brady* and *Napue* claims. *See, e.g.*, *Albrecht v. Horn*, 485 F.3d 103, 139 (3d Cir. 2007) (the prejudice prong of an ineffective assistance claim and the *Brecht* harmless error are essentially the same standard); *Rodriguez v. Sec'y, Florida Dept. of Corr.*, 756 F.3d 1277, 1303 (11th Cir. 2014) ("We do not conduct a *Brecht* inquiry when analyzing a *Brady* claim because the latter subsumes the former."); *Haskell v. Sup't Greene SCI*, 866 F.3d 139, 147-42 (2017) (same, with respect to a *Napue* claim).

### B.    Exhaustion and Procedural Default

The "exhaustion doctrine" requires that a state prisoner raise his federal habeas claims in state court through the proper procedures before he litigates them in a federal habeas petition. 28 U.S.C. § 2254(b), (c); *see, e.g.*, *Lambert v. Blackwell*, 134 F.3d 506, 513 (3d Cir. 1997).[12] It is "grounded in principles of comity; in a federal system, the States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights." *Coleman v. Thompson*, 501 U.S. 722, 731 (1991). It also "is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts[.]" *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

The doctrine of procedural default, like the doctrine of exhaustion, is also "grounded in concerns of comity and federalism," *Coleman*, 501 U.S. at 730. In relevant part, this doctrine prohibits federal habeas courts from reviewing a federal-law claim if the state court declined to

---

[12]    A petitioner must have "invoke[d] one complete round of the State's established appellate review process[,]" to satisfy the exhaustion requirement. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

rule on the merits of the claim because it determined that the petitioner did not present the claim in compliance with a state procedural rule.[13] *See, e.g.*, *Gray v. Netherland*, 518 U.S. 152, 162 (1996); *Coleman*, 501 U.S. at 732; *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *O'Sullivan v. Boerckel*, 526 U.S. 838, 851-56 (1999) (Stevens, J. dissenting) (describing the history of the procedural default doctrine); *Wainwright v. Sykes*, 433 U.S. 72 (1977).

As the Supreme Court has explained:

> State prisoners…often fail to raise their federal claims in compliance with state procedures, or even raise those claims in state court at all…. [T]o allow a state prisoner simply to ignore state procedure on the way to federal court would defeat the evident goal of the exhaustion rule. *See Coleman*, 501 U.S. at 732, 111 S. Ct. 2546. Thus, federal habeas courts must apply "an important 'corollary' to the exhaustion requirement": the doctrine of procedural default. [*Davila v. Davis*, 582 U.S. 521, 527 (2017)]. Under that doctrine, federal courts generally decline to hear any federal claim that was not presented to the state courts "consistent with [the State's] own procedural rules." *Edwards v. Carpenter*, 529 U.S. 446, 453, 120 S. Ct. 1587, 146 L. Ed.2d 518 (2000).
>
> Together, exhaustion and procedural default promote federal-state comity. Exhaustion affords States "an initial opportunity to pass upon and correct alleged violations of prisoners' federal rights," *Duckworth v. Serrano*, 454 U.S. 1, 3, 102 S. Ct. 18, 70 L. Ed.2d 1 (1981) (per curiam), and procedural default protects against "the significant harm to the States that results from the failure of federal courts to respect" state procedural rules, *Coleman*, 501 U.S. at 750, 111 S. Ct. 2546. Ultimately, "it would be unseemly in our dual system of government for a federal district court to upset a state court conviction without [giving] an opportunity to the state courts to correct a constitutional violation," *Darr v. Burford*, 339 U.S. 200, 204, 70 S. Ct. 587, 94 L .Ed. 761 (1950), and to do so consistent with their own procedures, *see Edwards*, 529 U.S. at 452-453, 120 S. Ct. 1587.

*Shinn v. Ramirez*, 596 U.S. 366, 378-79 (2022).

---

[13]    The rule applied by the state court must be independent of the federal question and adequate to support the judgment. A state rule is "adequate" if: (1) the state procedural rule was clear enough at the time of the default to have put the petitioner on notice of what conduct was required; (2) the state appellate court reviewing the petitioner's claim refused to review it on the merits because the petitioner violated the rule; and (3) the state court's refusal was consistent with other decisions. *Shotts v. Wetzel*, 724 F.3d 364, 370 (3d Cir. 2013); *Nara v. Frank*, 488 F.3d 187, 199 (3d Cir. 2007). *See also Beard v. Kindler*, 558 U.S. 53 (2009) (discretionary state rules can be "adequate"); *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991) (a state procedural rule is "adequate" if it is "firmly established and regularly followed" at the time that the alleged procedural default occurred).

19

### C.    Standards of Review

In 1996, Congress made a number of significant amendments to the federal habeas statutes with the enactment of AEDPA, which "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002) (citing *Williams v. Taylor*, 529 U.S. 362, 403-04 (2000)). AEDPA reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102-03 (2011) (internal quotations and citation omitted). AEDA's deferential standards applies "with full force even when reviewing a conviction and sentencing imposing the death penalty." *White v. Wheeler*, 577 U.S. 73, 81 (2015).

### 1.  Deference to All State Court Findings of Fact Under 28 U.S.C. § 2254(e)(1)

A finding of fact made by a state court has always been accorded considerable deference in a federal habeas proceeding. AEDPA continued that deference and mandates that "a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). Treiber has the "burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.*

### 2.  Standard of Review When the State Court Adjudicated a Claim on the Merits

AEDPA also put into place a new standard of review, which is codified at 28 U.S.C. § 2254(d). It applies "to any claim that was adjudicated on the merits in State court proceedings"[14]

---

[14]    For the purposes of § 2254(d), a claim has been "adjudicated on the merits in State court proceedings" when the state court made a decision that finally resolved the claim based on its substance, not on a procedural, or other, ground. *See, e.g.*, *Richter*, 562 U.S. at 98-100; *Robinson v. Beard*, 762 F.3d 316, 324 (3d Cir. 2014). When applying *Footnote continued on next page…*

and prohibits a federal habeas court from granting relief unless the petitioner first established that the state court's "adjudication of the claim":

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).[15]

### (a) Application of 2254(d)(1)

#### (i) "Clearly established Federal law"

Section 2254(d)(1) applies to questions of law and mixed questions of law and fact. In applying it, this Court's first task is to ascertain what law falls within the scope of the "clearly established Federal law, as determined by the Supreme Court of the United States[,]" 28 U.S.C. § 2254(d)(1). It is "'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'" *Dennis v. Sec'y, Pennsylvania Dep't of Corr.*, 834 F.3d 263, 280 (2016) (en banc) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003)). It "includes only 'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions.'" *White v. Woodall*, 572 U.S. 415, 420 (2014) (quoting *Howes v. Fields*, 565 U.S. 499, 505 (2012), which quoted *Williams*, 529 U.S. at 412); *Andrew v. White*, 145 S. Ct. 75, 81 (2025) (per curiam) ("When

---

§ 2254(d), the federal habeas court considers the "last reasoned decision" of the state courts. *Simmons v. Beard*, 590 F.3d 223, 231-32 (3d Cir. 2009) (quoting *Bond v. Beard*, 539 F.3d 256, 289-90 (3d Cir. 2008)); *Brown v. Sup't Greene SCI*, 834 F.3d 506, 512 (3d Cir. 2016).

[15]    In determining whether a petitioner has satisfied AEDPA's standard of review at either § 2254(d)(1) or (2), the federal habeas court may not consider any evidence other than that which was introduced into the state court record. 28 U.S.C. § 2254(d)(2) (inquiry when this subsection of AEDPA's standard of review applies is limited to "the evidence presented in the State court proceeding."); *Cullen v. Pinholster*, 563 U.S. 170, 180-86, and 185 n.7 (2011) (review under § 2254(d)(1), like that under § 2254(d)(2), is limited to the state court record).

this Court relies on a legal rule or principle to decide a case, that principle is a 'holding' of the Court for purpose of AEDPA.")[16]

### (ii) The "contrary to" clause

Once the "clearly established Federal law, as determined by the Supreme Court of the United States" is ascertained, this Court must determine whether the state court's adjudication of the claim at issue was "contrary to" that law. *Williams*, 529 U.S. at 404-05 (explaining that § 2254(d)(1)'s "contrary to" and "unreasonable application of" clauses have independent meaning). A state-court adjudication is "contrary to…clearly established Federal law, as determined by the Supreme Court of the United States" § 2254(d)(1), "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," *Williams*, 529 U.S. at 405, or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent," *id.* at 406.[17]

A "run-of-the-mill" state-court adjudication applying the correct legal rule from Supreme Court decisions to the facts of a particular case will not be "contrary to" Supreme Court precedent. *Williams*, 529 U.S. at 406. In such cases, the issue for the federal habeas court's evaluation of the

---

[16]    The Supreme Court "has repeatedly emphasized" that "circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court.'" *Glebe v. Frost*, 574 U.S. 21, 24 (2014) (per curiam) (quoting § 2254(d)(1) and citing *Lopez v. Smith*, 574 U.S. 1 (2014) (per curiam)). *See, e.g.*, *Renico v. Lett*, 559 U.S. 766, 779 (2010) (state court's failure to apply decision by federal circuit court "cannot independently authorize habeas relief under AEDPA."). Additionally, "[c]ircuit precedent cannot 'refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that [the Supreme] Court has not announced.'" *Lopez*, 574 U.S. at 2 (quoting *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013) (per curiam)).

[17]    A state court adjudication is not "contrary to…clearly established Federal law[,]" 28 U.S.C. § 2254(d)(1), just because it does not cite Supreme Court authority. In fact, the state court "does not even require awareness of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam); *see Bell v. Cone*, 543 U.S. 447, 455 (2005) (per curiam) ("Federal courts are not free to presume that a state court did not comply with constitutional dictates on the basis of nothing more than a lack of citation.").

petitioner's claim will center on whether he has satisfied § 2254(d)(1)'s "unreasonable application of" clause.

### (iii)  The "unreasonable application of" clause

"A state court decision is an 'unreasonable application of federal law' if the state court 'identifies the correct governing legal principle,' but 'unreasonably applies that principle to the facts of the prisoner's case.'" *Dennis*, 834 F.3d at 281 (quoting *Williams*, 529 U.S. at 413). To satisfy his burden under this provision of AEDPA's standard of review, Treiber must do more than convince this Court that the state court's adjudication of the claim at issue was incorrect. *Id.* He must show that it "'was *objectively* unreasonable.'" *Id.* (quoting *Williams*, 529 U.S. at 409 (emphasis added by court of appeals). This means that Treiber must show that the state court's decision "*was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement*." *Richter*, 562 U.S. at 103 (emphasis added).

The Supreme Court has explained:

It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable. *See Lockyer, supra*, at 75, 123 S. Ct. 1166. If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings. *Cf. Felker v. Turpin*, 518 U.S. 651, 664, 116 S. Ct. 2333, 135 L.Ed.2d 827 (1996) (discussing AEDPA's "modified res judicata rule" under § 2244*). It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no further.*

*Id.* at 102 (emphasis added).

### (b)  Application of § 2254(d)(2)

The standard of review set forth at § 2254(d)(2) applies when Treiber "challenges the factual basis for" the state court's "decision rejecting a claim[.]" *Burt v. Titlow*, 571 U.S. 12, 18 (2013). "[A] state court decision is based on an 'unreasonable determination of the facts' if the state court's factual findings are 'objectively unreasonable in light of the evidence presented in the state-court proceeding,' which requires review of whether there was sufficient evidence to support the state court's factual findings." *Dennis*, 834 F.3d at 281 (quoting § 2254(d)(2) and citing *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)).

"'[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'" *Titlow*, 571 U.S. at 18 (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)); *see Rice v. Collins*, 546 U.S. 333, 342 (2006) (reversing court of appeals' decision because "[t]he panel majority's attempt to use a set of debatable inferences to set aside the conclusion reached by the state court does not satisfy AEDPA's requirements for granting a writ of habeas corpus."). Thus, "if '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede'" the state court's adjudication. *Wood*, 558 U.S at 301 (quoting *Collins*, 546 U.S. at 341-42). "[H]owever, '[e]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review,' and 'does not by definition preclude relief.'" *Brumfield v. Cain*, 576 U.S. 305, 314 (2015) (quoting *Miller-El*, 537 U.S. at 340); *see also Dennis*, 834 F.3d at 281.

Since AEDPA's enactment, federal courts have debated how to harmonize §§ 2254(d)(2) and (e)(1). They "express the same fundamental principle of deference to state court findings[,]"

and federal habeas courts "have tended to lump the two provisions together as generally indicative of the deference AEDPA requires of state court factual determinations." *Lambert v. Blackwell*, 387 F.3d 210, 235 (3d Cir. 2004). The Supreme Court has not yet "defined the precise relationship between" these two provisions of AEDPA that deal with state court factual determinations. *Titlow*, 571 U.S. at 18. As discussed above, the deferential standard set forth in § 2254(e)(1) applies to all factual findings made by a state court. As for § 2254(d)(2), the Third Circuit Court has explained that, when it applies, it provides the "overarching standard" that a petitioner must overcome to receive habeas relief. *Lambert*, 387 F.3d at 235. It has declined to adopt a "rigid approach to habeas review of state fact-finding" *id.* at 236 n.19, however, and instead provided the following guidance:

> In some circumstances, a federal court may wish to consider subsidiary challenges to individual fact-finding in the first instance applying the presumption of correctness as instructed by (e)(1). Then, after deciding these challenges, the court will view the record under (d)(2) in light of its subsidiary decisions on the individual challenges. In other instances, a federal court could conclude that even if petitioner prevailed on all of his individual factual challenges notwithstanding the (e)(1) presumption of their correctness, the remaining record might still uphold the state court's decision under the overarching standard of (d)(2). In that event, presumably the (d)(2) inquiry would come first.

*Id.*

### 3. When This Court Can Review a Claim De Novo

This Court can review one of Treiber's claims de novo only under certain scenarios.

First, when analyzing the merits of a claim under AEDPA's standard of review at § 2254(d), if the Court determines that Treiber has satisfied his burden under either § 2254(d)(1) or (2), the Court must then "proceed to review the merits of the claim de novo to evaluate if a constitutional violation occurred." *Vickers*, 858 F.3d at 849 (citing *Lafler v. Cooper*, 566 U.S. 156, 174 (2012)). That is because "a federal court can only grant the Great Writ if it is firmly convinced

that a federal constitutional right has been violated" *Id.* (cleaned up). As the Supreme Court has explained, "[w]hile it is of course a necessary prerequisite to federal habeas relief that a prisoner satisfy the AEDPA standard of review…none of our post-AEDPA cases have suggested that a writ of habeas corpus should automatically issue if a prisoner satisfies the AEDPA standard[.]" *Horn v. Banks*, 536 U.S. 266, 272 (2001)

Second, if the state court did not adjudicate a claim on the merits, the Court must determine whether that was because Treiber procedurally defaulted it (*i.e.*, the state court determined he waived the claim under state law). If the claim is procedurally defaulted, the Court should deny it for that reason. If the claim is not defaulted, or if Treiber established grounds to excuse his default, the standard of review at § 2254(d) does not apply and this Court reviews the claim de novo. *See, e.g.*, *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001). This Court applies a de novo review, however, only if the state court did not provide an alternative adjudication on the merits. *See, e.g.*, *Rolan v. Coleman*, 680 F.3d 311, 320 (3d Cir. 2012).

Third, if the state court misconstrued the federal claim, and thus did not adjudicate it on the merits, then § 2254(d) does not apply and this Court must review the claim de novo. *See, e.g.*, *Appel*, 250 F.3d at 209-12; *but see Johnson v. Williams*, 568 U.S. 289 (2013) (where there is a lack of discussion of the federal constitutional claim by the state court in its decision rejecting a related state-law claim, there is a rebuttable presumption that the state court adjudicated the federal constitutional claim on the merits and that § 2254(d) applies.)

Finally, for claims that have no merit, this Court can, if it so chooses, skip a more complex procedural default analysis and simply review the claim de novo. *Lambrex v. Singletary*, 520 U.S. 518, 525, (1997) (the court may avoid the more complex issue of procedural default and evaluate

the claim on the merits if it is more efficient to do so); *Marcy v. Sup't Phoenix SCI*, 110 F.4th 210, 213 n.8 (3d Cir. 2024) (same).

## III.   Treiber's Claims

### Claim I

In Claim I, Treiber contends that trial counsel was ineffective for failing to challenge the Commonwealth's canine DNA evidence linking him to the "threat note."

#### The *Strickland* Standard

This is the first of a number of claims in which Treiber asserts that trial counsel provided him with constitutionally deficient representation. Claims of ineffective assistance of counsel are governed by the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).

*Strickland* recognized that a defendant's Sixth Amendment right to the assistance of counsel for his defense entails the right to be represented by an attorney who meets at least a minimal standard of competence.[18] 466 U.S. at 685-87. "[T]he Sixth Amendment does not guarantee the right to perfect counsel; it promises only the right to effective assistance[.]" *Titlow*, 571 U.S. at 24.

Under *Strickland*, it is Treiber's burden to establish that his "counsel's representation fell below an objective standard of reasonableness." 466 U.S. at 688. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687. The Supreme Court has emphasized that "counsel should be

---

[18]     Since the Fourteenth Amendment guarantees a criminal defendant pursuing a first appeal as of right certain "minimum safeguards necessary to make that appeal 'adequate and effective,'" *Evitts v. Lucey*, 469 U.S. 387, 392 (1985) (quoting *Griffin v. Illinois*, 351 U.S. 12, 20 (1956)), including the right to the effective assistance of counsel, *id.* at 396, the ineffective assistance of counsel standard of *Strickland* applies to a claim that direct appeal counsel (here, Attorney Lucas) was ineffective. *Smith v. Robbins*, 528 U.S. 259, 285 (2000); *United States v. Cross,* 308 F.3d 308, 315 (3d Cir. 2002).

'strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment[.]'" *Titlow*, 571 U.S. at 22 (quoting *Strickland*, 466 U.S. at 690). As the Supreme Court observed in *Strickland*:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel's was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

466 U.S. at 689 (internal citations and quotations omitted); *Richter*, 562 U.S. at 104 ("A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance.") (quoting *Strickland*, 466 U.S. at 689).

The Supreme Court has also instructed that "[i]t should go without saying that the absence of evidence cannot overcome the 'strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance.'" *Titlow*, 571 U.S. at 23 (quoting *Strickland*, 466 U.S. at 689). It has also advised:

> "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky,* 559 U.S. 356, —, 130 S. Ct. 1473, 1485, 176 L.Ed.2d 284 (2010). An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. *Strickland,* 466 U.S., at 689-690, 104 S. Ct. 2052. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of

28

materials outside the record, and interacted with the client, with opposing counsel, and with the judge.

*Richter*, 562 U.S. at 105.

*Strickland* also requires that Treiber show that he was prejudiced by his trial counsel's deficient performance. This places the burden on him to establish "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A 'reasonable probability' means one 'sufficient to undermine confidence in the outcome' of the proceeding." *Wharton v. Sup't Graterford SCI*, 95 F.4th 113, 123 (3d Cir. 2024) (quoting *Strickland*, 466 U.S. at 694, 697). "It is a lower standard than a preponderance of the evidence, but that distinction matters 'only in the rarest case.'" *Id.* (quoting *Richter*, 562 U.S. at 112).

The Supreme Court in *Strickland* explained that although it had discussed the performance component of an ineffectiveness claim before the prejudice component, there is no reason for an analysis of an ineffectiveness claim to proceed in that order. 466 U.S. at 697. Thus, if it is more efficient to dispose of an ineffectiveness claim on the ground that the petitioner failed to meet his burden of showing prejudice, a court may address only that prong of *Strickland*. *Id.* ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.")

**Background**

As discussed above, near the end of January 2001, Treiber reported to the police that a "threat note" had been taped to his mailbox by an unknown individual. The letter was addressed to Treiber and was made by cutting out letters from printed materials and gluing them on a piece

of paper. The note stated: "Get rid of the dogs or I will kill them and burn you out again." (Trial Tr., Day 1, at pp. 88-89.)

The Commonwealth introduced at trial expert testimony from Dr. Joy Halverson to support its theory that the "threat note" was authored by Treiber as he was planning to destroy his home in a fire and cast suspicion away from himself. Dr. Halverson conducted DNA testing on one of the hairs an investigator found affixed to glue on the note. She testified that the sample from Treiber's dog, Janie, and the hair on the threat note matched and that it was 1000 times more likely than not that it was Janie's hair found on the threat note. (Trial Tr., Day 4, at pp. 124-30.) This figure was reinforced through testimony from Dr. Christopher Basten, who the Commonwealth presented as an expert in statistics. (*Id.* at pp. 141-42.)

In Claim I, Treiber contends that trial counsel provided him with constitutionally deficient representation because they should have filed a pre-trial *Frye* motion challenging the admissibility of the Commonwealth's canine DNA evidence.[19] If the trial court denied that motion, Treiber claims, objectively reasonable counsel then would have sought to exclude Dr. Halverson from being qualified as an expert witness via a pre-trial or trial motion under Pa. R. Evid. 702. If trial counsel had done this, Treiber asserts, the defense would have precluded Dr. Halverson, and by implication Dr. Basten, from testifying at trial.

Treiber further claims that if a *Frye* challenge and a Rule 702 challenge to Dr. Halverson's expert credentials did not succeed, objectively reasonable counsel would have exposed flaws in the Commonwealth's canine DNA evidence during cross-examination, which Attorney Lucas,

---

[19]    Pennsylvania follows the test of *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), "which provides novel scientific evidence is admissible if the methodology underlying the evidence has general acceptance in the relevant scientific community." *Treiber II*, 121 A.3d at 448 n.7.

who cross-examined Dr. Halverson, did not do. Treiber also claims that objectively reasonable counsel would have presented expert testimony similar to what he presented at the PCRA hearings through his experts (Drs. Marcia Eggleston, Laurence Mueller and Randall Libby) to establish that the genetic and statistical methods underlying the trial testimony of Drs. Halverson and Basten were not generally accepted in the relevant scientific communities and that there was no scientifically reliable way to determine whether the hair sample came from Treiber's dog.[20]

Treiber maintains that he was prejudiced by trial counsel's failure to do each of the steps mentioned above. Had counsel done so, he asserts, the Commonwealth would not have been able to link the threat note to him via the canine DNA evidenced, thereby weakening its case against him while bolstering the defense's theory that someone else set fire to his home and was responsible for Jessica's death.

The Pennsylvania Supreme Court rejected Claim I on the merits because it determined that Treiber failed to show that he was prejudiced by trial counsels' alleged deficient performance.[21] It held:

> [E]ven if we assume [that Treiber established *Strickland's* first prong that] counsel had no reasonable basis for failing to challenge the Commonwealth's canine DNA evidence, [he] is not entitled to relief because he failed to demonstrate

---

[20]    The state courts provided extensive summarizations of the evidence Treiber introduced at the PCRA hearing in support of his contention that the genetic and statistical methods underlying the trial testimony of Drs. Halverson and Basten were not generally accepted in the relevant scientific communities. (PCRA Ct. Op. 3/27/12, ECF No. 11-2 at pp. 22-30 and *Treiber II*, 121 A.3d at 445-51).

[21]    Then-Chief Justice Saylor filed a dissenting opinion on Claim I only. In his view, the claim had merit and so it was his position that Treiber's request for a new trial should be granted. *Treiber II*, 121 A.3d 435, 477-92 (Pa. 2015) (Saylor, C.J., dissenting). At the same time, Justice Saylor noted that he did not accept Treiber's "position that, in the absence of the canine DNA evidence, the Commonwealth presented only a weak, circumstantial case against him." *Id.* at 491. "In point of fact," Justice Saylor noted, "I recognize that the prosecution presented strong circumstantial evidence concerning [Treiber's] guilt." *Id.* Still, it was Justice Saylor's opinion that trial counsel was objectively unreasonable for failing to challenge the canine DNA evidence and that Treiber was prejudiced as a result. *Id.* at 491-92.

the outcome of the guilt phase would have been different had the canine DNA evidence been excluded from his trial.

Evidence of [Treiber's] comprehensive preparatory activities was extensive. One month before the fire, he purchased straw on four separate occasions, along with two five-gallon gas cans, and he bought gasoline on two separate occasions the day of the fire—straw, gasoline, and two five-gallon gas cans were recovered at the fire's points of origin. During that month, he also changed his automobile comprehensive deductible to cover his vehicle if destroyed by fire— notably, he did not alter his collision insurance. Further, he tried to increase the limits on his homeowner's insurance and sought to purchase life insurance on Jessica, naming himself as beneficiary. A few days before the fire, he affixed a chain ladder to the residence as a means of escape. The jury heard testimony that [Treiber], on two separate occasions, discussed his plans to kill Jessica to avoid paying child support, stating he would use rope, gasoline, straw, and candles to start a fire in the home. Evidence established the security system had been disabled and the fire was started by using clothing, gasoline, straw, and candles.

Four days before the fire, [Treiber] requested a survey of his home from ADT Security Services, expressing it was urgent. He told the ADT employee he knew how to disable his home security system and said a fire may start in his home in a few days, indicating its likely points of origin—the same areas as the origin of the fire four days later. Because [Treiber] told the employee about the threatening note and that a fire might soon occur, the employee offered to install camera equipment that day at no immediate cost, but [Treiber] refused. Even though the employee explained she could place the cameras in any location [he] wished, he told her he didn't "think the camera is going to catch [any potential perpetrators] because they're going to come through the front door." N.T. Trial, 10/4/02, at 70. As the employee was leaving the home, [Treiber] said to her that "if [she] had noticed that his home had burnt ... in the paper that [she] would know that he wouldn't be needing [a security] system." *Id.*, at 67.

Moreover, significant evidence concerning the threatening note itself was submitted to the jury. Earlier on the day the note was discovered, [Treiber] called Ms. Riddle at work and told her someone was lurking around their house, yet he did not call the police at that time. Ms. Riddle did not initially notice the note on the mailbox when she arrived home; thus, [Treiber] insisted they leave the home and visit his parents. When they left, Ms. Riddle noticed the note, and [Treiber] made copies of it before calling police. When police arrived to investigate, [Treiber] told police the doorbell rang earlier in the night but no one was there when he answered, and he saw the note affixed to the mailbox at that time. Despite telling police he noticed the note on the mailbox earlier, [Treiber] did not retrieve it at that time but instead waited until Ms. Riddle came home and discovered it.

Telling evidence of [Treiber's] behavioral changes was also introduced at trial. [Treiber] implemented and enforced rules that shoes not be worn in the home, and that bedroom doors be closed and locked. Significantly, on the night of the fire, [Treiber] kept his shoes in his bedroom and his daughter's door was open. [Treiber]

had previously forbidden his girlfriend to go to a local bar, once even threatening to burn it down if she went there again. On the day of the fire, however, [he] called her at least ten times, repeatedly urging her to go to the bar. Several witnesses testified [Treiber], before and after Jessica's death, was very calm and showed no emotion. Other witnesses, including Ms. Riddle and [Treiber's] neighbor, stated he made no effort to assist rescuing Jessica, despite the facts that her bedroom was 11 feet away from his and, regarding Jessica's fire escape, that he previously told Ms. Riddle he could easily get to her bedroom by breaking a wall in a bathroom that separated their bedrooms. The jury also heard testimony that [Treiber] referred to his deceased daughter as "it" during funeral arrangements and, while she was burning inside the home, stated, "'[T]he firemen will get her. She's probably dead anyway[,]'" and "'it's probably too late anyway.'" N.T. Trial, 9/30/02, at 97, 242.

Given the overwhelming circumstantial evidence of [Treiber's] guilt, it is difficult to believe the outcome of the proceedings would have been different but for counsel's failure to challenge the canine DNA evidence. *See Commonwealth v. Philistin*, 617 Pa. 358, 53 A.3d 1, 10 (2012) (stating counsel presumed effective, and appellant must overcome such presumption by proving prejudice, *i.e.*, reasonable likelihood outcome would have been different but for counsel's alleged ineffectiveness (citations omitted)). Accordingly, we conclude [Treiber's] claims regarding counsel's ineffectiveness for not challenging the Commonwealth's canine DNA evidence fail for lack of prejudice.

*Treiber II*, 121 A.3d at 451-53 (footnotes omitted); *id.* at 451 n.13 (rejecting Treiber's argument that the prosecutor's public statements about the case on a television show suggested the significance of DNA evidence but also noting that "whether the prosecutor's televised comments comport with the actual contribution of the evidence does not matter—*the remainder of the evidence is overwhelming to the point that prejudice is not made out*.") (emphasis added).

**Discussion**

Because the Pennsylvania Supreme Court adjudicated Claim I on the merits, this Court is barred from granting Treiber relief on it unless he first establishes that its adjudication was "contrary to, or involved an unreasonable application of" *Strickland*, or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) & (2).

33

Treiber argues that the Pennsylvania Supreme Court's adjudication was "contrary to" *Strickland* because it required him to prove, in establishing prejudice, that the outcome of the trial "would have been different" but for trial counsel's alleged deficient performance, not whether, as stated in *Strickland*, there was a "reasonable probability" that the outcome of his trial "would have been different." 466 U.S. at 694. In support of this argument, he points to three places the Pennsylvania Supreme Court held that he did not prove the outcome of the guilt phase of his trial "would have been different." *Treiber II*, 121 A.3d at 451, 453 & 453 n.14.

If the Pennsylvania Supreme Court did in fact apply a more demanding prejudice standard than that required by *Strickland*, then its adjudication was "contrary to" *Strickland* under § 2254(d)(1) and this Court would have to review that prong of Claim I *de novo*. [22] *Williams*, 529 U.S. at 405-06. The Supreme Court has cautioned, however, that federal courts reviewing a state prisoner's habeas claim should not be too quick to assume that the state court applied the wrong law, even if the state court was imprecise in language it used in evaluating a claim. *Woodford v. Visciotti*, 537 U.S. 19, 23-24 (2002) (per curiam) (finding the court of appeals' "readiness to attribute error [to the state court] is inconsistent with the presumption that state courts know and follow the law," and is "also incompatible with § 2254(d)'s 'highly deferential standard for evaluating state-court rulings,' which demands that state court decisions be given the benefit of the doubt."). This is particularly so when a commonly-applied and well-known inquiry such as the

---

[22]     Because the Pennsylvania Supreme Court denied Claim I under *Strickland's* prejudice prong and this Court concludes that it's adjudication survives AEDPA's standard of review, this Court need not reach *Strickland's* performance prong. If the Court were to consider the performance prong, however, Treiber would have to overcome AEDPA's standard of review with respect to the PCRA court's adjudication of that prong, since the PCRA court's decision, which found that trial counsel's performance was not objectively unreasonable, was the last reasoned decision on that prong. *Laird v. Sec'y, Pennsylvania Dep't of Corr.*, 129 F.4th 227, 243-44 (3d Cir. 2024), cert. pending, 24-7262 (May 13, 2025).

*Strickland* prejudice prong is at issue. *Id. Cf. Titlow*, 571 U.S. at 19 (observing how common ineffective assistance of counsel claims under *Strickland* are and that it is "a claim state courts have now adjudicated in countless criminal cases for nearly 30 years[.]").

In *Visciotti*, the Supreme Court pointed out that it too has stated imprecisely *Strickland*'s prejudice standard at points in some of its decisions, and noted that the state court's shorthand reference to the *Strickland* standard that was not entirely accurate "can no more be considered a repudiation of the standard than can this Court's own occasional indulgence in the same imprecision." 537 U.S. at 24 (citing *Mickens v. Taylor*, 535 U.S. 162, 166 (2002) and *Williams*, 529 U.S. at 393).

Treiber has not convinced this Court that the Pennsylvania Supreme Court actually applied a more difficult prejudice inquiry than *Strickland* requires when it denied Claim I. In the section of its opinion just before its discussion of the claim, it set forth the well-known and appropriate inquiry. *Treiber II*, 121 A.3d at 445 ("prejudice [is] measured by whether there is a reasonable probability the result of the proceeding would have been different.") It also expressly recognized that Pennsylvania's ineffective assistance of counsel test is "consistent with the two-prong performance and prejudice test in *Strickland*[.]" *Id.* at 5. And, at the end of its analysis of Claim I, it cited a state court decision that set forth the appropriate standard and noted that to prove prejudice a petitioner must show a "reasonable likelihood [the] outcome would have been different but for counsel's alleged ineffectiveness." *Id.* at 453. [23] *Sawyer v. Sup't Muncy SCI*, 619 F. App'x

---

[23]    Thus, this case is distinguishable from *Rogers v. Sup't Green SCI*, 80 F.4th 458 (3d Cir. 2023). In that case, the Third Circuit Court held that the Pennsylvania Superior Court's adjudication of the petitioner's claim was "contrary to" *Strickland* because it applied the wrong prejudice standard. A review of the Superior Court's decision in *Rogers* shows that it never set forth the *Strickland* prejudice standard correctly in its decision and clearly applied the wrong standard. *Rogers*, 80 F.4th at 464-65; *Commonwealth v. Rogers*, 2019 WL 3103863, *4-5 (Pa. Super. Ct. *Footnote continued on next page…*

163, 170-71 (3d Cir. 2015) (rejecting the petitioner's contention that the state court applied the wrong prejudice standard because after reviewing the state court's "opinion as a whole…we cannot find an 'affirmative indication' to rebut the presumption that the court knew and followed the law.") (cleaned up).[24]

Because Treiber did not demonstrate that the Pennsylvania Supreme Court's decision was "contrary to" *Strickland*, the next question for this Court in evaluating Claim I is whether it's decision withstands review under § 2254(d)(1)'s "unreasonable application of" clause. Treiber argues that it was, but no argument that he makes shows that the Pennsylvania Supreme Court's decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. At most, Treiber only shows that the Pennsylvania Supreme Court arguably reached an incorrect result (although this Court does not conclude it did). But such a showing, as the Supreme Court has repeated many times, does not suffice to overcome AEDPA's deferential standard of review of state court adjudications. *Id.*; *Woodall*, 572 U.S. at 419 ("an 'unreasonable application of' [clearly established federal law] must be 'objectively unreasonable,' not merely wrong; even 'clear error' will not suffice.") (quoting *Lockyer*, 538 U.S. at 75-76). Therefore, the Pennsylvania Supreme Court's adjudication was not an "unreasonable application of" *Strickland*. *See also Buehl v. Vaughn*, 166 F.3d 163, 172 (3d Cir. 1999) ("It is firmly established that a court must consider

---

July 15, 2019); *see also Williams v. Sup't Greene SCI*, 112 F.4th 155, 169 (3d Cir. 2024) (the state court's adjudication was "contrary to" *Strickland* because it required the petitioner, in establishing prejudice, to show a "'*substantially greater* prospect for success,' [and, therefore,] demanded a higher standard than what *Strickland* requires[.]") In contrast, in *Treiber II*, the Pennsylvania Supreme Court expressly recognized that *Strickland* applied to its analysis of Treiber's ineffective assistance claims and it correctly described each prong of a *Strickland* claim. 121 A.3d at 445 & n.5. It also cited to *Strickland* during its analysis of Claim I. *Id.* at 449-50.

[24]    Notably, although Justice Saylor disagreed with the Majority's adjudication of Claim I and stated he would have granted Treiber relief on it, he did not state that he believed the Majority applied the wrong test for prejudice.

the strength of the evidence in deciding whether the *Strickland* prejudice prong has been satisfied.")

Finally, Treiber argues that the Pennsylvania Supreme Court's adjudication "resulted in a decision that was based on an unreasonable determination of the facts[,]" 28 U.S.C. § 2254(d)(2), because it rejected his assertion that objectively reasonable counsel would have called at trial experts like Drs. Libby and Mueller, who testified on his behalf during the PCRA proceedings. (ECF No. 47 at p. 102.) Treiber also argues that the Pennsylvania Supreme Court "ignored that trial counsel clearly knew Dr. Eggleston…, who was available to review the Commonwealth's DNA results and then testify [at trial], and who could have similarly impeached Halverson's findings and testimony." (*Id.*) These arguments are not relevant to the Pennsylvania Supreme Court's ultimate disposition of Claim I, which "assume[d] there is arguable merit to [Treiber's] claims and [that] counsel had no reasonable basis for failing to challenge the Commonwealth's canine DNA evidence," *Treiber II*, 121 A.3d at 451, and then determined that he failed to establish that he was prejudiced by counsel's alleged deficient performance. *Id.* at 451-453.

Based on the above, Claim I is denied because the Pennsylvania Supreme Court's adjudication survives review under § 2254(d)(1) & (2). The Court also concludes that it will not grant a certificate of appealability[25] on this claim because jurists of reason would not find debatable

---

[25]    A state prisoner may not appeal a district court's order denying habeas relief "unless a circuit justice or judge issues a certificate of appealability[.]" 28 U.S.C. § 2253(c)(1). "A certificate of appealability may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right." *Id.* § 2253(c)(2). "When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a [certificate of appealability] should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). When the district court has rejected a constitutional claim on its merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id. See also Becker v. Sec'y Pennsylvania Dept of Corr.*, 28 F.4th 459, 460 (3d Cir. 2022) ("When deference to state court *Footnote continued on next page…*

this Court's determination that the Pennsylvania Supreme Court's decision on Claim I withstands review under AEDPA's deferential standard. Therefore, a certificate of appealability is denied.

**Claim II**

Claim II is related to Claim I and premised on the same evidence. In Claim II, Treiber asserts that because the Commonwealth's canine DNA evidence was "neither scientifically accurate nor reliable," its admission at his trial was so prejudicial that it violated his right to due process. (ECF No. 10 at p. 35.)

**Background**

The Pennsylvania Supreme Court denied Claim II because it determined that it was barred by the state waiver rules. It so held because the defense did not object to the admission of the canine DNA evidence at the appropriate time before or during trial. *Treiber II*, 121 A.3d at 448 (citing 42 Pa.C.S. § 9544(b) (under the PCRA, "an issue is waived if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal or in a prior state postconviction proceeding.") The Pennsylvania Supreme Court rejected Treiber's "attempts to surpass waiver by cloaking a standard evidentiary claim with allegations of constitutional violations as a result of the introduction of 'false and unreliable' canine DNA evidence." *Id.* at 448 n.8.

**Discussion**

The Commonwealth argues that because the Pennsylvania Supreme Court held that Treiber waived Claim II, this Court must deny it as procedurally defaulted. Treiber counters that the

---

rulings under AEDPA will apply to the merits of a petitioner's habeas claim, such deference likewise applies to our decision whether to issue a [certificate of appealability] under 28 U.S.C. § 2253(c). Because [the petitioner] cannot meet that standard, we will deny his request for a [certificate of appealability.]")

Pennsylvania Supreme Court mischaracterized or misunderstood Claim II. Because it did so, he asserts, the doctrine of procedural default does not apply and this Court must review Claim II de novo.

Treiber's argument has no merit. There is no dispute that a defendant can claim that the admission of evidence at his trial was so prejudicial that it rendered his trial fundamentally unfair in violation of his right to due process. *See, e.g.*, *Andrews v. White*, 145 S. Ct. 75, 81 (2025) (per curiam) ("the introduction of unduly prejudicial evidence [can], in certain cases, violate the Due Process Clause."); *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974).[26] But in Pennsylvania, as in most if not all other jurisdictions, to preserve such a claim for appellate review the defense must have raised that due process challenge first to the trial court. If the trial court permitted the admission of the evidence and the defendant is convicted, he then can challenge the trial court's evidentiary ruling on direct appeal.

---

[26]    There also is no dispute that the government's *knowing* presentation of false testimony at trial can violate a petitioner's due process rights under *Napue v. Illinois*, 360 U.S. 264, 271 (1959). *See, e.g.*, *Glossip v. Oklahoma*, 145 S. Ct. 612, 626 (2025) ("To establish a *Napue* violation, a defendant must show that the prosecution knowingly solicited false testimony or knowingly allowed it to go uncorrected when it appeared.") (cleaned up). Of course, a *Napue* claim, like any other type of claim, must be raised when it is first available to the petitioner or it too will be deemed waived in a PCRA proceeding.

    Although Treiber asserted in his recent notice of new authority that the "prosecution's knowing presentation of false, faulty, and unreliable testimony in this case meets" the *Napue* standard (ECF No. 105 at p. 2), he did not make that same allegation in the Petition when discussing Claim II. (ECF No. 10 at pp. 35-44.) Moreover, in his Brief, he expressly stated that Claim II was predicated on: (1) the general rule that the trial court's erroneous admission of evidence was so prejudicial that it rendered the trial fundamentally unfair and violates due process ("this claim is squarely governed by *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974))," (ECF No. 47 at p. 115); and also (2) the due process rule accepted by the Third Circuit Court in the *Lee* line of habeas cases, which were issued in 2012 and 2015 and discussed below. (*Id*. at pp. 108, 116.) Although Treiber in his Brief quoted the general rule of *Napue* (*id*. at pp. 138-39), he did not contend he could satisfy the elements of a *Napue* claim in that portion of the Petition or Brief that addresses Claim II. (*Id*. at pp. 107-121.) Thus, Claim II *does not* contain a *Napue* claim. In any event, Treiber did not establish during the PCRA proceeding that the Commonwealth knew or should have known that it introduced false canine DNA evidence at his trial. Thus, a *Napue* claim would fail on the merits.

The PCRA's waiver rule, unsurprisingly, bars a petitioner in his collateral proceeding from raising a claim challenging evidence introduced at his trial if he could have raised that challenge at trial and then on direct appeal. 42 Pa.C.S. § 9544(b) (the PCRA's waiver rule).

The Pennsylvania Supreme Court applied this waiver rule to Claim II. After all, the very premise of the related claim of trial counsel's ineffectiveness (Claim I) is that there was a wealth of available evidence, had Treiber's trial counsel only investigated and presented it, that the defense could have used it to successfully challenge the admission or veracity of the Commonwealth's canine DNA evidence. Thus, the Pennsylvania Supreme Court did not misunderstand or misconstrue Claim II. It simply applied the standard state-law waiver rule to the Claim and held that, because Treiber did not raise the available due process challenge to the Commonwealth's canine DNA evidence before or during trial, his only recourse was to challenge his trial counsel's handling of the matter, which is exactly what he does in Claim I. *Commonwealth v. Tedford*, 960 A.2d 1, 29 (Pa. 2008) ("If the defendant thinks the prosecutor has done something objectionable, he may object, the trial court rules, and the ruling—not the underlying conduct—is what is reviewed on appeal. Where, as here, no objection was raised, there is no claim of 'prosecutorial misconduct' as such available. There is, instead, a claim of ineffectiveness for failing to object, so as to permit the trial court to rule.")

Treiber also faults the Pennsylvania Supreme Court for allegedly failing to recognize that the type of due process claim he asserts in Claim II is cognizable on collateral review[27] regardless

---

[27]    The PCRA at § 9543(a)(2) lists what types of substantive claims are cognizable in a post-conviction proceeding. Of relevance to this discussion are these provisions, which expressly state a petitioner is eligible for relief under the PCRA if he pleads and proves that his conviction or sentence resulted from one or more of the following: (1) a violation of a constitutional right (§ 9543(a)(2)(i)); (2) ineffective assistance of counsel (§ 9543(a)(2)(ii)); or *Footnote continued on next page…*

of whether the defense objected to the evidence at issue at trial. In support, Treiber relies on the

Third Circuit Court's decisions in *Lee v. Glunt*, 667 F.3d 397 (2012) ("*Lee I*") and *Lee v. Houtzdale*

*SCI*, 798 F.3d 159 (3d Cir. 2015) ("*Lee II*.")

The petitioner in the *Lee I/II*, Han Tak Lee, was convicted of first-degree murder and arson

after his 22-year-old daughter died in a cabin fire. During Lee's PCRA proceeding, he claimed

that he was entitled to relief under an earlier version of the PCRA's provision that deals with claims

of innocence based on after discovered evidence (§ 9543(a)(2)(vi)) (*see* footnote 27, *supra*) which

is the same as the current version in all relevant respects. Specifically, Lee claimed that, based on

new scientific evidence unavailable at the time of his trial, he could prove that the expert fire

testimony that the prosecution relied on to secure his convictions was fundamentally unreliable.

The Pennsylvania Superior Court denied Lee's claim on the merits. *Lee I*, 667 F.3d at 401-

02; *Lee II*, 798 F.3d at 165 n.5. Lee then filed a federal habeas petition in which he claimed that

his continued incarceration violated his right to due process because the expert fire evidence the

---

(3) "[t]he unavailability at the time of trial of exculpatory evidence that has subsequently become available and would have changed the outcome of the trial if it had been introduced[,]" § 9543(a)(2)(vi).

The third provision (§ 9543(a)(2)(vi))—which the Third Circuit Court has as described as "the provision of the [PCRA] dealing with claims of innocence based on after discovered evidence"—does not have a counterpart in the federal habeas statute. *Albrecht*, 485 F.3d at 123. Neither the Supreme Court nor the Third Circuit Court has held that a freestanding claim of actual innocence is cognizable in a federal habeas proceeding under § 2254. In fact, as the Third Circuit Court has explained, "[i]t has long been recognized that '[c]laims of actual innocence based on only newly discovered evidence' are never grounds for 'federal habeas relief absent an independent constitutional violation.'" *Fielder v. Varner*, 379 F.3d 113, 122 (3d Cir. 2004) (quoting *Herrera v. Collins*, 506 U.S. 390, 400 (1993)); *Albrecht*, 485 F.3d at 121-22. Nevertheless, in *Herrera*, the Supreme Court left open the possibility that "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there was no state avenue open to process such a claim." 506 U.S. at 417.

More recently, the Third Circuit Court has noted: "The Supreme Court has 'repeatedly left that [issue] unresolved, while expressing considerable doubt that any claim based on alleged 'actual innocence' is constitutionally cognizable.'" *Marcy v. Sup't Phoenix SCI*, 110 F.4th 210, 219 (3d Cir. 2024) (quoting *In re Davis*, 557 U.S. 952, 955 (2009) (Scalia, J., dissenting)). "Whatever the contours of such a right, it would entail an 'extraordinarily high' burden of proof—one so high that no petitioner in [the Third Circuit] nor the Supreme Court has ever met it." *Id.* (citing *Herrera*, 506 U.S. at 417).

prosecution introduced at his trial was "premised on beliefs and practices of arson investigation which have, since the time of trial, been discovered and proven to be scientifically invalid." *See Lee v. Tennis*, 2010 WL 3812160, *2 (M.D. Pa. 2012); *see also Lee I*, 667 F.3d at 403. The district court denied this claim because it determined that, although Lee couched the claim as one asserting a due process violation, it was a claim of "actual innocence," which, as explained below, has never been held to be cognizable in a federal habeas proceeding. *Id.* at *5; *see also* footnote 27, *supra*.

The Third Circuit Court reversed in *Lee I*. In so doing, it accepted Lee's assertion that he stated a cognizable due process claim rather than a freestanding, non-cognizable "actual innocence" claim[28] and remanded the case to the district court. *Lee I*, 667 F.3d at 403 n.5, 407. *But see Marcy v. Sup't Phoenix SCI*, 110 F.4th 210 (3d Cir. 2024) (conducting an analysis under *Teague v. Lane*, 489 U.S. 288 (1989) on the petitioner's claim that due process demanded his release because he had proven during his PCRA proceeding that key evidence introduced by the prosecution at his trial (testimony from the victim) was false; concluding "*Teague* bars a retroactive application of [the petitioner's] claimed right as a novel rule of criminal procedure.")[29]

---

[28]    There is a circuit split on the validity of the due process rule the Third Circuit Court accepted in *Lee I. See, e.g., Nicholls v. Long*, 2022 WL 211617, at *7-10 (10th Cir. Jan. 25, 2022) (rejecting the petitioner's "due process" claim and concluding that it in fact was an "actual innocence" claim, which has never been held to be cognizable in a federal habeas case); *id.* at *9 ("It is notable…that state counsel on appeal in *Lee I* conceded that petitioner's claim sounded in due process and that 'this type of claim is cognizable in a federal habeas petition.' *Lee I*, 667 F.3d at 403 n.6. Consequently, the characterization of petitioner's newly discovered evidence claim as a due-process claim—cognizable in habeas proceedings—actually was not contested in the *Lee* litigation… More importantly, even if *Lee I* is understood as holding that a petitioner's claim based on newly discovered scientific evidence may be in some instances characterized as a due-process claim cognizable in habeas proceedings, [the petitioner] does nothing to explain why he should benefit from *Lee I* and its progeny here—let alone clarify how *Lee I* and *Lee II* (which he specifically cites) square with the Supreme Court's actual-innocence decision in *Herrera* and our own precedent applying it.")

[29]    In a footnote in *Marcy*, the Third Circuit Court noted that during oral argument the petitioner's counsel had cited in support of his client's due process claim the due process claim that was accepted by it in *Lee I/II*. The Court in *Marcy* distinguished *Lee I/II* because "that case dealt with flawed forensic evidence or other junk science." 110 F.4th at 218 n.17 (cleaned up).

On remand, discovery was conducted and an evidentiary hearing was held. The district court then granted Lee relief on his due process claim, concluding that he established that the admission of the expert fire testimony at his trial "undermined the fundamental fairness of the entire trial because the verdict rested almost entirely upon scientific pillars which have now eroded." *Lee II*, 798 F.3d at 162 (cleaned up). The Third Circuit Court affirmed in *Lee II*.

Treiber's reliance on the *Lee I/II* is misplaced for at least two reasons. First, the Pennsylvania Supreme Court *did not* decline to decide Claim II on the merits because it found the due process claim to be non-cognizable under the PCRA. Rather, the Pennsylvania Supreme Court denied Claim II as waived under state law because it determined that the due process claim he raised in it was available to the defense at the time of trial.

Second, *Lee I/II* is distinguishable because the state court in that case adjudicated on the merits the petitioner's claim that his convictions were based on what new scientific evidence had proven to be fundamentally unreliable expert evidence. The Third Circuit Court, for reasons that are not relevant here, determined that it could review Lee's due process claim de novo. *Lee I*, 667 F.3d at 401-03; *Lee II*, 798 F.3d at 165 n.5. Thus, in *Lee I/II* the procedural default doctrine did not prohibit the federal habeas court from reaching the merits of the petitioner's due process claim and granting him relief on it. In contrast, here the procedural default doctrine bars this Court from granting Treiber relief on Claim II because the Pennsylvania Supreme Court denied that claim under the state's independent and adequate waiver rule.

Based on the above, Claim II is denied because it is procedurally defaulted. Because jurists of reason would not "find it debatable whether [Claim II] states a valid claim of the denial of a

constitutional right and…whether [this Court] was correct in its procedural ruling," *Slack*, 529 U.S. at 484, a certificate of appealability is denied with respect to Claim II.

**Claim III**

In Claim III, Treiber contends that trial counsel was ineffective for failing to investigate and present evidence to undermine the Commonwealth's motive theory that he committed the arson and killed Jessica because he was in financial distress.

### Background

In support of this claim, Treiber presented at a PCRA hearing testimony from Kenneth McCrory, a certified public accountant and fraud examiner qualified as an expert in accounting and economics. Treiber contends that trial counsel should have presented expert testimony from McCrory (or another expert like him) to counter the Commonwealth's evidence that he was in financial distress at the time of the fire and Jessica's death.

McCrory testified during the PCRA proceeding that he reviewed thousands of pages of Treiber's financial records, as well as portions of the trial testimony and other sources of information commonly relied on by experts in his field. He explained why, in his expert opinion, Treiber "had no significant financial need nor was he in financial distress" at the time of the fire. (PCRA Hr'g Tr., 8/12/09, at p. 178.) McCrory also testified that financial records showed that, contrary to what the Commonwealth had argued to the jury, Treiber would not have "pocketed money"[30] from the loss of his house and personal property. Thus, in McCrory's opinion Treiber had "no likely significant financial gain to be realized to him from the arson." (*Id.*; *see also* PCRA

---

[30]    In his closing statement at the end of the guilt phase of the trial, the prosecutor argued that Treiber thought he would profit from the fire because he would receive the insurance proceeds and, since he was a carpenter, could rely on his own labor to rebuild his house and then "pocket[ ]" some of the proceeds. (Trial Tr., Day 7, at p. 109.)

Ct. Op. 3/27/12, ECF No. 11-3 at pp. 14-16 and *Treiber II*, 121 A.3d at 453-54 (summarizing McCrory's PCRA testimony)).

Treiber also contends that an expert like McCrory would have corroborated and bolstered testimony presented by the defense at trial from his family law attorney, Kelly Mroz. She testified at trial that Treiber never asked her to attempt to reduce the amount of child support he paid for Jessica. (Trial Tr., Day 7, at p. 213.)

Treiber also faults trial counsel for not eliciting additional testimony at trial from Attorney Mroz regarding his financial status around the time of the fire. He cites testimony given by Attorney Mroz during the PCRA proceeding in which she stated that she learned, during her work for him around the time of the fire, that he "had a net income of $6,000 per month from his rental properties," and "some equity from the properties." (PCRA Hr'g Tr., 7/7/09, at p. 70.)

To counter McCrory's PCRA hearing testimony, the Commonwealth presented testimony from its own financial expert, Michael P. Hanley, a supervisory forensic auditor with the Federal Bureau of Alcohol, Tobacco, Firearms and Explosives. Hanley explained that he was prepared to testify at trial if the Commonwealth elected to call him as to why, in his expert opinion, Treiber's finances were not sound at the time of the fire. (PCRA Hr'g Tr., 10/22/10, at pp. 191-204; *see also* PCRA Ct. Op. 3/27/12, ECF No. 11-3 at pp. 16-17 (summarizing Hanley's PCRA hearing testimony)).

Attorney Lucas addressed at the PCRA hearing why the defense elected not to retain or call an expert financial witness. He explained that in preparing for the trial, he reviewed the voluminous records the Commonwealth made available to the defense regarding Treiber's finances. (PCRA Hr'g Tr., 8/10/09, at p. 90.) Attorney Lucas also spoke with Treiber about these

records and his financial situation. He described Treiber as "very helpful and very familiar with his financial situation[,]" and determined that Treiber was the best source to explain to the jury the status of his finances. (*Id.* at pp. 90-91.)

Attorney Lucas also explained that he considered the fact that the Commonwealth was not going to call a financial expert. He believed that, through cross-examination of the Commonwealth witnesses and Treiber's own testimony, he could succinctly and persuasively make a common-sense argument to the jury that Treiber did not think he would benefit financially from the fire. (*Id.* at pp. 91-93.) Attorney Lucas determined that it was best to proceed this way because it would avoid a potential battle of experts with the Commonwealth. (*Id.*)

When it denied Claim III, the PCRA court summarized parts of McCrory's and Hanley's PCRA hearing testimonies. (PCRA Ct. Op. 3/27/12, ECF No. 11-3 at pp. 14-17.) It observed that "[t]hree things were notable from McCrory's testimony. First, [Treiber] was using [his] available credit to finance his [business] operations. Second, [he] was not sitting on a lot of cash. Third, [he] did not keep good records." (*Id.* at p. 15.) The PCRA court also discussed weaknesses in McCrory's opinion and areas in which he and Hanley reached contradictory conclusions. (*Id.* at pp. 14-17.) It determined that "[h]ad Mr. McCrory testified at trial, he would not have refuted the evidence that showed that [Treiber] had significant expenses in the way of liquid assets." (*Id.* at pp. 15-16.)

The PCRA court further explained:

Testifying as to [Treiber's] checking account activity (which was not contradicted by Mr. McCrory), Hanley indicated that during the period [of] January 2000 until the fire, [Treiber's] checking account balance decreased from $21,000.00 to $3,000.00. [PCRA Hr'g (Day 8), 10/22/10] at 193. The average amount of deposits for the period January through March 2001 was fifty percent (50%) less than the average deposits for the same period in the year 2000. [Treiber's] debt-to-income

ratio supported Marquette Savings Bank's decision not to lend him money, contrary to what Mr. McCrory opined. *Id.* at 193-194. Furthermore, Mr. Hanley stated that had [Treiber] sold his residential property for $220,000.00 and paid off the mortgage, he would have netted $24,000.00. (This, of course, assumes a willing buyer.) However, [Treiber] netted approximately $141,000.000 from the insurance carrier as a result of the fire. (This amount includes insurance coverage for both the house and contents, less the mortgage payoff.) *Id.* at 202. With that money, he could have paid off his credit cards debts and satisfied the balance he owed his ex-wife under the martial settlement agreement. *Id.* This, too, directly contradicts Mr. McCrory's conclusions. Finally, McCrory's testimony does not support [Treiber's] claim that he could not have profited by destroying his house. Actually, it is a matter of degree as to how much he would have profited.

*Id.* at pp. 16-17 (footnotes omitted).

The PCRA court concluded, after considering the facts cited by it, that Attorney Lucas had an objectively reasonable basis for not retaining and presenting testimony from a financial expert. It also rejected Treiber's assertion that Attorney Lucas lacked adequate information to make a strategic decision on how to counter the Commonwealth's evidence about his finances because he failed to conduct an acceptable investigation into the issue.[31] (*Id.*)

The PCRA court also pointed out that Attorney Lucas' desire to avoid a "battle of the experts," was well founded. That is exactly "what occurred during the PCRA evidentiary hearing," the PCRA court observed, and it "added nothing of value to [Treiber's] attempt to rebut the Commonwealth's motive evidence." (*Id.* at p. 17.) In fact, the PCRA court determined, had such a battle occurred at trial it would have resulted in the introduction of evidence that was determinantal to the defense. (*Id.*)

As for Treiber's assertion that testimony from McCrory would have corroborated Attorney Mroz's trial testimony that Treiber never said to her that he wanted to reduce his child support

---

[31]    Under *Strickland*, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." 466 U.S. at 690-91.

payments, the PCRA pointed out "the fact that [Treiber] was paying [child support] does not mean that [he] wanted to do so." (*Id.* at p. 16.) The PCRA court also was not persuaded by Treiber's argument that trial counsel could have presented admissible or persuasive testimony through Attorney Mroz that he was financially sound. It determined that "[c]ontrary to [Treiber's] claim, [Attorney Mroz] would not have supported [his] claim that he was financially sound. In fact, she and [Treiber] did not specifically discuss his support situation and she did not have a clear picture of [his] overall finances." (*Id.* at p. 18, citing Trial Tr., Day 4, at p. 213 and PCRA Hr'g Tr., 7/7/09, at pp. 64. 87-89.)

Finally, the PCRA court rejected Treiber's assertion that trial counsel should have done more to show that he had no financial motive to destroy his home. It found Treiber's "claim that trial counsel should have investigated/presented evidence that he would not have received full replacement value for his home and he was physically unable to rebuild [it]" to be "speculative, undeveloped and contrary to the evidence presented at the PCRA hearing." (*Id.* at p. 17 n.32.) The PCRA court pointed to evidence that Treiber "had rebuilt his parent's home after a previous fire" and "was able to maintain his rental properties and participate in competitive powerlifting." (*Id.*) It thus concluded that Attorney Lucas' "decision not to portray [Treiber] as feeble" was objectively reasonable. (*Id.*)

For all these reasons, the PCRA court concluded that Treiber failed to satisfy his burden of showing that trial counsel fell below an objective standard of reasonableness or that he was prejudiced by counsel's alleged ineffectiveness. The Pennsylvania Supreme Court affirmed, holding that "the PCRA court's conclusions are free from legal error and supported by the record." *Treiber II*, 121 A.3d at 454-55. It pointed out that "[a]part from the fact that [Treiber] failed to

demonstrate that Mr. McCrory was known at the time of trial or should have been known to counsel, it is unlikely that the expert would have established [Treiber] was financially sound, as Mr. McCrory would not have refuted [Treiber's] substantial expenses and lack of liquid assets." *Id.* at 455. The Pennsylvania Supreme Court added that "expert testimony on [Treiber's] financial status was unnecessary, particular where [Attorney Lucas] cross-examined the Commonwealth in an effective manner." *Id.* Additionally, the Pennsylvania Supreme Court noted, "[Treiber] does not explain how he was prejudiced by the failure to present a financial expert, but instead argues he was collectively prejudiced by counsel's failure to call a multitude of experts." *Id.*

**Discussion**

Treiber argues that the Pennsylvania Supreme Court's adjudication of Claim III was "contrary to" *Strickland* because it observed that he did not show that McCrory was known or should have been known to counsel at the time of the trial. *Treiber II*, 121 A.3d at 454. He correctly points out that the proper analysis under *Strickland* asks whether objectively reasonable counsel would have retained *a qualified expert*, not whether counsel should have known of the existence of *a specific expert* (here, McCrory). Nevertheless, because the Pennsylvania Supreme Court denied Claim III for alternative, separate and appropriate factors, this Court cannot conclude that its adjudication of Claim III was "contrary to" *Strickland*.

The next question for this Court, then, is whether the Pennsylvania Supreme Court's adjudication was an "unreasonable application of" *Strickland*. In considering this question, this Court is mindful that when evaluating *Strickland's* performance prong, trial counsel's "strategic decisions—including whether to hire an expert—are entitled to a 'strong presumption' of reasonableness." *Dunn v. Reeves*, 594 U.S. 731, 739 (2021) (per curiam) (quoting *Richter*, 562

U.S. at 104). "Defense lawyers have 'limited' time and resources, and so must choose from among 'countless' strategic options. Such decisions are particularly difficult because certain tactics carry the risk of 'harm[ing] the defense' by undermining credibility with the jury or distracting from more important issues." *Id.* (quoting *Richter*, 562 U.S. at 106-08). "In fact, even if there is reason to think that counsel's conduct 'was far from exemplary,' a court still may not grant relief if '[t]he record does not reveal' that counsel took an approach that no competent lawyer would have chosen." *Id.* (citing *Titlow*, 571 U.S. at 23-24).

Moreover, because the specific question before this Court is whether the Pennsylvania Supreme Court's adjudication was "an unreasonable application of" *Strickland*, this Court is further mindful that, when considering whether Treiber satisfied *Strickland's* first prong, it "owes deference to both [Treiber's trial] counsel *and* the state court." *Id.* (emphasis in original). Thus, Treiber's burden "is all the more difficult." *Richter*, 562 U.S. at 105. That is because:

> [t]he standards created by *Strickland* and § 2254(d) are both "highly deferential," [*Strickland*, 466 U.S.] at 689; *Lindh v. Murphy*, 521 U.S. 320, 333, n.7 (1997), and when the two apply in tandem, review is "doubly" so, [*Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)]. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. [*Id.*] Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Id.* (parallel citations omitted).

While the "double deference" this Court must apply here is not insurmountable, *Rosa v. Att'y Gen. of New Jersey*, 141 F.4th 477, 483-84 (3d Cir. 2025), it is very difficult to satisfy[32] and Treiber has not done so here.

Nor has Treiber shown that the Pennsylvania Supreme Court's determination that he was not prejudiced by trial counsel's failure to do all the things he faults him for in Claim III was an "unreasonable application of" *Strickland's* second prong. That is, he has not shown that its adjudication was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

Finally, Treiber also has not shown that the state court's adjudication of Claim III "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The state court had before it the requisite evidence necessary for its adjudication to withstand review under § 2254(d)(2)'s deferential standard.

In conclusion, because the Pennsylvania Supreme Court's adjudication of Claim III survives review under § 2254(d)(1) & (2), this Court is barred from granting Treiber relief on it and it is denied for that reason. A certificate of appealability is also denied.

---

[32]    As the Court explained above in the section of this opinion discussing the *Strickland* standard, "[j]udicial scrutiny of counsel's performance must be highly deferential." 466 U.S. at 689. "Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is 'all too tempting' to 'second-guess counsel's assistance after conviction or adverse sentence.'" *Richter*, 562 U.S. at 105 (quoting *Strickland*, 466 U.S. at 689). When AEDPA's standard of review applies, as it does here, the burden on the petitioner "is all the more difficult." *Id.*

### Claim IV(a)

Jamie Pianta was an important witness for the Commonwealth whose testimony helped establish premeditation, specific intent and motive to commit murder. As explained above, Pianta testified at trial that he was present, along with Riddle's son, Erik Keith, during two car rides from Erie to Pittsburgh when Treiber discussed purchasing the supplies he needed to start the fire in his home with the intent of kill both his daughters (Jessica and Sheila). (Trial Tr., Day 3, at pp. 208-15.) Pianta admitted during cross-examination that he did not offer this information during at least the first three times he spoke with the police. (*Id.* at pp. 216-17.) He said he did not do so because he was afraid of Treiber and Keith. (*Id.* at pp. 236-37.)

In Claim IV, Treiber asserts several subclaims related to Pianta. In what the Court will refer to as Claim IV(a), Treiber contends that trial counsel was ineffective for failing to impeach Pianta's credibility with reputation evidence. Specifically, Treiber faults trial counsel for not presenting allegedly readily available testimony from Janice Lehman and her son, Jay Tupitza, (both of whom knew Pianta from the neighborhood); and, Teresa Nicole Young (Pianta's former girlfriend and the mother of his child) and her aunt, Sally Owen. (ECF No. 10, ¶¶ 125-126; ECF No. 18, ¶ 4; ECF No. 48 at pp. 6-8.) Treiber claims these witnesses could have testified at trial about Pianta's general reputation in the community for dishonesty. Treiber also faults trial counsel for failing to review and present evidence from Pianta's juvenile file, which he claims contained a wealth of evidence that could have been used to impeach him, including information related to Pianta's mental health issues, a history of previous fire-starting, and extrinsic impeachment evidence related to his lack of credibility.

## Background

After considering the proffered testimony from Lehman, Tupitza, Young and Owen during the PCRA proceeding, the PCRA court held that none of it would have been admissible at trial under Rule 608 of the Pennsylvania Rules of Evidence, which governs the admissibility of evidence of a witness's character for truthfulness or untruthfulness (PCRA Ct. Op. 3/27/12, ECF No. 11-3 at pp. 6-8.)[33] The PCRA court explained:

> [Treiber] asserts that Theresa Nicole Young, (a woman who had a relationship and a child with Pianta), would have provided evidence that Pianta had a bad reputation for truthfulness, peacefulness and as a law-abiding citizen. N.T. PCRA Hearing (Day 4), 8/12/09, at 23-24. First, the only trait that arguably would have been relevant was truthfulness. Second, her conclusion as to reputation was based upon specific instances, not reputation within the community. *Id.* at 26, 32, and 33. In fact, she only made reference to two individuals to whom she may have spoken about him concerning reputation. *Id.* at 34. This is clearly an insufficient basis for character evidence. Finally, she based her information on her knowledge of Pianta for the period May through August of 2000. As such, her testimony would not have been admissible because it did not reflect his purported reputation at the time he testified in 2002.

---

[33]    On January 17, 2013, the Pennsylvania Supreme Court rescinded and replaced the Pennsylvania Rules of Evidence, effective March 18, 2013. "The goal of the Pennsylvania Supreme Court's recission and replacement of the Pennsylvania Rules of Evidence was...to make its rules more easily understood and to make the format and terminology more consistent, but to leave the substantive content unchanged." *See* Explanatory Comments preceding the Pa.R.E. at ¶ 2. At the time of Treiber's trial and proceeding before the PCRA court, Rule 608 read as follows, in relevant part:

> (a)  Reputation Evidence of Character
> The credibility of a witness may be attacked or supported by evidence in the form of reputation as to character, but subject to the following limitations:
> (1)  the evidence may refer only to character for truthfulness or untruthfulness; and
> - - -
> (b)  Specific Instances of Conduct
> Except as provided in Rule 609 (relating to evidence of conviction of crime),
> (1)  the character of a witness for truthfulness may not be attacked or supported by cross-examination or extrinsic evidence concerning specific instances of the witness' conduct[.]

Pa.R.E. 608 (rescinded and replaced on 1/17/13). Furthermore, as the PCRA court explained, under Pennsylvania law, "evidence for truthful character must relate to the witnesses' reputation *at the time of trial*." (PCRA Ct. Op. 3/27/12, ECF No. 11-3 at p. 6 (emphasis added) (citing *Commonwealth v. Showers*, 681 A.2d 746, 752-53 (Pa. Super. Ct. 1996)).

Sally Owen, (Young's Aunt), was proffered as a character witness as to multiple traits. As to Pianta's reputation for truthfulness, she, too, was relying on evidence of purported specific incidents, not reputation. *Id.* at 42. Therefore, her testimony would not have been admissible.

As to Janice Lehman, any knowledge about Pianta that she may have had related to the period 1989 to the mid 1990's when Pianta was a juvenile (10-16 years old). This was too remote given that he testified [at Treiber's trial] in 2002.

Jay Tupitza testified at the PCRA evidentiary hearing that his information about Pianta was based upon alleged specific incidents that occurred in the 1990's. N.T. PCRA Hearing, (Day 4), 08/12/09, at 137. By his own admission, this was "a long time ago." *Id.* at 143. Once again, he discussed a number of traits, not of [sic] all of which would have been relevant. Finally, he was relying upon evidence of specific instances, not reputation. *Id.* at 140-141, 143, (The Tupitza's were the victims of Pianta's 1997 juvenile theft adjudication.) Therefore, his testimony was inadmissible.

(*Id.*)

As for Pianta's juvenile file,[34] the PCRA court held nothing in it would have been admissible at trial except for a crimen falsi juvenile adjudication (*id.* at pp. 8-9 ), which is the basis of a separate subclaim (Claim IV(c)) and discussed below.

In his PCRA appeal, Treiber urged the Pennsylvania Supreme Court to conclude that the testimony from his four proffered character witnesses and the information from Pianta's juvenile file would have been admissible reputation evidence to attack Pianta's credibility. (ECF No. 11-86 at pp. 47-50 & ECF No. 19-17 at pp. 2-5.) The Pennsylvania Supreme Court rejected Treiber's arguments and affirmed the PCRA court's decision, concluding that the PCRA court's "findings are supported by the record and free of legal error." *Treiber II*, 121 A.3d at 457-58; *see also id.* at 457 ("[t]he testimony [Treiber] presented [from the four character witnesses] primarily addressed Mr. Pianta's specific instances of conduct, *i.e.*, specific acts of theft and lying, which would have been inadmissible to attack his credibility under Pa.R.E. 608(b)(1)."); *id.* at 458 ("[o]ur review of

---

[34]    Documents from Pianta's juvenile file were filed under seal in both the PCRA proceeding and in this habeas case.

the record demonstrates any evidence in Mr. Pianta's juvenile file relevant to his credibility would be inadmissible as specific instances of conduct, *see* Pa.R.E. 608(b)(1), and none of the information involved Mr. Pianta's credibility at the time of trial.")

**Discussion**

Treiber argues the evidentiary rulings made by the state court in adjudicating and rejecting Claim IV(a) were erroneous and that its decision to deny this claim was "contrary to, or an unreasonable application of" *Strickland* under § 2254(d)(1) or "based on an unreasonable determination of the facts" under § 2254(d)(2).

There is no basis, however, for the Court to conclude that the Pennsylvania Supreme Court applied "a rule that contradicts the governing law set forth in [Supreme Court] cases," *Williams*, 529 U.S. at 405, or "confront[ed] a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrive[d] at a result different from [Supreme Court] precedent," *id.* at 406. Thus, it's adjudication was not "contrary to" *Strickland* under § 2254(d)(1).

Nor has Treiber established that the Pennsylvania Supreme Court's adjudication was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. Thus, this Court cannot conclude that its adjudication was an "unreasonable application of" *Strickland* under § 2254(d)(1).

Treiber also has not shown that the Pennsylvania Supreme Court's adjudication "was based on an unreasonable determination of the facts" on the record before the state court. Thus, he has not overcome AEDPA's standard of review at § 2254(d)(2).[35]

Finally, in large part what Treiber is asking this Court to do is to re-examine the state court's application of its state evidentiary law. This Court has no authority to do that. As explained above, a federal habeas court cannot re-examine a state court's determination of a state-law issue, even if the petitioner argues that the state misapplied its own evidentiary rules. *Estelle*, 502 U.S. at 67-68; *Wilson v. Vaughn*, 533 F.3d 208, 213 (3d Cir. 2008) ("Admissibility of evidence is a state law issue.")

In conclusion, Claim IV(a) is denied because the Pennsylvania Supreme Court's adjudication of it survives review under § 2254(d)(1) & (2). A certificate of appealability is also denied.

### Claim IV(b)

In what this Court will refer to as Claim IV(b), Treiber contends that trial counsel was ineffective for failing to request a corrupt-source instruction on Pianta because he allegedly was an accomplice. (ECF No. 10, ¶¶ 134.) The Pennsylvania Supreme Court denied this claim on the merits. *Treiber II*, 121 A.3d at 459-60. (*See also* PCRA Ct. Op. 3/27/12, ECF No. 11-3 at pp. 12-13.)

---

[35]    The Pennsylvania Supreme Court did note, in affirming the PCRA court's decision denying Claim IV(a), that "except for Ms. Owen—whose declarations only cited Mr. Pianta's specific instances of conduct—[Treiber] failed to establish the witnesses were known or should have been known to counsel." *Treiber II*, 121 A.3d at 457 (emphasis added). Treiber argues that was an unreasonable determination of the facts because it allegedly ignored that Theresa Nicole Young testified during the PCRA hearing that she spoke with trial counsel's investigator. (PCRA Hr'g Tr., 8/12/09, at p. 24.) This Court need not evaluate this argument given the PCRA court's separate determination that none of the witnesses' proffered testimony would have been admissible at trial was affirmed by the Pennsylvania Supreme Court as being "supported by the record and free of legal error." *Treiber II*, 121 A.3d at 457.

Treiber did not brief this subclaim. (*See* ECF No. 47 at p. 138; ECF No. 48.) Therefore, he waived it for the purposes of federal habeas review. (*See* ECF No. 3, directing that in Treiber's brief in support of the Petition he must, among other things, include "a thorough discussion of the merits of the claim under the law.")

In any event, if not waived, Claim IV(b) has no merit. The Pennsylvania Supreme Court affirmed the PCRA court's determination that the evidence did not support Treiber's assertion that Pianta was his accomplice under Pennsylvania law.[36] Thus, it held that there was no basis for trial counsel to request a corrupt-source instruction. *Treiber II*, 121 A.3d at 459 (citing 18 Pa.C.S. § 306(c)(1) (defining accomplice under state law) and *Commonwealth v. Williams*, 732 A.2d 1167, 1181 (Pa. 1999) (a corrupt-source instruction is warranted where sufficient evidence is presented as to whether the witness is an accomplice)). Once again, this Court may not re-examine the state court's determination on that state law issue. *See*, *e.g.*, *Estelle*, 502 U.S. 62, 67-68; *Priester v. Vaughn*, 382 F.3d 394, 401-02 (3d Cir. 2004); *see also Jenner v. Class*, 79 F.3d 736, 740 (8th Cir. 1996) (the state court held that the petitioner was not entitled to an accomplice instruction because the witness at issue was not an accomplice under state law; "Given the [state court's] ruling, there is no basis for ruling that counsel was deficient for not proposing the instruction.").

Since an attorney cannot be ineffective for failing to request an instruction to which the defendant was not entitled, *see, e.g.*, *Strickland*, 466 U.S. at 691, Treiber cannot show that trial counsel was ineffective here, let alone that this Court is empowered to grant him relief on Claim IV(b) under AEDPA's standard of review.

---

[36] The Pennsylvania Supreme Court also observed: "Moreover, as the PCRA court pointed out, we see no reason why counsel would have requested an instruction that Mr. Pianta is a corrupt and pollute source—whose testimony should not be believed because he helped [Treiber] plan and commit the arson and murder—because counsel's defense strategy was to blame the arson on an unknown intruder." *Treiber II*, 121 A.3d at 460.

For all the reasons, Claim IV(b) is denied. A certificate of appealability is also denied

## Claim IV(c)

Treiber alleges in what the Court will refer to as Claim IV(c) that trial counsel was ineffective for failing to impeach Pianta with his "contacts with law enforcement." This claim is comprised of three subclaims.

First, Treiber contends that trial counsel should have impeached Pianta by pointing out that at one point he was allegedly a person of interest in the police investigation of the March 9, 2001, arson at Treiber's home.[37] Treiber refers to this as Pianta's "uncharged misconduct," and he contends that trial counsel should have asked Pianta about it because it gave Pianta a motive to shift blame to Treiber.[38]

Second, Treiber contends that trial counsel should have impeached Pianta with what he calls Pianta's "charged misconduct." This contention is premised on the fact that in the month or so before testifying against Treiber at the 2002 trial, Pianta was arrested for his involvement in a hit and run accident in a stolen car. In connection with this incident, Pianta was charged with several crimes, including theft, unauthorized use of an automobile, conspiracy, false identification

---

[37]    As part of their investigation, the police sought and received authorization to have Riddle's son, Erik Keith, secretly record a conversation with Pianta. According to Treiber, in the request for authorization, the police referred to Pianta as a "person of interest."

Keith met with Pianta, but during their conversation Keith warned Pianta not to say anything because he was wearing a wire. Keith was later charged with the crime of hindering apprehension for his actions during this incident.

[38]    As the Commonwealth points out, a review of the trial transcript establishes that Attorney Lucas briefly explored this issue on cross-examination. Lucas asked Pianta "[n]ow how is it that you became aware that the Millcreek Police had wired Mr. Keith to determine what you knew about this case?" (Trial Tr., Day 3, at pp. 224-25.) In response to Lucas' questioning, Pianta acknowledged that the police equipped Keith with a hidden wire to record their conversation and that during their conversation Keith indicated to him that he was wearing a wire. (*Id.*)

to law enforcement, and endangering the welfare of a child.[39] These charges were pending at the time Pianta testified and that is why Treiber refers to them as Pianta's "charged misconduct." That these charges were pending, Treiber contends, gave Pianta a motive to provide testimony favorable to the Commonwealth.

Third, information contained in Pianta's juvenile file demonstrated that many years before the trial, in July 1997, Pianta had been adjudicated delinquent for the offenses of theft and unauthorized use of an automobile and placed on probation. This was a *criminal falsi* adjudication and, as such, it was admissible under Pennsylvania law as impeachment evidence. Accordingly, Treiber contends, trial counsel should have asked Pianta about this adjudication during cross-examination.

The PCRA court disposed of each of these subclaims as follows. As to the first and second subclaims, Treiber asserted during the PCRA proceeding that the Commonwealth conferred a benefit on Pianta related to his uncharged or charged misconduct in exchange for his testimony against Treiber. (ECF No. 19-19 at p. 5.) Thus, Treiber claimed, trial counsel was ineffective for not questioning Pianta about the alleged "understanding" (whether implicit or explicit) between Pianta and the Commonwealth. (*Id.*) The PCRA court rejected this argument. It found that "no evidence was introduced at the PCRA evidentiary hearing that demonstrated any such favorable treatment or consideration by the Commonwealth." (PCRA Ct. Op. 3/27/12, ECF No. 11-3 at p. 9.)

---

[39]    Pianta, who left his one-year-old child home alone, lied to police by telling them his name was "James Doller." Treiber argues that trial counsel could have impeached Pianta with his use of the alias. The PCRA held that Pianta's "use of aliases would not have been admissible in the context of this case." (PCRA Ct. Op. 3/27/12, ECF No. 11-3 at p. 9.) This Court is bound by that state law determination and may not re-examine it. *See, e.g.*, *Estelle*, 502 U.S. at 67-68.

As for Pianta's subclaim pertaining to his juvenile *crimen falsi* adjudication, the PCRA court held that, given the importance of Pianta's testimony, objectively reasonable counsel would have cross examined him about it no matter how minor the offense. (PCRA Ct. Op. 3/27/12, ECF No. 11-3 at p. 9.) The PCRA court determined, therefore, that Treiber satisfied *Strickland's* performance prong. It ultimately concluded, however, that Treiber failed to satisfy *Strickland's* prejudice prong and denied the subclaim for that reason. (*Id.*)

In his appeal to the Pennsylvania Supreme Court, Treiber argued that "[r]egardless of whether Pianta *ultimately* received favorable treatment" from the Commonwealth, "bias is always a proper subject of cross-examination." (ECF No. 11-86 at p. 49 (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986)). Accordingly, Treiber contended, counsel "had no reasonable basis for failing to cross examine Pianta with "facts from which jurors…could appropriately draw inferences relating [to his] reliability." *Id.* (citing *Davis v. Alaska*, 415 U.S. 308, 305 (1974)). He also argued that trial counsel had no reasonable basis for not cross-examining Pianta about his juvenile *crimen falsi* adjudication. (*Id.* at p. 48.)

The Pennsylvania Supreme Court affirmed the PCRA court's decision. *Treiber II*, 121 A.3d at 458. It found as fact, as did the PCRA court, that Pianta did not receive favorable treatment in exchange for his trial testimony. Thus, it concluded, Attorney Lucas did not perform deficiently for failing to pursue a line of questioning regarding this topic when he cross-examined Pianta. *Treiber II*, 121 A.3d at 458.

The Pennsylvania Supreme Court further held that Attorney Lucas could not have explored with Pianta potential bias he might have because of his charged misconduct because information related to it would have been barred under Rule 609 of the Pennsylvania Rules of Evidence, which

60

requires an actual conviction of a crime involving dishonesty or false statement for a witness's credibility to be attacked with evidence of a crime. Accordingly, the Pennsylvania Supreme Court held, trial counsel was not ineffective for declining to explore Pianta's potential incentive to curry favor with the Commonwealth because of the criminal charges that were pending against him.

As for Pianta's crimen falsi adjudication, the Pennsylvania Supreme Court denied it because Treiber's arguments focused only on the *combined* prejudice he incurred as a result of all the alleged errors by trial counsel that he raised in Claim IV. *Id.* at 457. Because he did not explain how he was prejudiced *solely* by counsel's failure to cross-examine Pianta about his crimen falsi adjudication—which was the only subclaim in which the PCRA court found trial counsel's performance to be deficient—the Pennsylvania Supreme Court held that Treiber failed to establish the prejudice prong of the ineffective assistance test with respect that single issue. *Id.*

**Discussion**

Treiber contends that the Pennsylvania Supreme Court's determination that Pa.R.E. 609 would have barred trial counsel from exploring Pianta's possible motivations to testify for the Commonwealth was "contrary to" *Davis v. Alaska*, 415 U.S. 308 (1974) because Treiber's rights under the Confrontation Clause would have permitted that line of questioning even if the state rules of evidence did not. The Commonwealth concedes this point and agrees that this Court must review de novo Treiber's subclaims that trial counsel was ineffective for not impeaching Pianta by suggesting that his charged and uncharged misconduct gave him a basis to testify favorably for the Commonwealth. (ECF 69 No. at p. 71.) And because the Court must consider the *cumulative* prejudice of any deficient performance by trial counsel that Treiber establishes in Claim IV(c), this

Court likewise gives no deference to the state court's prejudice determination, since it considered only the prejudicial effect of trial counsel's failure to ask Pianta about his crimen falsi adjudication.

Thus, the Court assumes that, as the PCRA court found, objectively reasonable counsel would have asked Pianta about his crimen falsi adjudication (PCRA Ct. Op. 3/27/12, ECF No. 11-3 at p. 9), and also about any incentive he may have to testify against Treiber because of his charged and uncharged misconduct. This Court concludes, however, that Treiber has not shown that he was prejudiced by Attorney Lucas' decision not to cross-examine Pianta about these matters. Although Attorney Lucas could have suggested that Pianta had an incentive to curry favor with the Commonwealth, the effectiveness of that line of questioning would have been blunted at least somewhat because, as the state court found as fact, there was no understanding between Pianta and the Commonwealth, either implicit or explicit, that he would receive favorable treatment in exchange for his testimony against Treiber. Moreover, Pianta gave his statements inculpating Treiber well before Pianta committed the charged misconduct in 2002, and that fact too would have blunted the effectiveness of any attempt to impeach his testimony by referencing his charged misconduct. As for Pianta's 1997 crimen falsi adjudication, Treiber has not convinced the Court that, if the jury had learned of that adjudication that it would have moved the needle further from finding his testimony credible, even when considered together with knowledge of Pianta charged and uncharged misconduct.

None of this is to suggest that the fact that the evidence at issue in Claim IV(c) was not impeachment evidence—it was. But Treiber has not convinced the Court that if the jury had learned of this evidence that there is a reasonable probability that the outcome of the trial would have been different. Pianta's testimony was largely corroborated by other evidence, including the

strong circumstantial evidence that Treiber started the fire himself by using the type of materials (gasoline, gas cans and straw) that Treiber had recently purchased; that he undertook extensive efforts to plan for the fire and to attempt to deflect suspicion away from himself and onto a neighbor who allegedly had an issue with his dogs; and, that he made suspiciously little effort to save his two-year-old daughter from the fire. Moreover, Treiber's older daughter, Sheila Lee, also testified, consistent with Pianta's trial testimony, that Treiber tried to get her to stay at his house the same weekend of the fire. (See Trial Tr., Day 3, at pp. 184-88, 210.)

Finally, it is an open question in the Third Circuit whether multiple claims of deficient performance under *Strickland* should be analyzed in the aggregate for prejudice purposes, or whether a petitioner instead must state a separate claim of cumulative error under the Due Process Clause to avail himself of such an aggregated prejudice analysis. *Zeledjieski v. Sup't Greene SCI*, 833 F. App'x 950, 957 (3d Cir. 2020) ("We have not yet decided whether any prejudice from multiple claims of deficient performance should be analyzed together under *Strickland* or as cumulative error under the Due Process Clause."); *Albrecht v. Horn*, 485 F.3d 103, 139 (3d Cir. 2007) (equating aggregate *Strickland* analysis with cumulative-error analysis to which *Brecht's* "actual prejudice" harmless error standard applies*); cf. Collins v. Sec'y, Pa. Dep't of Corr.*, 742 F.3d 528 542 (3d Cir. 2014) (requiring that claims of cumulative error be independently exhausted.) The Court will assume for the sake of argument that: (1) Treiber did not have to exhaust a separate due process claim of cumulative prejudice; and, (2) that this Court must consider the cumulative prejudicial effect of trial counsel's deficient performance. Proceeding under those assumptions, the Court has considered the cumulative effect of trial counsel's failure to challenge the Commonwealth's canine DNA evidence (Claim I, which is the only claim of ineffective

assistance of counsel claim that the Pennsylvania Supreme Court resolved solely because it determined Treiber failed to establish prejudice) and his deficient performance in this claim (Claim IV(c)) for failing to attempt to impeach Pianta by asking him about his charged and uncharged misconduct and his crimen falsi juvenile adjudication. Treiber has not established that the cumulative prejudice resulting from the errors at issue undermined confidence in the jury's verdict. *Strickland*, 466 U.S. at 694 ("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.")

Based on the above, Claim IV(c) is denied. The Court further concludes that, under the circumstances and given the importance of Pianta's trial testimony, a certificate of appealability is granted with respect to Claim IV(c).

### Claim V

In Claim V, Treiber contends that the Commonwealth's introduction of Pianta's testimony at his trial when it knew, but did not disclose, that it was unreliable violated his right to due process.

#### Background

Treiber's co-defendant, Erik Keith, originally pleaded guilty to conspiracy to commit murder and arson. In September 2002, around one month before Treiber's trial, Attorney Charbel Latouf entered his appearance as Keith's attorney and moved to withdraw Keith's guilty plea.

In the meantime, the defense subpoenaed Keith to testify at Treiber's trial. On the sixth day of trial, Keith appeared before the court with Attorney Latouf. The trial court acknowledged that Keith had "a motion to withdraw [his] plea which will be heard at a hearing and decided by me

probably sometime at the end of this month or next month." (Trial Tr., Day 6, at p. 5.) After Keith

stated that he was invoking his right not to testify, the trial court asked him: "Has anyone promised

you anything, or threatened you in any way, or done anything to make you render this decision

here today?" (*Id.* at p. 7.) Keith responded: "No." (*Id.*) The trial court then found that Keith was

"unavailable to testify in this matter, having been called by the defense." (*Id.*)

The hearing on Keith's motion to withdraw his guilty plea was held on October 31, 2002,

around three weeks after Treiber's trial had concluded. Attorney Latouf would later testify during

the PCRA proceedings that minutes before this hearing, Erie County Assistant District Attorney

Robert Sambroak informed him that the Commonwealth did not oppose Keith's motion to

withdraw his plea. Attorney Sambroak also told Attorney Latouf that the Commonwealth offered

to withdraw the conspiracy to commit arson and murder charges against Keith in exchange for a

plea of guilty to the charge of hindering apprehension of a witness, graded as a misdemeanor of

the second degree. (PCRA Hr'g Tr., 7/7/09, at pp. 16-18; ECF No. 11-73 at pp. 24-25.)

Keith accepted the Commonwealth's offer and he pleaded guilty to the crime of hindering

apprehension of a witness. The court accepted the plea and sentenced Keith that same day. Before

the court did so, Attorney Sambroak stated:

> [I]f I could, with your permission, just give a brief reason why we're doing this. I mean, given this case, I think it's important that there's something of record as to why the Commonwealth has entered into this agreement the way it has. And quite simply, given the fact that the conspiracy charges were withdrawn against Mr. Treiber at his trial, we couldn't see any point in pursuing conspiracy charges against this defendant.
>
> In addition, we believe we would have had serious problems of proof with James Pianta, given that as well as the fact that this person [Keith] is young and has been in jail for…over a year now, we felt that this was the proper and fairest way to go.
>
> And those are the reasons we've done this.

(ECF No. 11-73 at pp. 37-38.)

The trial court sentenced Keith, who had been jailed since around March 2001, to a maximum term of 15 months' imprisonment with credit for time served. Keith was released that day. (*Id.* at pp. 38-39.)

The next day, on November 1, 2002, an article was published in the Erie Times News about Keith's case. This article contained the following information:

> Assistant District Attorney Robert Sambroak said the DA's Office had no choice but to drop most of the case against Keith, 22.
>
> The state Attorney General prosecutor's decision to drop conspiracy charges against Treiber before his capital murder trial last month, as well as a lack of strong evidence against Keith, left them with no alternative, Sambroak said.
>
> "In our view, [the plea deal] was just the thing to do given what happened in the Treiber case and the problem we know to exist with the testimony of Jamie Pianta (against Keith)," he said. "No conspiracy was left when the commonwealth dropped the conspiracy charges against Treiber."
>
> "In our view, the bad guy has been convicted. This was the fairest and best way to resolve the rest of the case," Sambroak said.

(ECF No. 11-73 at p. 41) (parenthetical "(against Keith)" contained in the article).

In Claim V, Treiber claims that the statements made by Attorney Sambroak at Keith's October 31, 2002 hearing, and then to the newspaper reporter, evidenced that the Commonwealth knew that testimony given by Pianta at Treiber's trial was unreliable. He asserts that, therefore, the Commonwealth's reliance on Pianta's testimony at his trial, when it knew but did not disclose that Pianta's testimony was unreliable, violated his right to due process. *Napue v. Illinois*, 360 U.S. 264, 271 (1959); *Brady v. Maryland*, 373 U.S. 83 (1963).

The Pennsylvania Supreme Court denied Claim V because it concluded it was available to Treiber to raise in a post-sentence motion and then on direct appeal. Since Treiber did not raise

Claim V until the PCRA proceeding, the Pennsylvania Supreme Court held Treiber waived it under state law. *Treiber II*, 121 A.3d at 460 ("As the PCRA court properly held, [Claim V] is waived for failure to raise it on direct appeal.") (citing 42 Pa.C.S. § 9544(b) (the PCRA's waiver rule).

**Discussion**

The Commonwealth asserts that because the Pennsylvania Supreme Court denied Claim V as waived, this Court must deny it as procedurally defaulted. In response, Treiber suggests that the Court should not deem Claim V to be procedurally defaulted because the Pennsylvania Supreme Court also gave an alternative reason when it denied it, concluding that the claim also lacked merit. *Treiber II*, 121 A.3d at 460. In support of this argument, Treiber cites *Harris v. Reed*, 489 U.S. 255, 266 (1989), in which the Supreme Court held that a state court decision does not bar federal habeas review of a claim under the procedural default doctrine unless it "clearly and expressly" relies on state procedural grounds when it disposes of the claim.

Treiber's argument is not persuasive. The Pennsylvania Supreme Court "clearly and expressly" held that he waived Claim V under state law. That it also gave an alternative holding on the merits is irrelevant. *Harris*, 489 U.S. at 264 n.10 ("a state court need not fear reaching the merits of a federal claim in an alternative holding. By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law."); *Johnson v. Pinchak*, 392 F.3d 551, 558 (3d Cir. 2004) ("Where a state court refuses to consider a petitioner's claim because of a violation of state procedural rules, a federal habeas court is barred by the procedural default doctrine from considering the claims[.]… The fact that [the

state courts] made reference to the merits of the case as an alternative holding does not prevent us from finding procedural default.")

Thus, Treiber procedurally defaulted Claim V. Anticipating that the Court would reach this conclusion, Treiber also argues that he can establish "cause and actual prejudice" to excuse his default. A petitioner may avoid the default of a claim by showing "cause for the default and actual prejudice as a result of the alleged violation of federal law[.]" *Coleman*, 501 U.S. at 750. "'Cause' under the cause and prejudice test must be something *external* to the petitioner, something that cannot fairly be attributed to him[.]" *Id.* at 753 (emphasis in original). "The existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986).

Treiber asserts that the Commonwealth's alleged "suppression of its disbelief of Pianta's testimony as reliable establishes cause and prejudice for his default" of Claim V. (ECF No. 47 at p. 142 (citing *Strickler v. Greene*, 527 U.S. 263, 282 (1999)). The Court rejects this argument. Treiber had ample opportunity during the PCRA proceeding to develop evidence, if it existed, to support his allegation that the Commonwealth suppressed any information about Pianta.[40] For example, during discovery in the PCRA proceeding he requested that the Commonwealth produce

---

[40]    The Court recognizes that whether Treiber can establish "cause and actual prejudice" to overcome the default of Claim V is a matter of federal law that would not have been at issue in Treiber's PCRA proceeding. Nevertheless, the assertions that Treiber makes on the merits of Claim V (that the Commonwealth knew, but did not disclose, that Pianta's testimony was unreliable) overlaps with the argument he makes as to why he can overcome the default of Claim V (that the Commonwealth purportedly suppressed the information as to why it had determined Pianta's testimony was unreliable). Thus, the time for Treiber to gather and introduce into the record evidence to support his assertion that the Commonwealth suppressed information was during the PCRA proceeding. That was one of the reasons this Court denied Treiber's request to conduct further discovery on Claim V in this federal habeas case. (ECF No. 99 at p. 15) ("Petitioner has not shown that it is necessary for him to develop the record beyond what occurred during the PCRA proceeding.")

"all information in [its] possession…regarding the Commonwealth's public averments that [its] witness James Pianta is unreliable." (PCRA Ct. Op. 9/16/08, ECF No. 85-9 at p. 38.)

In response to this request, the Commonwealth stated "that it does not have the requested information and that Assistant District Attorney Robert Sambroak indicated that his statements were based upon information disclosed in the trial discovery phase and the trial evidence. He claims that his comments were not based on any other undisclosed information." (*Id.* at pp. 38-39.) The PCRA court accepted this response but determined that it would still "conduct an *in camera* review of the District Attorney's file relative to any agreements or arrangements with Pianta and/or Keith." (*Id.* at p. 39.) On September 18, 2008, Attorney Sambroak provided to the PCRA court the District Attorney's files for Pianta and Keith as directed. (ECF No. 11-4 at p. 4.) Then, in a letter dated September 23, 2008 and sent by the PCRA court to the parties, the PCRA court explained the results of its review. (*Id.* at pp. 5-6.)

Moreover, Attorney Sambroak (who made the statements at issue in this claim), Assistant Attorney General Anthony Krastek (who prosecuted the Commonwealth's case against Treiber), Attorney Latouf (Keith's attorney) and Treiber's trial counsel (Attorneys Lucas and George) all testified at the PCRA hearings. Treiber has not directed this Court to testimony given by any of them that supports his allegation that the Commonwealth suppressed any information about Pianta. (*See also* PCRA Ct. Op. 3/27/12, ECF No. 11-3 at pp. 1-5.)

In conclusion, Claim V is denied because it is procedurally defaulted and there are no grounds to excuse Treiber's default of it. Because jurists of reason would not "find it debatable whether [Claim V] states a valid claim of the denial of a constitutional right and…whether [this

Court] was correct in its procedural ruling," *Slack*, 529 U.S. at 484, a certificate of appealability is denied with respect to Claim V.

### Claim VI(a)

In what the Court will refer to as Claim VI(a), Treiber asserts that the Commonwealth interfered at trial with the ability of the defense to call Keith as a witness. He claims that the Commonwealth violated *Brady* because it withheld knowledge that Keith would exercise his Fifth Amendment rights at Treiber's trial. The Commonwealth knew this information, Treiber claims, because Keith and the Commonwealth had an agreement, which he alleges the Commonwealth suppressed, that Keith would not testify for Treiber in exchange for favorable consideration in Keith's own case.

To prevail on a *Brady* claim, the petitioner has the burden of proving: (1) favorable evidence was suppressed by the prosecution; and, (2) the suppressed evidence was material. *See*, *e.g.*, *Slutzker v. Johnson*, 393 F.3d 373, 386 (3d Cir. 2004); *see also Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

### Background

In support of this claim, Treiber relies on a statement Keith made in a declaration he signed early in the PCRA proceeding, dated June 2, 2007. Keith stated: "Attorney Latouf spoke with the prosecutor and told me that it was agreed that I would not testify for [Treiber] and instead would plead the 5th and that way I could still help the prosecutor but without lying against [Treiber]." (ECF No. 11-50 at p. 5.)

When Attorney Latouf testified at the PCRA hearing, however, he provided no testimony to substantiate what Keith had stated in his declaration. In fact, Attorney Latouf testified that he

advised Keith to invoke his Fifth Amendment rights solely because he felt that it was in Keith's best interest to do so. Attorney Latouf testified that he also instructed Keith not to talk to anyone about the case. (PCRA Hr'g Tr., 7/7/09, at pp. 14, 20-22.) Attorney Latouf did not testify that there was any *quid pro quo*, explicit or implicit, between the Commonwealth and Keith about Keith invoking his Fifth Amendment rights at Treiber's trial in exchange for favorable treatment in his own criminal case.

Attorney Krastek, who represented the Commonwealth at Treiber's trial, similarly testified during the PCRA proceeding that no discussions about Keith's invocation of his Fifth Amendment rights ever took place. (PCRA Hr'g Tr., 6/7/11, at pp. 8-13.)

As for Keith, when he testified in 2010 during a PCRA hearing, the PCRA court sustained the Commonwealth's hearsay objection to him testifying about the statement he made in his 2007 declaration. (PCRA Hr'g Tr., 10/21/10, at pp. 76-77.) Treiber's counsel was permitted to ask Keith about conversations he had with Attorney Latouf regarding whether he would testify at Treiber's trial, however. (*Id.* at pp. 75-77.) Keith testified: "[Attorney Latouf said to me] I don't want you talking to anybody and testifying for anybody whatsoever. He basically said the best thing that you could do is not say nothing to nobody, and that's how it's going to stay. That's what he told me I needed to do." (*Id.*)

Keith also suggested that he knew the charges against him would be dropped before the October 31, 2002, hearing in his case but that he did not know why. He testified: "Like I said, I didn't know of any dealings or anything like that. All's I was told was that the charges were going to be withdrawn, dismissed, because obviously I didn't do anything. That's about as far as it went there. I like said, I mean, that's to my knowledge. I mean, I didn't do anything so…" (*Id.* at p. 79.)

After considering the testimony given at the PCRA hearings from all relevant individuals, the PCRA court denied Claim VI(a), determining that it was "baseless." (PCRA Ct. Op. 3/27/12, ECF No. 11-3 at p. 1.) In so holding, the PCRA court rejected the factual premise of the Claim VI(a), which was that there was an explicit or implicit understanding between the Commonwealth and Keith, which the Commonwealth suppressed, that he would invoke his Fifth Amendment rights and not testify for Treiber in exchange for favorable treatment in his own criminal case. (*Id.* at pp. 1-2.)

The Pennsylvania Supreme Court affirmed the PCRA court's disposition of Claim VI(a). It held that "the record supports the factual finding that no agreement existed[.]" *Treiber II*, 121 A.3d at 462.[41]

**Discussion**

Because the Pennsylvania Supreme Court denied Claim VI(a) based on findings of fact and credibility determinations made by the PCRA court, the two provisions of AEDPA that pertain to such findings by the state courts–§ 2254(e)(1) and § 2254(d)(2)–provide the relevant standards under which this Court must review the claim.[42]

As explained above, under § 2254(e)(1) this Court is bound by the credibility determinations and findings of fact that the PCRA court made unless Treiber produced "clear and convincing evidence" that the PCRA court was wrong. *See also Vickers*, 858 F.3d at 850 n.9 (even

---

[41]    The Pennsylvania Supreme Court also observed that Treiber waived Claim VI(a). It then explained that "because the Commonwealth does not argue waiver, we will address the claim on the merits." *Treiber II*, 121 A.3d at 461. Thus, although there is an issue about whether Treiber may have defaulted Claim VI(a), this Court need not address that issue because the state court provided an alternative, merit-based decision for denying it, and it is more efficient for this Court to simply deny the claim on the merits.

[42]    Given that the findings of fact made by the state court are dispositive here, there is no basis for this Court to conclude that the state court's adjudication of Claim VI(a) was "contrary to, or an unreasonable application of" *Brady* or any other decision by the Supreme Court.

in pre-AEDPA cases, "'federal habeas courts [had] no license to redetermine credibility of witnesses whose demeanor ha[d] been observed by the state trial court, but not by them'") (quoting *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983) (bracketed text added by the Third Circuit Court)). And, as explained above, the standard of review at § 2254(d)(2) requires that Treiber show that the Pennsylvania Supreme Court's adjudication of a claim "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." "[A] state court decision is based on an 'unreasonable determination of the facts' if the state court's factual findings are 'objectively unreasonable in light of the evidence presented in the state-court proceeding,' which requires review of whether there was sufficient evidence to support the state court's factual findings." *Dennis*, 834 F.3d at 281 (quoting § 2254(d)(2) and citing *Miller-El*, 537 U.S. at 340).

Treiber has not met his burdens under § 2254(e)(1) and (d)(2). He argues that this Court does not owe deference to the credibility and factual determination made by the PCRA court because the PCRA court allegedly deprived him of the opportunity to develop the facts during the PCRA proceeding.[43] That is not an accurate description of what occurred during the PCRA hearings, however. As explained above, Attorney Latouf, Attorney Krastek and Keith testified during the PCRA hearings about this claim.

Moreover, the Pennsylvania Rules of Evidence apply to PCRA hearings and the fact that the PCRA court sustained the Commonwealth's objection to Treiber's attempt to introduce hearsay evidence through Keith is not, as Treiber describes it, "procedural unfairness." It certainly does

---

[43]    Treiber argued in his appellate brief to the Pennsylvania Supreme Court that "[t]he PCRA court improperly prevented [his] counsel from inquiring into and making a record of the understanding Keith and his counsel reached with the Commonwealth prior to [Treiber's] trial." (ECF No. 11-87 at p. 45.) The Pennsylvania Supreme Court held that Treiber waived this issue because he did not raise it in his Rule 1925(b) Statement. *Treiber II*, 121 A.3d at 475.

not establish that Treiber was not given the opportunity to appropriately develop the record on this claim during the PCRA proceeding. Simply put, the evidentiary rulings the PCRA court made with respect to Claim VI(a) do not provide a means by which Treiber can overcome the deference this Court must afford the credibility determinations and findings of fact the PCRA court made in disposing of the claim.

For all these reasons, Claim VI(a) is denied because there is no basis on the record before this Court to determine that Treiber has overcome AEDPA's deference to the state courts' factual determinations that preclude relief on this claim. A certificate of appealability is also denied.

### Claim VI(b)

During the PCRA proceeding, Treiber established that the police housed Pianta and his girlfriend in a local motel for around one month during March and April 2001 at the cost of around $525.00. *Treiber II*, 121 A.3d at 462. In Claim VI(b), Treiber asserts that the Commonwealth violated the rule of *Brady* because it withheld information of this "financial benefit" from the defense. Had the defense known of this information, Treiber contends, the defense could have presented it as substantive evidence and also during cross-examination of Pianta to cast doubt on his credibility and truthfulness.

#### Background

The Commonwealth does not dispute that it did not disclose the information at issue to the defense. Not every failure to disclose, however, warrants relief under *Brady*. As explained above, to prevail on a *Brady* claim the petitioner must also establish that the suppressed evidence was material. The Commonwealth argued during the PCRA proceeding, as it does to this Court, that the suppression of the information at issue in Claim VI(b) was not material.

Evidence is material, the Supreme Court has explained, only if it could be shown that "'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985) (opinion of Blackmun, J.)).

> [A] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant). *Bagley's* touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial." *Bagley*, 473 U.S., at 678, 105 S. Ct., at 3381.

*Id.* at 434 (additional internal citations omitted). The materiality test "is not a sufficiency of evidence test." *Id.*[44]

When it denied Claim VI(b), the PCRA court agreed with the Commonwealth that the suppressed information was not material. It held that the police's arrangements with Pianta "was not an inducement or emolument provided in exchange for Pianta's cooperation. Rather, these arrangements were made because Pianta feared [Treiber]." (PCRA Ct. Op. 3/27/12, ECF No. 11-2 at p. 2.) To support this conclusion, the PCRA court cited testimony given by Lt. Michael Kabasinski at a PCRA hearing. Lt. Kabasinski testified that when he and other investigators first interviewed Pianta in March 2001, they sensed he was hesitant to answer their questions because

---

[44]     The effect of the suppressed evidence must be "considered collectively, not item by item." *Kyles*, 514 U.S. at 436. As explained above, the PCRA court found as fact, in disposing of Claim VI(a), that there was no explicit or implicit agreement between Keith and the Commonwealth that was suppressed. There are therefore no other items of suppressed information to consider collectively when the Court evaluates whether the withheld information at issue in Claim VI(b) was material.

he was afraid of Treiber. After all, Treiber was his landlord and so knew and had access to the place where Pianta and his girlfriend lived. (PCRA Hr'g Tr., 8/4/11, at pp. 34-35.) To address this, Lt. Kabasinski testified, the police arranged for Pianta and his girlfriend to be housed at a local hotel for a time. (*Id.* at pp. 35-36.)

The Pennsylvania Supreme Court affirmed the PCRA court's decision. It observed that "[Treiber] fails to acknowledge that Mr. Pianta was essentially placed in a witness protection program because he feared [Treiber] would retaliate after he implicated him in the arson and murder, especially due to the fact that, as his landlord, [Treiber] knew where he lived and had access to his apartment." *Treiber II*, 121 A.3d at 462. It concluded that the suppressed information "was not material or helpful to [Treiber], as it would have raised the inference he would retaliate." *Id.* "Thus," it held, "we find [Claim VI(b)] lacks merit, as the evidence would not have changed the result of [Treiber's] trial in his favor and thus was not *Brady* material." *Id.*

**Discussion**

Treiber argues that the Pennsylvania Supreme Court's adjudication was "contrary to" *Kyles* because it applied an outcome-determinative materiality standard. As explained above, however, the Supreme Court has instructed federal habeas courts to give decisions of state courts "the benefit of the doubt[,]" *Visciotti*, 537 U.S. at 24, and has cautioned that the "readiness to attribute error is inconsistent with the presumption that state courts know and follow the law." *Id.*

With these principles in mind, the Court concludes that Treiber has not met his burden of showing the Pennsylvania Supreme Court actually applied an incorrect materiality standard, particularly because it set forth the correct standard at the beginning of the section in which it discussed his *Brady* claims. *Treiber II*, 121 A.3d at 461. Thus, Treiber has not shown that the

Pennsylvania Supreme Court's adjudication of Claim VI(b) was "contrary to" *Kyles* (or any other relevant Supreme Court precedent) under § 2254(d)(1).

Nor has Treiber demonstrated that the Pennsylvania Supreme Court's materiality determination "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. Because he has not done so, this Court cannot conclude that the Pennsylvania Supreme Court's adjudication was an "unreasonable application of" *Kyles* (or any other relevant Supreme Court precedent) under § 2254(d)(1).[45]

Accordingly, Treiber has not overcome AEDPA's standard of review with respect to Claim IV(b) and it is denied for that reason. A certificate of appealability is also denied.

## Claim VII

In Claim VII, Treiber argues that the trial court violated his Sixth Amendment right to an impartial jury and the due process right to a fundamentally fair trial when it failed to voir dire the remaining jurors after it dismissed one of the jurors.

### Background

On the fifth day of Treiber's trial, the trial court's tipstaff received a note from a juror advising her of inappropriate behavior and comments made by another juror the night beforehand. The reporting juror stated that another juror became very drunk at a restaurant the night beforehand, "ramble[d] on about the case[,]" and "implied he would find [Treiber] guilty." (Trial Tr., Day 5, at pp. 3-4.)

---

[45]    Treiber does not argue that the state court's adjudication of Claim VI(b) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding[,]" under § 2254(d)(2). (*See* ECF No. 47 at pp. 150-54; ECF No. 83 at 50.)

The trial court, in chambers and in the presence of all counsel, questioned the tipstaff, the accused juror and two other jurors who interacted with the accused juror at the restaurant. (*Id.* at pp. 3-13.) After hearing this testimony, the trial court dismissed the accused juror. (*Id.* at pp. 30-31.) As the dismissed juror was leaving chambers, he said, "this is fucking bullshit." (*Id.* at p. 34.) There was no sign that the other jurors heard this comment. (*Id.* at pp. 34-35.)

Everyone then returned to the courtroom and the trial court asked the entire jury panel whether any of them felt they could not be fair or impartial. No juror suggested that his or her fairness or impartiality had been affected and the trial proceeded. (*Id.* at pp. 48-51.) Trial counsel did not object to the process employed by the trial court.

As discussed above, Treiber asserts in Claim VII that the trial court's alleged failure to adequately question the remaining jurors violated his rights to a fair trial and due process under the Sixth and Fourteenth Amendments. The Pennsylvania Supreme Court held that Treiber waived Claim VII because the defense did not object at trial to the process employed by the trial court and then challenge any alleged trial court error on direct appeal. *Treiber II*, 121 A.3d at 463 (citing 42 Pa. Cons. Stat. § 9544(b) (the PCRA's waiver rule).

**Discussion**

Because Treiber waived Claim VII under state law, the Commonwealth asserts that this Court must deny it as procedurally defaulted. Treiber argues in response that trial counsel's failure to preserve the issue at trial amounts to sufficient "cause" to excuse his default of this claim and that, therefore, this Court should review Claim VII de novo.

The Supreme Court has recognized that attorney error that constitutes ineffective assistance of counsel under *Strickland* can constitute "cause" for relief from a procedural default. *Coleman*,

501 U.S. at 753-54. Treiber cannot, however, rely on his trial counsels' alleged ineffective assistance to avoid his default here. Concerned with comity and the prospect of placing federal courts in the anomalous position of adjudicating unexhausted claims, the Supreme Court requires that "a claim of ineffective assistance of counsel [must] be presented to the state courts as an independent claim before it may be used to establish procedural default." *Murray*, 477 U.S. at 488-89. This Treiber failed to do, since he did not exhaust during the PCRA proceeding the claim that trial counsel was ineffective for failing to challenge the process employed by the trial court when it dismissed the juror. (*See* ECF No. 11-87 at pp. 5-6.) Thus, Treiber cannot rely on his trial counsel's alleged ineffective assistance to overcome his default of Claim VII.

Another exception to the procedural default rule applies in the rare case when the petitioner shows a "fundamental miscarriage of justice" would occur if the federal habeas court does not review a claim on the merits. This exception, which the Supreme Court recognized in *Schlup v. Delo*, 513 U.S. 298, 316 (1995), provides a "gateway" through which the federal habeas court can examine the merits of an otherwise defaulted claim if the petitioner has new evidence of his "actual innocence" that is "so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error[.]"[46] 513 U.S. at 316. *See also McQuiggin v. Perkins*, 569 U.S. 383 (2013); *see, e.g.*, *Reeves v. Fayette*, SCI, 897 F.3d 154, 157 (3d Cir. 2018). "'Actual innocence' means factual innocence, not mere legal insufficiency." *Sistrunk v. Rozum*, 674 F.3d 181, 191 (3d Cir. 2012) (quoting *Bousley v. United States*, 523 U.S. 614, 623 (1998)).

---

[46]    This type of "gateway" actual innocence claim is different from a "freestanding" actual innocence claim discussed in footnote 27, *supra*.

Treiber briefly asserts in his Reply that he can avoid his default of Claim VII because he allegedly proved during his PCRA proceeding that he is "actually innocent." (ECF No. 83 at p. 51.) This argument has no merit. Treiber has not established that this is the rare case in which a "fundamental miscarriage of justice" will occur if the Court does not permit him to avoid the default of Claim VII (or of any of his other defaulted claims, for that matter).

Thus, based on the above, Claim VII is denied as procedurally defaulted. Because jurists of reason would not "find it debatable whether [Claim VII] states a valid claim of the denial of a constitutional right and…whether [this Court] was correct in its procedural ruling," *Slack*, 529 U.S. at 484, a certificate of appealability is denied with respect to Claim VII.

## Claim VIII

In Claim VIII, Treiber asserts that trial counsel was ineffective for failing to present evidence of his good character during the guilt phase of the trial to bolster his credibility. He also asserts that such evidence could also have been introduced as substantive evidence that might have independently created a reasonable doubt in the minds of the jurors. Specifically, Treiber contends that trial counsel should have presented good character testimony from his parents, Edith and Kenneth; his friends, Bonnie and Charlie Condon; and, his former employer, Gerald Niebauer.[47] (ECF No. 10, ¶ 170.) He maintains that these witnesses would have testified as to his reputation in the community as a peaceful, honest, and law abiding citizen. Had trial counsel presented this available good character evidence, Treiber argues, there is a reasonable probability that at least

---

[47]    Kenneth Treiber and Gerard Niebauer testified at the penalty phase as a defense witness but not during the guilt phase. Edith Treiber testified in the guilt phase as a defense witness but Attorney Lucas did not ask her any questions about her son's character.

one juror would have credited some or all of his testimony and thus formed a reasonable doubt as to his guilt.

### Background

The PCRA court denied Claim VIII on its merits. (PCRA Ct. Op. 3/27/12, ECF No. 11-3 at pp. 19-20.) It credited Attorney Lucas' PCRA hearing testimony that he and Attorney George explored the possibility of presenting character evidence but ultimately decided against it. (*Id.* at p. 20, citing PCRA Hr'g Tr., 8/10/09, at pp. 67-69, 99-102.) The PCRA court then summarized Attorney Lucas' PCRA hearing testimony relevant to Claim VIII and determined that Treiber had not established the performance prong of an ineffective assistance claim (and thus it did not address the prejudice prong). It held:

> Although [trial counsel] interviewed a number of people, there was a "down side" to calling them. First, calling [Treiber's] parents as character witnesses would have been of little or no value, even assuming counsel could have shown sufficient evidence of community.[48] Second, there was evidence of [Treiber's] bad character, such as his involvement with other fires (approximately nine) committed while he was a juvenile and adult. *Id.* at 67-68, 100-102. Third, [Treiber] had been previously convicted of trespass and had been accused of thefts from Joe's Gym, an establishment frequented by [Treiber] and whose denizens were potential character witnesses. *Id.* at 101.[49] Therefore, trial counsel faced a dilemma based upon [Treiber's] checkered past. Had they presented character evidence, this would have opened the door to negative character evidence on rebuttal, including the possibility of specific incidents of bad acts or criminal conduct. See, Pa. R. E. 405(a). *Id.* at 101. Therefore, there was a rational basis for counsels' decision and

---

48    Attorney Lucas testified: "At least in my experience, calling a mother and father to testify about good character in a homicide case doesn't carry a lot of weight with juries. That's just been my own personal experience. So I would never have strongly considered calling them as character witnesses." (PCRA Hr'g Tr., 8/10/09, at p. 100.)

49    On this point, Attorney Lucas testified that, according to his recollection, Treiber "was barred from [Joe's Gym] because he was stealing—he was convicted of trespass,… he was stealing supplements or vitamins. There were some other things but, in fact, there was the whole issue of a lot of people who knew him and liked him but were suspicious of other fires and what his involvement may have been in other fires. He was never charged, but many of those individuals had knowledge or street knowledge of the fact that a lot of things seemed burned." (PCRA Hr'g Tr., 8/10/09, at pp. at 101-02.)

viewing their actions through the lens of hindsight analysis does not render [t]his strategy ineffective.

(*Id.*)

In his appeal to the Pennsylvania Supreme Court, Treiber argued, in relevant part, that it was objectively unreasonable for trial counsel not to call his parents as character witnesses. (ECF No. 11-87 at p. 8.) He also noted that the Commonwealth had stipulated during the penalty phase of his trial that he *had no prior convictions*. Therefore, Treiber pointed out, Attorney Lucas was incorrect when he stated during his PCRA testimony that Treiber had been *convicted* of trespass.[50] (*Id.*) Finally, Treiber argued that the PCRA court's evidentiary ruling with respect to negative character evidence was erroneous because Pennsylvania law does not permit "[c]ross-examination of character witnesses with prior misconduct not resulting in conviction[.]" (*Id.*, citing *Commonwealth v. Morgan*, 739 A.2d 1033 (Pa. 1999)).

In its responsive appellate brief, the Commonwealth did not contest Treiber's argument that the PCRA court erred when it repeated Attorney Lucas' reference to a prior trespass conviction, since Treiber had no such conviction. The Commonwealth maintained, however, that aside from making that one misstatement, Attorney Lucas otherwise articulated during his PCRA testimony a "reasonable strategic basis for his decision not to call character witnesses during the guilt phase of the trial[,]" and that that "decision was not the product of a lack of diligence on the part of counsel, but rather a strategic decision based on the bad reputation that Treiber had made for himself[.]" (ECF No. 11-91 at p. 13.)

---

[50]    Attorney Lucas testified at a 2009 PCRA hearing, almost seven years after Treiber's trial. Therefore, it is understandable that he misremembered this detail or misspoke.

The Pennsylvania Supreme Court agreed with the Commonwealth. It also rejected Treiber's assertion that the PCRA court misapplied the relevant state rules of evidence when it denied relief on Claim VIII. It held:

> [W]e conclude, as did the PCRA court, that after exploring the possibility of presenting good character evidence, counsel had a reasonable, strategic basis in not calling character witnesses. "While character witnesses may not be impeached with specific acts of misconduct, a character witness may be cross-examined regarding his or her knowledge of particular acts of misconduct to test the accuracy of the testimony." [*Commonwealth v. Puksar*, 951 A.2d 267, 281 (Pa. 2008)] (citation omitted). Counsel testified at the PCRA evidentiary hearings that [Treiber] had minimal evidence of good character and substantial bad character evidence— specifically, the involvement in nine other fires, some of which were ruled as arsons—and he did not want to risk introduction of that evidence. Accordingly, trial counsel was not ineffective for failing to present good character evidence.

*Treiber II*, 121 A.3d at 464.[51]

**Discussion**

The only part of AEDPA's standard of review that is implicated in this Court's review of Claim VIII is that which requires that Treiber show that the Pennsylvania Supreme Court's adjudication was "an unreasonable application of," 28 U.S.C. § 2254(d)(1), *Strickland* or any other

---

[51]    The Pennsylvania Supreme Court also noted that Treiber failed to identify the potential character witnesses that trial counsel should have called and his failure to do so "alone is grounds to deny relief." *Treiber II*, 121 A.3d at 464. Treiber claims that the Pennsylvania Supreme Court's ruling in this regard was an "unreasonable determination of the facts" under 28 U.S.C. § 2254(d)(2) because *the beginning* of his appellate brief, in the section in which he summarized the evidence he presented at the PCRA hearing, contained this single sentence: "Further, [Treiber] presented witnesses at the PCRA hearing who testified to his good character and would have been willing to do so at trial, if they had been asked. NT 8/11/09 at 9-10, 18, 20 [the Condons' PCRA testimony]; NT 8/12/09 at 9-10 [Niebauer's PCRA testimony])." (ECF No. 11-86 at p. 23.) Treiber did not, however, identify or discuss the testimony of any potential character witnesses in the discussion section of his brief in which he addressed the merits of Claim VIII (ECF No. 87 at pp. 6-9.), which is likely why the Pennsylvania Supreme Court made the observation it did.

In any event, the Pennsylvania Supreme Court denied Claim VIII for the alternative and independent reason set forth in the above-quoted paragraph: trial counsel articulated a reasonably strategic basis for not presenting character witnesses.

decision from the Supreme Court.[52] Treiber has not met his burden. He challenges the Pennsylvania Supreme Court's evidentiary ruling and reliance on *Commonwealth v. Puksar*, 951 A.2d 267 (Pa. 2008), but this Court cannot "reexamine state-court determinations on state-law questions." *Estelle*, 502 U.S. at 67-68.

Additionally, trial counsel's decision not present character evidence during the guilt phase of the trial is precisely the type of strategic decision that the Supreme Court held is protected from second-guessing. *Strickland*, 466 U.S. at 690-91. As the Supreme Court has explained, "[e]ven under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is 'all too tempting' to 'second-guess counsel's assistance after conviction or adverse sentence.'" *Richter*, 562 U.S. at 105 (quoting *Strickland*, 466 U.S. at 689). When AEDPA's standard of review applies, as it does here, the burden upon a petitioner "is all the more difficult[,]" because this Court is applying "double" deference. *Id.* That is, "the question" for this Court "is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.*

Here, the Pennsylvania Supreme Court held that trial counsels' challenged conduct fell within the wide range of reasonable professional assistance. Its decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any

---

[52]    Treiber does not make any argument that would require this Court to evaluate the Pennsylvania Supreme Court's adjudication of Claim VIII under § 2254(d)(1)'s "contrary to" clause. And, as explained in footnote 51, his assertion that its adjudication was an "unreasonable determination of the facts" is neither persuasive nor relevant given the alternative and primary reason it gave for denying Claim VIII, which is set forth above.

possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. Thus, Treiber has not satisfied his burden of proving that its adjudication was an "unreasonable application of" *Strickland*.

In conclusion, Claim VIII is denied because the state court's adjudication of it withstands review under AEDPA's standard of review. A certificate of appealability is also denied.

## Claim IX

In Claim IX, Treiber contends that he was erroneously denied his constitutional right to represent himself at trial in violation of the rule of *Faretta v. California*, 422 U.S. 806 (1975). He also contends that Attorney Lucas was ineffective for failing to preserve the *Faretta* claim before the trial court and then on direct appeal.

### Background

On the seventh day of the trial, near the end of the guilt phase, Treiber informed the court that he wanted to dismiss his counsel and represent himself. (Trial Tr., Day 7, at pp. 3-13.) During an in-chambers colloquy held after Treiber made his request, Treiber told the court that he had "[i]rreconcilable differences" with his counsel, explaining: "I don't agree with the way it's being done at this point. I feel I'd be more effective if I finished it myself. So I plan on doing it. It's almost over anyhow. With as little as is left I feel I'm capable of [representing myself]." (*Id.* at p. 8.) Treiber stated that it was not his intention to delay the case and that he had drafted his own closing argument and was prepared to give it. (*Id.* at p. 12.)

The trial court explained to Treiber that "[t]he law is generally that the defendant has a right to represent himself or herself under *Faretta v. California*, [and] Pennsylvania cases that have followed it." (*Id.* at p. 9.) The trial court further informed Treiber: "However, once you get into the trial itself, that right is not absolute." (*Id.*)

The trial court then denied Treiber's request and gave several reasons for its decision, including Treiber's lack of legal competency and technical proficiency. The trial court also noted that Treiber's self-representation would disrupt the proceedings. (*Id.* at pp. 9-13.)

After the trial concluded, Treiber, through Attorney Lucas, filed a post-trial motion in which he argued that the trial court erred and abused its discretion when it denied his request to represent himself. The trial court denied this motion, holding:

> It is well-settled that a defendant has a right of self-representation under both the Federal and Pennsylvania Constitutions. *See, Faretta v. California*, 422 U.S. 806 (1975); *Commonwealth v. Starr*, 664 A.2d 1326 (Pa. 1995). However, "this right may be limited or waived, for instance, if it is not raised before trial." *See*, *Commonwealth v. Vaglica*, 673 A.2d 371, 373 (Pa. Super. 1996), citing *Commonwealth v. Owens*, 436 A.2d 129 (Pa. 1981).
>
> > The Superior Court noted in *Vaglica* that:
> >
> > [in] justifying the need to timely raise the right of self-representation, Courts have recognized among other things, the need to minimize disruptions, to avoid inconvenience and delay, to maintain continuity, and to avoid confusing the jury. *U.S. v. Dunlap*, 577 F.2d 867 (4th Cir. 1978). In light of these objectives, when the request for self-representation is asserted after "meaningful trial proceedings have begun" the granting of the right rests within the trial judge's discretion. *See*, *U.S. v. Lawrence*, 605 F.2d 1321 (4th Cir. 1979).
>
> *Id.* at 373. *See also*, *Commonwealth v. Waskovich*, 805 A.2d 607, 612 (Pa. Super. 2002). In *Commonwealth v. Jermyn*, 709 A.2d 849 (Pa. 1998) the Pennsylvania Supreme Court noted its approval of the Superior Court's holding in *Vaglica*. *Id.* at 863.
>
> > Here, the defendant sought to represent himself when the guilt phase of the trial was nearly complete. Therefore, he would have been representing himself during the final portion of that phase, as well as the penalty phase. There is absolutely no question, especially given his performance on the witness stand, that to allow him to represent himself would have caused a disruption, inconvenience, delay and would have confused the jury. Moreover, it would have been absurd to allow him to represent himself in this capital case when he had two experienced counsel to assist him. Therefore, the Court properly exercised its discretion in disallowing his request to act as his own attorney.

86

(Tr. Ct. Op., 2/27/03, ECF No. 11-1 at pp. 23-25 (footnotes omitted)).

Treiber, through Attorney Lucas, challenged the trial court's decision on direct appeal. Attorney Lucas did not raise a *Faretta* challenge to the trial court's decision to deny Treiber's request to represent himself. (ECF No. 11-84 at p. 15.) Rather, Attorney Lucas acknowledged that when a defendant moves for self-representation *during* the trial, the law in Pennsylvania (and in other jurisdictions) is that the rule of *Faretta* does not apply and the trial court has the discretion to deny the defendant's request. (*Id.* at pp. 15-16, citing *Commonwealth v. Jermyn*, 709 A.2d 849 (Pa. 1998) and *Commonwealth v. Vaglica*, 673 A.2d 371 (Pa. Super. Ct. 1996)).[53] Attorney Lucas then argued that the trial court's decision to deny Treiber's motion for self-representation was an abuse of discretion that justified a new trial. (*Id.* at pp. 16-19.)

The Pennsylvania Supreme Court adjudicated that abuse-of-discretion claim on the merits in *Treiber I.* It first observed that "[b]ecause [Treiber] made his request to represent himself during trial, the grant of such right was within the trial court's discretion." *Treiber I*, 874 A.2d at 32 (citing *Jermyn*, 709 A.2d at 863). The Pennsylvania Supreme Court then held that the trial court did not abuse its discretion and denied the claim. *Id.*

In his PCRA proceeding, Treiber once again challenged the trial court's decision to deny his motion for self-representation. This time, however, Treiber's challenge was based on a new

---

[53]    *Jermyn* and *Vaglica* both cited *Commonwealth v. Owen*, 436 A.2d 129 (Pa. 1981). In *Owen*, the Pennsylvania Supreme Court cited decisions from the federal courts of appeals for the proposition that:

> Where the accused does not request to represent himself before trial, the constitutional right to self-representation recognized in *Faretta v. California*, 422 U.S. 806, 95 S. Ct. 2525, 45 L.Ed.2d 562 (1975), is not implicated. When, during the course of trial, an accused wishes to dismiss counsel and either represent himself or obtain new counsel, his request is addressed to the sound discretion of the trial court.

436 A.2d at 133 n.6.

legal theory. He asserted that the trial court's decision to deny his request was not a discretionary one. Rather, he claimed, once he expressed his desire to represent himself, the rule of *Faretta* (and Pennsylvania's corresponding rule of criminal procedure) *required* that the trial court colloquy him to ensure that he was making a knowing, voluntary and intelligent waiver his constitutional right to assistance of counsel. Treiber asserted that because the trial court did not conduct that colloquy, and instead denied his request for self-representation based on factors that were irrelevant to a proper *Faretta* inquiry, a structural error occurred that, if it had been properly preserved, would have automatically entitled him to a new trial. (ECF No. 11-87 at pp. 9-11.) *See also McKaskle v. Wiggins*, 465 U.S. 168, 177 n.8 (1984) ("the right to self-representation is either respected or denied; its deprivation cannot be harmless.")

Treiber also claimed that Attorney Lucas, in his role as trial counsel and then direct appeal counsel, was ineffective for failing to preserve and litigate the *Faretta* claim. Treiber asserted that he was prejudiced by Attorney Lucas' alleged deficient performance because, if counsel had "properly litigated [his] *Faretta* claim, there is a reasonable probability that the trial court and/or [the Pennsylvania Supreme Court on direct appeal] would have reached a different decision." (*Id.* at p. 11.)

Not surprisingly, under the PCRA a petitioner cannot re-litigate issues that were previously decided on direct appeal. To obtain relief under the PCRA, a petitioner must prove, among other things, that an "allegation of error *has not been previously litigated*[.]" 42 Pa.C.S. § 9543(a)(3). Under the PCRA, "an issue has been previously litigated" if "the highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits *of the issue*[.]" 42 Pa.C.S. § 9544(a)(2) (emphasis added). Importantly, under the PCRA, "'an issue may not be

88

relitigated merely because *a new or different theory is posited as a basis for reexamining an issue that has already been decided*.'" *Boyd v. Waymart*, 579 F.3d 330, 367 (3d Cir. 2009) (Hardiman, J., in Part III) (emphasis added) (quoting *Commonwealth v. Senk*, 4437 A.2d 1218, 1220 (Pa. 1981)).

In *Treiber II*, the Pennsylvania Supreme Court held that Treiber's *Faretta* claim was "previously litigated" because he challenged the trial court's decision to deny his motion for self-representation on direct appeal. 121 A.3d at 464. Therefore, Pennsylvania prohibited him from challenging the trial court's decision again in a PCRA proceeding under a new or different legal theory. *Id.*

Accordingly, the only claim available to Treiber in his PCRA proceeding was that Attorney Lucas was ineffective for failing to raise the *Faretta* claim at trial and then on direct appeal. *Id.* The Pennsylvania Supreme Court denied this claim for procedural reasons, holding that this "cursory claim of ineffectiveness is waived for failure to develop it in any meaningful fashion capable of review." *Id.* (citing *Commonwealth v. Walter*, 966 A.2d 560, 566 (Pa. 2009) (an appellant can waive claims for failing to develop them), which cited *Commonwealth v. Steele*, 961 A.2d 786, 798 n.12 (Pa. 2008) (considering inadequate appellant's single-sentence assertions in the brief)).

**Discussion**

Before this Court in Claim IX, Treiber raises a freestanding *Faretta* claim and contends that the trial court violated his constitutional right to self-representation because it refused to honor his voluntary and intelligent request to represent himself at trial. He also claims that Attorney

Lucas was ineffective for failing to preserve and litigate the *Faretta* claim at trial and on direct review.[54]

There are somewhat complicated issues related to whether Treiber procedurally defaulted some or all of the grounds for relief that he asserts in Claim IX. Because neither the freestanding *Faretta* claim nor the related ineffective assistance of counsel claim has merit, this Court need not dwell on the procedural default issues and instead will simply review them de novo. *Lambrex*, 520 U.S. at 525 (habeas court may avoid the more complex issue of procedural default and evaluate the claim on the merits if it is more efficient to do so.)

As Respondents point out, the Supreme Court has recognized that "the right to self-representation is not absolute… and most courts require" a defendant to move for self-representation "in a timely manner." *Martinez v. Ct. of Appeal of California, Fourth App. Dist.*, 528 U.S. 152, 162 (2000). As explained above, that is the rule in Pennsylvania. *Jermyn*, 709 A.2d at 863 (citing *Owens*, 436 A.2d at 133 n.6); *Vaglica*, 673 A.2d at 373.

Pennsylvania law in this way is consistent with many other jurisdictions. As the Court of Appeals for the Eighth Circuit has explained, "[i]t is fundamental…that the right to self-representation is unqualified only if demanded before trial. Once trial commences, that right is subject to the trial court's discretion which requires a balancing of the defendant's legitimate interests in representing himself and the potential disruption and possible delay of proceedings already in progress." *United States v. Wesley*, 798 F.2d 1155, 1155-56 (8th Cir. 1986) (internal

---

[54]    For a discussion of claims asserting trial counsel was ineffective for failing to preserve and litigate a structural error *see Weaver v. Massachusetts*, 582 U.S. 286 (2017); *Stoffa v. Zaken*, 2024 WL 1243056, at *8 (W.D. Pa. Mar. 22, 2024), aff'd sub nom., 2025 WL 2159094 (3d Cir. July 30, 2025); *Rega v. Wetzel*, 2018 WL 897126, at *48 (W.D. Pa. Feb. 15, 2018), aff'd sub nom., 115 F.4th 235 (3d Cir. 2024).

citations omitted). *See also Buhl v. Cooksey*, 233 F.3d 783, 795 (3d Cir. 2000) (collecting cases for the proposition that a request to proceed pro se is made in a timely manner if it is asserted *before* trial); *United States v. Mayes*, 917 F.2d 457, 462 (10th Cir. 1990) (district court did not abuse its discretion when it denied the defendant's request to proceed pro se on the third day of a four-day trial).

Thus, since Treiber moved for self-representation during his trial, the *Faretta* rule did not apply to him. Therefore, the trial court did not violate his federal constitutional rights in the way it handled his motion. Anticipating this conclusion, Treiber argues that even if the trial court's decision to deny his motion was discretionary with respect to the *guilt phase* of his trial, the *Faretta* rule required that he be permitted to represent himself during the *sentencing phase* of his trial because that phase had not begun when he made his request. This argument has no merit because the Pennsylvania Supreme Court "has consistently described the guilt and penalty portions of a capital trial as being 'phases' of the same trial." *Jermyn*, 709 A.2d at 863-64.

For all these reasons, a *Faretta* claim was unavailable to Treiber during his trial or on direct appeal. And because counsel cannot be ineffective for failing to raise a meritless claim, *see, e.g.*, *Werts*, 228 F.3d at 203, Treiber has not satisfied his burden of establishing that Attorney Lucas' handling of the matter fell below an objective standard of reasonableness (*Strickland's* first prong). Nor has he shown, had Attorney Lucas preserved and litigated a *Faretta* claim, that there is a reasonable probability that the outcome of either his trial or direct appeal would have been different.

For all these reasons, Claim IX is denied. A certificate of appealability is also denied.

## Claims X(a)

In what the Court will refer to as Claim X(a),[55] Treiber asserts that trial counsel was ineffective for failing to present testimony from a fire investigation expert during the defense's case-in-chief.

### Background

To support Claim X(a), Treiber relies on the PCRA hearing testimony of David Redsicker. He is the fire investigation expert that trial counsel retained and consulted before the trial, but did not call to testify at trial. Treiber cites portions of Redsicker's PCRA hearing testimony (PCRA Hr'g Tr., 8/11/09, at pp. 53-96) to support his contention that, if trial counsel had called Redsicker (or another fire expert like him), the defense could have created reasonable doubt in the mind of at least one juror as to his guilt because Redsicker's testimony would have: (1) cast doubt on the Commonwealth's theory that Treiber used a delay device to start the fire; (2) corroborated Treiber's testimony that the extreme temperatures and excessive smoke caused by the fire prevented him from saving Jessica; and, (3) supported the conclusion that the clothes of the guilty party would have retained a strong odor of gasoline, and Treiber's own clothes tested negative for the presence of an accelerant.

During his PCRA hearing testimony, Attorney Lucas explained why the defense opted not to call an expert fire examiner, and discussed his walkthrough of the crime scene with Redsicker.

---

[55] Claim X is comprised of four subclaims. Treiber contends that trial counsel was ineffective for failing to investigate and present during the defense's case-in-chief: (1) expert evidence to rebut the Commonwealth's canine DNA evidence; (2) a fire expert; (3) a mental health expert to rebut the Commonwealth's evidence of his indifferent demeanor; and, (4) a financial expert to rebut the Commonwealth's theory that Treiber was in financial distress before the fire. Treiber also raised the first and fourth subclaims in Claim I and Claim III, respectively, and therefore they have already been addressed and denied by the Court. As for the remaining subclaims, the Court will refer to the one pertaining to a fire expert as "Claim X(a)," and the one pertaining to a mental health expert as "Claim X(b)."

(PCRA Hr'g Tr., 8/10/09, at pp. 51-53.) The PCRA court credited this testimony when it denied

Claim X(a), explaining that Treiber had not established *Strickland's* deficient performance and

prejudice prongs. It held:

> At trial, the Commonwealth presented the testimony of Deputy State Fire Marshall Trooper Paul McGuire. N.T. Trial (Day 2), 10/01/02, at 3 *et seq.* McGuire began his examination of the scene when the fire was still in progress. *Id.* at 21. After excluding other causes, he concluded that there were two unconnected points of origin, one in the garage and one in the basement of the home. *Id.* at 3, 113-114. He also testified that various accelerants were used *i.e.*, straw gasoline and a candle. *Id.* at 209. The accelerants used in the basement acted as a delay device. *Id.*
>
> Mr. Lucas consulted a fire expert, David Redsicker, prior to trial but did not call him as a witness. Mr. Lucas correctly determined there was no dispute that the fire was the result of an arson. N.T. PCRA Hearing (Day Two), 8/10/09, at 51. Mr. Lucas was concerned that Redsicker believed that [Treiber's] basement window had been opened in order to provide oxygen to fuel the fire. *Id.*, at 52. Moreover, Redsicker pointed to a potential third point of origin in the upstairs hallway near [Treiber's] and the baby's [Jessica's] bedroom. *Id.*, at 52. Mr. Lucas, therefore, made a reasonable, strategic choice not to call Redsicker as there was a down side to his testimony (a third point of origin). *Id.*, at 53. Accordingly, [Treiber] failed to satisfy [*Strickland*'s deficient performance prong].
>
> Moreover, [Treiber] was not prejudiced by Mr. Lucas's decision not to call Redsicker as a witness. Redsicker testified at the PCRA evidentiary hearing. *See* N.T. PCRA Hearing (Day 3), 8/11/09, at 53 et seq. Redsicker did not dispute McGuire's opinion regarding the points of origin. *Id.* at 61. He also confirmed that when Mr. Lucas consulted him, Lucas sent him various documents to review. *Id.* at 57, et seq. Included was McGuire's report. Although he said that he did not discuss the subject of a delay device with Mr. Lucas (*Id.* at 68), that information was contained in McGuire's report. *Id.* at 81-82. Therefore, it is reasonable to assume that given his expertise, if he disagreed with McGuire on that point, he would have—and should have—informed Mr. Lucas. Because he did not, Lucas had no reasonable basis upon which to assume McGuire might be mistaken. Moreover, Redsicker could not rule out the possibility that that [sic] the straw, gasoline and candle could were [sic] used as a delay device. *Id.*, at 76-84.
>
> As to [Treiber's] claim that Redsicker would have testified at trial that there would have been gasoline on [Treiber's] clothes had he started the fire, that conclusion would not have been admissible because it is pure speculation. *Id.*, at 77, 88.
>
> Finally, Redsicker's testimony concerning the intensity of the fire on the second floor (which [Treiber] argues prevented him from saving [Jessica], would not have materially contradicted the Commonwealth's trial evidence.[28]

> [28] Denise Riddle testified that [Treiber] attempted to enter [Jessica's] room after the fire started. N.T. Trial (Day 3), 10/2/02, at 125. Therefore the jury had that evidence (arguably favorable to [Treiber]) to consider.

(PCRA Ct. Op. 3/27/12, ECF No. 11-2 at pp. 47-51.)

The Pennsylvania Supreme Court agreed with the PCRA court's disposition of the claim and its conclusion that Treiber failed to demonstrate either of *Strickland's* prongs. *Treiber II*, 121 A.3d at 465-666, and explained:

> [T]he mere failure to call an expert rebuttal witness is not per se ineffectiveness, and counsel need not introduce such expert if he effectively cross-examines the Commonwealth's witnesses and elicits helpful testimony. *See Chmiel*, at 1143 (citations omitted). [Treiber] fails to argue counsel's cross-examination of the fire marshal was inadequate. Our review of the record demonstrates counsel effectively cross-examined the fire marshal and elicited helpful testimony in support of the defense theory that an unknown intruder committed the arson. *See* N.T. Trial, 10/1/02, at 134-44 (questioning as to evidence of forced entry in home and possibilities that may have shown intruder committed arson). Thus, counsel was not ineffective.
>
> We also conclude the PCRA court correctly determined [Treiber] failed to establish the reasonable basis and prejudice prongs of the ineffectiveness test. As the court pointed out, Mr. Redsicker indicated a possible third point of origin located outside Jessica's bedroom. His testimony, therefore, would have diminished the defense's theory that an intruder committed the arson and supported the Commonwealth's theory that [Treiber] burned the house to murder Jessica. Thus, counsel had a reasonable basis for not calling Mr. Redsicker. Moreover, [Treiber] does not explain how counsel's failure to call Mr. Redsicker prejudiced him; he focuses only on the cumulative effect of counsel's alleged errors, arguing counsel could have significantly weakened the Commonwealth's case by calling experts in canine DNA, mental health, arson, and accounting. [Treiber] claims, without support, that the outcome of the guilt phase would have been different had counsel offered this expert testimony and properly impeached the fire marshal. Accordingly, [Treiber] fails to establish prejudice.

*Id.* at 466.

**Discussion**

The Pennsylvania Supreme Court's adjudication of Claim X(a) withstands the Court's review of it under AEDPA. It held that Treiber failed to establish that trial counsel's decision not

to present testimony from a fire investigation expert was objectively unreasonable under *Strickland*. Treiber does not specifically argue that the state court's decision on this first prong of an ineffective assistance of counsel claim was "contrary to" *Strickland* under § 2254(d)(1), or an "unreasonable determination of the facts" under § 2254(d)(2), let alone establish that he has overcome either of these provisions of AEDPA's standard of review. (*See* ECF 47 at pp. 191-97; ECF 83 at pp. 70-72.)

Thus, as to *Strickland's* first prong, the only remaining question for the Court is whether Treiber has established that the state court's adjudication was an "unreasonable application" of *Strickland* § 2254(d)(1). Treiber contends that it was, but none of his arguments are persuasive. As explained above, "[i]n answering this question, [this Court] owe[s] deference to both [trial counsel's decision not to call a fire investigation expert] *and* the state court." *Dunn*, 594 U.S. at 739 (emphasis in original). Thus, Treiber's burden "is all the more difficult." *Richter*, 562 U.S. at 105. He has not met it here.[56]

In conclusion, Claim X(a) is denied because the state court's determination that Treiber failed to establish *Strickland's* first prong survives review under AEDPA. A certificate of appealability is also denied.

## Claims X(b)

In what the Court will refer to as Claim X(b), Treiber asserts that although trial counsel was ineffective for failing to present testimony from a mental health expert during the defense's

---

[56]    Treiber also challenges the state court's adjudication of *Strickland's* prejudice prong. But since he has not satisfied *Strickland's* first prong, this Court need not address the prejudice prong.

case-in-chief to explain his emotionally "flat affect" or indifferent demeanor that some witnesses observed he displayed during and after the fire.

**Background**

The PCRA court denied Claims X(b) because it determined, among other things, that Treiber failed to establish that trial counsel's performance fell below and objective standard of reasonableness (*Strickland's* first prong). In so doing, the PCRA court provided a lengthy summarization of the evidence introduced during the PCRA hearings relevant to this claim (as well as the related penalty-phase claim, Claim XI, which is discussed next). Because a review of that evidence is necessary to assess Claim X(b) (as well as Claim XI), and because the PCRA court made important findings of fact and credibility determinations that are binding on this Court, much of the PCRA court's decision relevant to Claim X(b) (as well as to Claim XI) is set forth in full, except for that part of its decision in which it provided lengthy quotations from letters Treiber wrote to Attorney George.[57, 58]

The PCRA court held:

> In spite of [Treiber's] failure to cooperate with them, [trial] counsel explored the possibility of presenting mental health evidence. In late 2001/early 2002 [Attorney George] was hired to assist the defense, primarily the penalty phase of the case. N.T. PCRA Hearing (Day 8), 10/22/10, at 7. From the beginning of Attorney George's involvement, continuing to the time of trial, [Treiber] resisted spending time and money purely on the penalty phase. He made it clear to Attorney

---

[57]    In these letters, Treiber expressed his desire that trial counsel focus on the guilt phase of the case. He also stated that did not want to spend money to develop mental health mitigating evidence and he would likely kill himself if he was convicted.

[58]    As discussed above, Treiber's mother, Edith, testified during the penalty phase about Treiber's 1991 car accident. Treiber was treated at Hamot Hospital. Dr. Marc Flitter was his treating neurological surgeon at Hamot. Treiber was discharged from Hamot to in-patient care at Lake Erie Institute of Rehabilitation ("LEIR") in April 2, 1991. Dr. Michael Schwabenbauer was Treiber's treating neuropsychologist from his admission until his discharge from in-patient care on April 19, 1991. Treiber presented testimony from Dr. Flitter and Dr. Schwabenbauer, among several other experts, in support of this claim and the related ground for relief at Claim XI.

George that he wanted him to work on the guilt phase of the trial with Lucas. *Id.,* at 19, 24. [Treiber] "withdrew" and was not an active participant in the penalty phase. Through correspondence and conversations, [Treiber] expressed his unwillingness to assist with the penalty phase investigation and instructed Attorney George on several occasions to instead focus on the guilt phase. *Id.,* at 29, 34-35, 153-157.

 …

 Attorney George testified that [Treiber] never wavered from his position that he would not participate in the penalty phase in an effort to argue for a life sentence. *Id.,* at 157.

 In [a mitigation questionnaire that Treiber completed at Attorney George's request], [Treiber] claimed his family had a history of mental illness and that his parents never expressed any emotional support. *Id.,* at 27, 28. [Treiber] claimed he was a hyperactive child and had been on juvenile probation for stealing a letter. *Id.,* at 27, 83. He mentioned a 1991 accident and resulting head injury. *Id.,* at 27, [Treiber] also indicated that, "If I lose, I lose/I don't care about the death phase." *Id.,* at 27.

 - - -

 Prior to trial, Attorney George consulted two mental health experts. He spoke with Dr. Michael Schwabenbauer, a psychologist, and Mr. Steven Reilly, an expert forensic psychologist, to determine whether [Treiber] had a cognitive defect or mental impairment. *Id.,* at 146-147. Attorney George wanted their guidance to develop a mental health component at both the guilt and penalty phases. *Id.,* at 147. Attorney George was also relying on them to make the appropriate referrals to other specialists, if necessary. *Id.,* at 147. Attorney George provided them with [Treiber's] medical records, including Hamot Medical Center records from March 21, 1991 (1991 accident) to 2002. *Id.,* at 170.[24] Based upon Dr. Schwabenauer's review of the records and Reilly's psychological assessment that there was no cognitive impairment or emotional deficit, Attorney George ultimately concluded there was no evidence to support a mental health component of the defense. *Id.,* at 105. Therefore, Attorney George did not call them as witnesses. *Id.,* at 168, 169.

> [24] On January 2002, George requested Hamot records from 1991 to "the present," *i.e.,* 2002. *Id.,* at 170. George testified he provided Schwabenbauer and Reilly with the entire record. *Id.,* at 91-92, 170. Neither Schwabenbauer nor Reilly asked for additional records, despite George's willingness to provide them. *Id.,* at 147.

 At the PCRA hearing, Dr. Schwabenbauer testified that he had been consulted. He testified that Attorney George requested that he perform neuropsychological testing on [Treiber]. According to Schwabenbauer, George never provided him with the Hamot 1996 records. N.T. PCRA hearing, 06/01/11, at 43. Dr. Schwabenbauer also testified that he told George to have [Treiber] examined by a neuropsychologist specializing in traumatic brain injury. *Id.,* at 47.

As noted above, Attorney George testified that on March 22, 2002, he met with Schwabenbauer and reviewed [Treiber's] records. N.T. PCRA Hearing (Day 8), 10/22/10. at 108-110. Schwabenbauer told him that: (1) [Treiber's] recovery from the 1991 accident was good; (2) [Treiber] did not lose control of his emotions; (3) [Treiber] never lost consciousness, which suggested no long lasting or serious brain injury; (4) [Treiber] showed no signs of residual cognitive deficit; and (5) [Treiber's] CT scan reflected that he was in the "mild range" of head injuries. *Id.*, at 112-113, 160. Schwabenbauer never requested additional records and never advised Attorney George to consult with a neuropsychologist or psychiatrist. *Id.*, at 159 171. Attorney George sensed that Schwabenbauer was not anxious to get involved or help develop the penalty issue. *Id.*, at 113-114.

On April 11, 2002, Attorney George wrote Schwabenbauer, requesting he test [Treiber] for any neurological deficits. On May 7, 2002, Attorney George received Schwabenbauer's letter that indicated his unwillingness to participate further. Attorney George testified that Schwabenbauer offer to refer him to other qualified psychologists. *Id.*, at 130. However, he never mentioned a referral to a neuropsychologist, nor did he suggest a psychiatric assessment. *Id.*, at 131. After review, this Court finds that Attorney George's PCRA hearing testimony in this regard to be credible.

During the trial preparation stage, Mr. Reilly concluded that [Treiber] did not suffer from any mental abnormalities. However, at the PCRA evidentiary hearing, Reilly testified he was never provided with the 1996 Hamot medical records. N.T. PCRA Hearing (Day 2), 08/10/09, at 115. Moreover, he says that he was not provided with [Treiber's] juvenile record, which included a psychological report from Dr. Frank Pizzat. *Id.* He now claims that these records would have caused him to recommend neuropsychological testing. *Id.*, at 116-117. *See also*, Reilly Deposition, 06/07/11, [Treiber's] Exhibit Volume 30, No. 1 & 2.

Attorney George testified that he contacted Mr. Reilly because he had a forensic background as a clinical psychologist, was affordable, and was well respected in the legal community. *Id.*, at 85, 149. George was aware that he was not a neuropsychologist; however, he wanted him to identify any issues for the defense. *Id.*, at 121, 149. Mr. Reilly concluded that [Treiber] did not suffer from any mental abnormalities. Contrary to Reilly's testimony, Attorney George testified that Reilly never told him to hire a neuropsychologist or a psychiatrist. N.T. PCRA Hearing (Day 8), 10/22/10, at 167. Reilly also never requested additional records. *Id.*, at 164, 167. On these points, this Court finds Attorney George to be the credible witness.

On April 22, 2002, Attorney George wrote Reilly, requesting he evaluate [Treiber] about his lack of emotion/flat affect. *Id.*, at 39-40, 85 (At the PCRA hearing, George testified he had a "dual purpose"—guilt phase (emotion/flat affect) along with the penalty phase (cognitive deficits)). *Id.*, at 40-41.

On April 24, 2002, during a phone conversation, Reilly informed Attorney George he would review [Treiber's] records, and perform intelligence, verbal, knowledge and mechanical reasoning tests. *Id.*, at 87-88. Mr. Reilly first wanted to

98

see if [Treiber] had any cognitive deficits <u>before</u> comparing other records. *Id.*, at 148, 162. He also informed Attorney George that a frontal lobe injury would not explain why [Treiber] acted without emotion. *Id.*, at 88.

On April 25, 2002, during another phone conversation, Reilly told Attorney George he had spoke with a Dr. Robert M. Dowling (a forensic psychologist who practices in [the] same building). Dr Dowling told Reilly that if the accident affected [Treiber's] emotion or ability to respond appropriately, there must have been a deep intrusion as opposed to simply damage to the frontal lobe. *Id.*, at 89-90[,] 166. (In both phone calls, Attorney George and Reilly never discussed the particulars of the medical records. *Id.*, at 126.)

Also on April 25, 2002, Attorney George sent Mr. Reilly payment and medical records, including the Hamot medical records <u>for the period 1991 to 2002</u>. *Id.*, at 91.

Reilly met with [Treiber] on May 13, 2002 (interview), May 20 2002 (WAIS III test) and May 27, 2002. *Id.*, at 43. After one of the meetings, [Treiber] wrote Attorney George and told him that Reilly was useless and not worthwhile. *Id.*, at 42.

On June 12, 2002, Attorney George received Reilly's report, indicating that [Treiber] did not suffer from any mental abnormalities. *Id.*, at 12. Attorney George contacted Reilly and discussed [Treiber's] 1996 emergency room visit for a headache brought on by weightlifting. Reilly told him the 1996 incident was "too isolated." *Id.*, at 94, 96.

Attorney George testified he did not provide Reilly with prison records. However, had Reilly requested them George would have provided them to him. *Id.*, at 101. George did not supply Reilly with [Treiber's] school records because Reilly concluded that [Treiber] was not experiencing any current problems. *Id.*, at 117.

As to [Treiber's] claim that his 1991 head injury was the cause of his "flat affect," Mr. Lucas and Attorney George had been told that [Treiber] <u>did not suffer</u> any psychiatric or emotional problems associated with that event. N.T. PCRA Hearing (Day 2), 08/10/09, at 57-59; N.T. PCRA Hearing (Day 8), 10/22/10, at 12, 105, 168-169. Moreover, [Treiber] and his parents indicated to Mr. Lucas that [Treiber's] flat affect was a family trait predating the 1991 accident. N.T. PCRA Hearing (Day 2), 08/10/09, at 59, 89-90. In addition he <u>was</u> capable of expressing emotion as evidenced by his behavior with Denise Riddle (N.T. Trial (Day 3), 10/02/2002, at 79-80) and his reaction to the Millcreek Township Authority when [Treiber] helped his parents rebuild their house (after their own fire). *See*, Opinion at [infra].

Accordingly, Mr. Lucas made a strategic decision not to call Mr. Reilly or another expert because Reilly would not have attributed [Treiber's] flat affect to a psychological or neurological impairment. *Id.* Rather, he introduced evidence of [Treiber's] flat affect through the testimony of his mother, Edith Treiber, within the context of [Treiber's] and his family's emotion traits. *Id.* at 89-90; N.T. Trial (Day 7), 10/07/02, at 33.

In regard to the penalty phase, counsel explored a mental health component, but were stymied by [Treiber's] lack of cooperation and information they received from Dr. Schwabenbauer and Mr. Reilly.[26] In particular, Attorney George testified that:

> The reason that there was no psychiatrist or forensic psychiatrist retained is because I was looking for an evaluation. I received a record review from Dr. Schwabenbauer, and I received a complete psychological assessment from a clinical psychologist, forensic clinic psychologist [Mr. Reilly]. Following the evaluation performed by Mr. Reilly there was no issue. There was no red flag according to him that cause him and, as a result, me to think this mental health component that we were attempting to develop for purposes of both the guilt[] phase and the penalty phase had any merit.

N.T. PCRA Hearing (Day 8), 10/22/10, at 105. Attorney George concluded that, in the absence of persuasive evidence, an attempt to introduce "weak" proof would be "akin" to fostering a portrayal of [Treiber] as calculated and deceptive. *Id.*, at 59, 60.

> [26] [Treiber] also claims trial counsel should have interviewed Elizabeth Spriegel, a former employee of LEIR. He claims that she would have told counsel to retain a neuropsychologist. Spriegel Deposition, 06/21/11, ([Treiber's] Volume 32, No. 1) a 30-31. Ms. Spriegel was a psychology associate who did not perform any formal testing on [Treiber]. *Id.*, at 10. Furthermore, when Attorney George initially spoke to her she did not recall treating [Treiber]. Because she was not helpful to the case and given what Dr. Schwabenbauer and Mr. Reilly told Attorney George, trial counsel was not ineffective for not contacting her to discuss the case.

Of critical importance is the fact that the Commonwealth's mental health experts, as well as [Treiber's], concluded that [Treiber] could perform the mental functions of daily life, including the operation of a business that required sophistication. The Pennsylvania Supreme Court has declined to find counsel ineffective for failing to proffer testimony from a mental health professional to establish a mitigating circumstance where there is no showing that such testimony was indicated by evidence of mental illness, or that such testimony would have been beneficial in terms of altering the outcome of the penalty phase [of the trial.] *Commonwealth v. Howard*, 719 A.2d 233, 238 (Pa. 1998) (citations omitted).

In summary, given the available evidence at [the] time of trial, there would have been no reasonable basis for Mr. Lucas or Attorney George to

100

present mental health testimony, especially in light of [Treiber's] lack of cooperation and the fact that Dr. Schwabenbauer and Mr. Reilly would not render opinions that would have furthered [Treiber's] cause. Therefore, [Treiber] has failed to satisfy [*Strickland's* first prong]. *See*, *Commonwealth v. Gribble*, 580 Pa. 647 863 A.2d 455, 460 (2004) (noting that, under *Strickland*, this Court requires defendant to prove not only that counsel arguably should have chosen the path not taken, but also that the path counsel did take was objectively unreasonable.)

Turning to the PCRA hearing, PCRA counsel and the Commonwealth presented the testimony of a number of mental health experts. This Court will discuss their testimony.

On June 13, 2011, the parties deposed [Treiber's] expert, Dr. Neil Blumberg, a forensic psychiatrist. Blumberg Deposition. 06/13/11 ([Treiber's] Exhibit Volume 24, No. 1-2), at 6. He reviewed records and performed a forensic psychiatric evaluation. Dr. Blumberg diagnosed [Treiber] with personality change due to traumatic brain injury (which reflected extreme mental disturbance and substantial impairment) and attention deficit hyperactivity disorder. *Id.*, at 14-15, 43-44. He also opined that [Treiber's] ability to express emotions appropriately was significantly limited. *Id.*, at 41, 43.

On cross-examination, Dr. Blumberg stated that [Treiber's] family history of mental illness would not have been relevant to his mental state. *Id.*, at 61. Moreover, he testified to [Treiber's] parents' unemotional and detached personalities. *Id.*, at 62. However, Dr. Blumberg found it significant that [Treiber] was able to acquire and manage his real estate business. *Id.*, at 64-64.

On May 23, 2011, the parties deposed [Treiber's] PCRA expert, Marc A. Flitter. He is a board-certified neurological surgeon who treated [Treiber] from his 1991 head injuries. Flitter Deposition 05/23/11, at 6. Dr. Flitter had no independent recollection of treating [Treiber], but testified solely from his review of the records. *Id.*

Dr. Flitter testified that: (1) [Treiber] suffered a closed-head injury as a result of the 1991 accident (*Id.*, at 11, 37); (2) [Treiber] suffered brain damage as a result (*Id.*, at 16-17); (3) [Treiber] complained of headaches in 1996 (*Id.*, at 31); and, (4) the headaches appeared to be remote effects of the 1991 head injury (*Id.*, at 39). When asked whether this could have affected [Treiber's] emotional affect, he stated, "It certainly can." *Id.*, at 40.

However, Dr. Flitter conceded that he had no contact with [Treiber] after 1996 (*Id.*, at 44-45) and could not refute the findings of [Treiber's] attending psychiatrist who, in 1991, indicated that [Treiber's] prognosis was excellent and that "his abilities for social leisure and community participation were equal for those prior to the injury." *Id.*, at 46. Therefore, his proffered testimony would not have refuted the Commonwealth's evidence of [Treiber's] "flat affect."

[Treiber's] PCRA expert neuropsychologist, Dr. Jonathan Mack, Psy.D., testified at the PCRA hearing. He concluded that [Treiber] suffered from decreased mental processing speed, short-term memory problems, changes in emotional regulation, impairment in higher level cognitive skills, including verbal reasoning, inappropriate responses (preservation) and mood issues. N.T. PCRA Hearing (Day 5), 08/13/09, at 19-21. He opined that, based upon [Treiber's] medical records (including Dr. Pizzat's 1980 diagnosis of minimal brain dysfunction)[27] [Treiber] has neuropsychological impairment and brain damage. N.T. PCRA Hearing (Day 5), 08/13/09, at 10, 63, 68-76. During his testimony, Mack stated that [Treiber] may have met the "extreme mental distress mitigator" [at § 9711(e)(2)] and that he met the "substantially impaired" mitigator [at § 9711(e)(3)]. *Id.*, at 82.

> [27] In 1980, [Treiber] saw Dr. Pizzat for setting fires and for general behavioral problems. *Id.*, at 113-114. This latter point is quite significant because had Dr. Mack testified at trial—or the death penalty phase—this evidence would have been admissible and the jury would have learned that the commission of arson was not a new aspect of [Treiber's] behavior.

However, on cross-examination, Dr. Mack conceded that: (1) [Treiber] could plan, manage, and operate a real estate rental business; (2) adjusted well to a structured environment; and, (3) could work successfully with others. *Id.*, at 84, 111.

Mack's conclusions concerning [Treiber's] cognitive defects were convincingly contradicted by [the] Commonwealth's experts, Dr. Timothy J. Michals and Dr. John E. Gordon, as well as the trial record. Dr. Michals, an expert in clinical forensic psychiatry, disagreed with all of Dr. Mack's findings. He opined that [Treiber] was not suffering from any mental disorder at the time of the offense, nor was he under extreme mental or emotional disturbance at the time of the offense. N.T. PCRA Hearing (Day 5), 08/13/09, at 118-119. Moreover, [Treiber] was able to appreciate the criminality of his conduct and could conform his conduct to law. *Id.*, at 120.

On May 20 2009, Dr. Michaels performed a forensic mental health evaluation of [Treiber]. He did not find any emotional or cognitive impairment. *Id.*, at 127. Moreover, he found no personality change due to traumatic brain injury. *Id.*, at 128. Importantly, he concluded that [Treiber's] flat affect or unemotional response about his daughter was not related to the 1991 injury. *Id.*, at 135. In fact, [Treiber] did not exhibit a flat affect when Michael's examined him. *Id.*, at 136. Dr. Michals concluded that [Treiber's] unemotional response to his daughter's death was due to his narcissistic and antisocial traits. *Id.*, at 140-41.

Dr Gordon, a neuropsychologist, reviewed [Treiber's] records and Dr. Mack's report and testimony. He disagreed with Dr. Mack's methodology and conclusions. Dr. Gordon opined that [Treiber] was not substantially impaired and had the capacity to conform his conduct to the law. Gordan Deposition, 4/22/10,

Commonwealth Exhibit 11a., at 9-10. In arriving at his conclusions, he noted the following factors: (1) when discharged from the rehabilitation head trauma center (LEIR) in 1991 (following the accident), the neuropsychologist found [Treiber] was able to comprehend information, reason, and solve problems; (2) after the 1991 accident, [Treiber] was able to pass a union carpenter examination and continued to manage his real estate properties; (3) [Treiber] was able to adapt to prison, demonstrating his ability to control impulses; (4) when comparing [Treiber's] IQ tests from childhood until present he concluded the 1991 accident did not impact his measured IQ; (5) test results showed that [Treiber] was not within the impaired range and his functioning returned to normal; (6) Dr. Mack's testing data was incomplete and inaccurate; (7) test results showed [Treiber] was able to problem solve and scored high in his ability to reason. [Treiber] also showed good concentration and speech; and, (8) there was no evidence of attention/concentration problems. *Id.*, at 11, 13-17, 20-26, 32, 53-54 and 56. Dr. Gorden also found that [Treiber's] parents observed that [he] had difficulty expressing his emotions before the 1991 accident.

(PCRA Ct. Op. 3/27/12, ECF No.11-1 at pp. 33-50) (additional footnotes omitted; emphasis in original). "Based upon the above," the PCRA concluded, trial counsel's "decisions [were] reasonable in light of the extant circumstances." (*Id.* at 47.)

In disposing of Claim X(b) on appeal, the Pennsylvania Supreme Court held that "while [Treiber] offers extensive argument as to counsel's ineffectiveness for failing to present mental-health evidence during the penalty phase [Claim XI, discussed next].… he fails to explain why counsel had no reasonable basis for his guilt phase decisions or how the outcome would have been different[.]" *Treiber II*, 121 A.3d at 466-67. The Pennsylvania Supreme Court therefore held that Treiber waived Claim X(b) "as underdeveloped." *Id.* at 467 (citing *Walter*, 966 A.2d at 566).

**Discussion**

The Commonwealth contends that because the Pennsylvania Supreme Court denied Claim X(b) as waived, this Court must deny it as procedurally defaulted. In response, Treiber asserts that the waiver rule the Pennsylvania Supreme Court applied when it denied Claim X(b) is not "adequate."

This Court need not address whether Treiber procedurally defaulted Claim X(b). Instead, the Court has determined that, under de novo review, Claim X(b) is denied for the same reasons given by the PCRA court. *Lambrex*, 520 U.S. at 525 (habeas court may avoid the more complex issue of procedural default and evaluate the claim on the merits if it is more efficient to do so.)

The Court proceeds this way for two reasons. First, under § 2254(e)(1) this Court is bound by the crucial, and in many ways determinative, factual and credibility findings made by the PCRA court. That is because Treiber has not met his burden of rebutting, by "clear and convincing evidence," the presumption of correctness this Court must accord to the PCRA court's findings under § 2254(e)(1). Second, the Court also finds that the PCRA court's analysis of Claim X(b)—which thoroughly and persuasively explained why the claim lacked merit under the findings of fact and credibility determinations made by it—requires no further explication. Therefore, because the Court finds the PCRA's disposition of Claim X(b) to be persuasive, this Court adopts it as its own. Stated another way, after undertaking a de novo review of Claim X(b), this Court agrees with the PCRA court that, under the finding of facts and credibility determinations made by it, Treiber failed to demonstrate *Strickland's* first prong.[59]

Based on the above, Claim X(b) is denied. Because jurists of reason would not find it debatable that this claim lacks merit, a certificate of appealability is denied.

### Claim XI

In Treiber's final claim for relief, Claim XI, he contends that trial counsel was ineffective for failing to investigate, develop and present during the penalty phase: (1) expert evidence of his

---

[59]    In so doing, this Court recognizes that the PCRA court's decision denying Claim X(b) is not subject to AEDPA's deferential standard of review at § 2254(d) because the Pennsylvania Supreme Court denied the claim as waived. *See, e.g.*, *Thomas v. Horn*, 570 F.3d 105, 114-17 (3d Cir. 2009).

alleged long-standing organic brain damage and mental health impairments (ECF 10 at pp. 79-89); (2) more evidence of his positive adjustment to prison life (*id.* at pp. 89-91);[60] and (3) additional lay witness testimony from his family and friends, and more detailed testimony from his parents (who did testify during the penalty phase), about his childhood, developmental issues, and family history (*id.* at pp. 91-94.)

Such evidence, Treiber contends, was available at the time of his trial but his counsel failed to investigate, develop and present it. He asserts that trial counsel's decision to abandon presenting evidence of his psychological and sociologic problems in favor of a "life is worse than death" argument was an irrational strategy. He also contends that if trial counsel had conducted a constitutionally adequate investigation, trial counsel could have presented expert psychiatric and neuropsychological testimony, as well as additional lay witness testimony, that would have supported the two mental health mitigating circumstances at § 9711(e)(2) and (3), and the "catch-all" mitigator under (e)(8).

**Background**

As discussed above, during the penalty phase, the defense presented testimony from Treiber's parents, Edith and Kenneth; his former supervisor, Gerald Niebauer; and, his former tenants, Deborah and Jack Harford. Attorney George also introduced into evidence medical records that documented Treiber's care and treatment following his 1991 car accident; Treiber's school transcripts, which included his grades and comments by his teachers; and, Treiber's prison

---

[60]     During the penalty phase of the trial, Attorney George introduced into evidence Treiber's Erie County Prison Inmate Adjustment Summary. (Trial Tr., Day 8, at pp. 102, 134-35) The trial court instructed the jurors that they could consider evidence that Treiber had adapted well in prison and cooperates with prison personnel, among the other relevant evidence submitted by the defense, when each juror determined whether the defense proved by a preponderance of the evidence the "catch-all" mitigating factor at § 9711(e)(8). (*Id.* at p. 125).

records, which summarized his conduct in the Erie County Prison since his arrest. The Commonwealth agreed to stipulate that Treiber had no prior criminal history.

During Attorney George's closing argument, he first argued that, for an individual like Treiber, life imprisonment without parole would be a worse punishment than death. (Trial Tr., Day 8, at pp. 115-18, 123.) Attorney George then reviewed some of the mitigating evidence the defense introduced (*id.* at pp. 118-20) and reminded the jurors that there were also "other factors that weigh in favor of a life sentence," and asked the jurors to consider those factors as well. (*Id.* at p. 121.)

At the conclusion of the sentencing phase of the trial, the jurors reported that they unanimously found beyond a reasonable doubt that the Commonwealth had proven the three aggravating factors put forth by it ((1) that Treiber committed a murder while in the perpetration of a felony; (2) in the commission of the offense, Treiber knowingly created a grave risk of death to another person in addition to the victim; and, (3) the victim was a child under twelve years of age). As for the mitigating factors, the jurors found, as instructed by the trial court, that Treiber had no significant history of prior criminal convictions (the mitigating factor at § 9711(e)(1)). One or more of the jurors also found that Treiber had positive work history (which fell under § 9711(e)(8)'s "catch-all" mitigating factor). The jurors concluded that the aggravating circumstances outweighed the mitigating circumstances and returned a unanimous sentence of death on the first-degree murder conviction.

The PCRA court, in its decision regarding this claim and Treiber's related claim (Claim X(b)), which is quoted in full above, discussed in detail the reasons Attorney George gave during his PCRA hearing testimony as to why the defense did not present expert testimony during

the penalty phase of the trial. As set forth above, the PCRA court determined that, based on

Dr. Schwabenbauer's review of Treiber's medical records and Reilly's psychological assessment

of Treiber that there was no cognitive impairment or emotional deficit, Attorney George concluded

no evidence supported a mental health mitigating factor. ((PCRA Ct. Op. 3/27/12, ECF No. 11-1

at pp. 33-50); *see also* PCRA Hr'g Tr., 10/22/02, at pp. 93-106, 141.)

Attorney George also discussed during his PCRA hearing testimony his decision to present

during the penalty phase of the trial Treiber's Hamot Medical Center records, school records and

the records from the Erie County Prison to the jury without additional testimony or explanation.

He explained that he made the strategic decision to share these records with the jury without

overemphasizing them and detracting from his main theme, which was that in Treiber's case, a life

sentence was worse than death. (PCRA Hr'g Tr., 10/22/02, at pp. 171-76; *id.* at p. 173 ("I was

going to take what [the jury] knew to be true about him, controlling nature, desire for power and

uber control[.]… I wanted to take all those things [the jury] knew to be true about him and say,

look, all right, it's true, but how do you hurt someone like him? You don't hurt him by killing him.

You hurt him by making him live in the very way he loathes. And the best way to do that is to give

him a life sentence so that he has no control, he has no power.")

Attorney George also gave an additional reason as to why he had Treiber's mother, Edith,

discuss his 1991 accident, and not call a medical expert to discuss it. He stated:

> Well, as for the medical records, I wanted Edith Treiber to talk about [Treiber's]
> condition at and after the 1991 motor vehicle accident. I thought that if I had her
> explain his condition, that the prosecutor would be unlikely to try to cross-examine
> her with medical records that would suggest, don't you know that this indicates a
> pretty good recovery. I believed that if I had called a nurse or some other medical
> professional or a psychologist to go through those records, that they would have
> been far more likely to have been subjected to cross-examination by [the

> prosecutor] in a way that would suggest that, hey, look, yes, [the accident] happened, but he appears to have made a pretty good recovery.

(*Id.*, at pp. 171-72.)

Attorney George also discussed why he did not obtain other types of records Treiber faulted him for not gathering. He explained that Reilly would ask for records if he needed them. *Id.*, at p. 56. Attorney George explained that he would have provided Reilly the records if requested. *Id.*, at pp. 58, 66, 72-73.

As for the Gertrude Barber Center records, which reflected that: (1) Treiber's mother was in labor with him for 36 hours; (2) Treiber had a 104 degree fever as a child; (3) Treiber had speech problems and a tongue thrust as a child; and, (4) at the age of five, Treiber's mother referred to him as "backwards," Attorney George testified that he did not obtain these records because:

> I was apprised of consultation with the Barber Center after [Treiber] had submitted to a complete psychological assessment with Mr. Reilly and after Mr. Reilly prepared his report and after I had met and spoke with both Dr. Schwabenbauer and Mr. Reilly. And based upon what Mr. Reilly told me, there being nothing that suggested any cognitive or emotional abnormality or deficit with [Treiber], and coupled with what we knew to be a successful career in real estate and his ability to manage and earn a living based upon not only what we knew—apart from what Mr. Reilly concluded, my view was we had had an assessment. The psychologist obtained a complete history. The psychologist spoke with me both before and after the assessment. It seemed to me that if [Treiber] had no cognitive or emotional deficits in 2002, that anything that happened 20 to 30 years earlier when he was young wouldn't fit into any theory that I was trying to develop for the penalty phase….
>
> In addition to what Mr. Reilly concluded in his report and told me, coupled with what we knew about [Treiber's] development and his achievement despite poor grades, I felt that to try to offer some remote documentation of something that required him to go to the Barber Center, based upon what I understood involved hyperactivity, would in the context of this trial in which the Commonwealth went to great lengths to show that [Treiber] was deceptive, calculating, and attempted to misdirect investigators, that this would smack of more deflection, more deception at the penalty phase.
>
> I believed that if I were to present Gertrude Barber Center records of 20 years earlier in the face of what I knew my own clinical psychologist had told me,

108

there being nothing wrong with [Treiber] at this time, that it would be rejected and completely undermine my efforts to convince the jury that they can impose a life sentence and make [Treiber] live a life worse than death.

It would seem to me if I'm going to end up having to argue, given the context of this case, given everything the Commonwealth developed in its guilt phase—we have to remember the guilt phase wasn't just about fire. It was about [Treiber] and his personality and the way he was. We knew that was coming. And if I were to without any real mental health component to this case, attempt to offer something so remote, my view is it would smack as a pure appeal to their sympathy and their emotions and undermine my ability to convince them that if you really want to punish him, you make him live.

(*Id.* at pp. 52-54.)

As for Treiber's juvenile records, Attorney George explained that he did not obtain them because the District Attorney's Office had informed him that Treiber had no criminal history. (*Id.* at pp. 65-71.) Attorney George also explained that Treiber had informed him that when he was a juvenile he committed a theft from a mailbox. (*Id.* at p. 65.) Thus, he explained, "my view was I didn't want to start requesting records such as a juvenile file because I was concerned that I would uncover criminal history information that would upset or cause the [prosecution] not to stipulate that [Treiber] has no criminal history." (*Id.* at p. 65.)

Attorney George also acknowledged during his PCRA hearing testimony that Treiber's juvenile file contained a psychological evaluation that found that he suffered as a juvenile from "minimal brain dysfunction." (*Id.* at p. 73.) He testified that this evidence was too remote, and would not have been helpful given the information he had from the defense experts that showed that Treiber did not suffer from any cognitive deficit or emotional impairment. Moreover, Attorney George explained, the records would have shown that Treiber was deceptive. (*Id.* at pp. 74-80.)

When it decided Claim XI, the PCRA court first set forth the law on the application of the *Strickland* standard specifically to allegations that counsel was ineffective for failing to investigate

109

and present available mitigating evidence in a capital case. (PCRA Ct. Op. 3/27/12, ECF No. 11-3 at pp. 27-29.) The PCRA court then referred to its discussion of Claim X(b), which is quoted above and which also extensively addressed that part of this claim (Claim XI) in which Treiber alleged trial counsel was ineffective for failing to present expert mitigating evidence. (*Id.* at 30; *see also id.*, ECF No. 11-1 at pp. 33-50.) Next, the PCRA court cited and quoted from Attorney George's PCRA testimony, during which he explained the many decisions he made related to his investigation and presentation of mitigating evidence, as well as the strategic decisions he made in presenting the defense's case during the sentencing phase. (*Id.* at pp. 30-33, 35.) The PCRA court held that Treiber failed to establish that Attorney George's performance fell below an objective standard of reasonableness (*Strickland's* first prong). (*Id.*)

Finally, the PCRA court also held that Attorney George was not ineffective for failing present additional lay witness mitigation. (*Id.* at pp. 33-35.) In so holding, it explained:

> In a January 14, 2002, letter to Attorney George, [Treiber] told him that only his parents could speak at the penalty phase, but <u>nothing else</u> (underlined in the January 14th letter). N.T. PCRA Hearing (Day 8), 10/22/10, at 30. [Treiber] only wanted his parents to testify during the penalty phase. Furthermore, [Treiber's] family did not supply Attorney George with the names of Audrey Hoover, Nancy Dougherty, "Aunt Cindy,"[39] Whitney Sedgewick or Ted Treiber. N.T. PCRA Hearing (Day 8), 10/22/10, at 137-138, 154, 177. Except for "Aunt Cindy," Attorney George was unaware of these people. Therefore, he cannot be deemed ineffective for failing to call them. As to Aunt Cindy, given the information he received from Dr. Schwabenbauer and Mr. Reilly, there would have been no reasonable basis to present evidence of her mental illness.

> [39] Cynthia Treiber, "Aunt Cindy," was not named as a potential mitigation witness by [Treiber's] mother. However [Treiber] mentioned her in his mitigation questionnaire.

> Attorney George did not call Leo Banka during the penalty phase because Banka told him that he knew about "other fires" caused by [Treiber] and [Treiber's] history of damaging cars for insurance proceeds. *Id.*, at 176. Also, Banka was afraid to testify, lacked the strength and was worried it would hurt his business. *Id.*, at 177.[40]

⁴⁰ At the PCRA hearing, Leo Banka testified that, although he was willing to testify at trial, he may have told George he did not want to testify. Banka stated he never told George that he did not want to testify because it would have hurt his business. Moreover, Banka stated he never said that [Treiber] destroyed vehicles for insurance money. As to whether Banka was an available witness, this Court finds Attorney George's testimony credible and Banka's not credible.

As to purported evidence of the Treiber family's mental illness, no specific information was provided to George by [Treiber] or his parents. ([Treiber] also told Mr. Reilly that he and his family had not history of psychiatric and/or psychological intervention. *See*, Reilly Report, Respondent's Exhibit R-2.) When George met with [Treiber's] parents, they always met as a couple and when George went over the mitigation questionnaire, Edith Treiber always responded for her husband. *Id.*, at 134-136. At the penalty phase, Attorney George did not ask Edith Treiber about her alcohol abuse  because he was never informed that she had an alcohol problem. *Id.*, at 138. Also, he was not told she suffered from any mental health conditions.

(*Id.* at pp. 34-35.)

The Pennsylvania Supreme Court agreed with the PCRA court that Treiber failed to show that Attorney George's performance fell below an objective standard of reasonableness under prevailing norms. *Treiber II*, 121 A.3d at 467-73. It also held that Treiber failed to establish that he was prejudiced. The Pennsylvania Supreme Court held:

Counsel described the basis for his penalty-phase decisions at the PCRA hearings. He decided there was no genuine mental-health issue based on Dr. Schwabenbauer's and Mr. Reilly's conclusions and the fact that [Treiber] successfully maintained a real-estate career. *Id.*, at 52-54, 59-61, 172-74. He also explained the Commonwealth at trial set forth substantial evidence of [Treiber's] controlling personality, deception, and planning, *i.e.*, efforts requiring mental competence and intelligence. *Id.* Counsel reasoned because [Treiber] lacked any real mental-health component, presenting weak mental-health evidence would offend the jury and convey to it that the defense was appealing to its sympathy. *Id.* Counsel felt this approach would backfire and undermine his attempt to save [Treiber] from the death penalty by convincing the jury it should make [him] serve a life sentence if it truly wanted to punish him. *Id.* He did not call Dr. Schwabenbauer as a witness because he was unwilling to help, *id.*, at 114, 130-31, and he did not call Mr. Reilly because he would have testified in accordance with his report that [Treiber] was normal, had average intelligence, and could

111

function regularly at the time of the murder, *id.*, at 168. He also stated that presenting expert testimony of [Treiber's] mental-health records would give rise to cross-examination or conflicting Commonwealth expert testimony demonstrating [Treiber] made a good recovery from his 1991 injury and thus did not suffer cognitive deficiencies. *Id.*, at 171-72.

Dr. Schwabenbauer and Mr. Reilly both testified at the PCRA hearings. Dr. Schwabenbauer agreed counsel consulted with him and requested he perform neuropsychological testing on [Treiber], but he claimed counsel never provided him with [Treiber's] 1996 MRI records, which indicated [Treiber's] brain damage. N.T. PCRA Hearing, 6/1/11, at 43, 57-58. Dr. Schwabenbauer also stated he told counsel [Treiber] should be examined by a neuropsychologist. *Id.*, at 47. Mr. Reilly testified counsel never provided him with [Treiber's] 1996 MRI records, juvenile records, or the 1980 diagnosis from his childhood psychologist. N.T. PCRA Hearing, 8/10/09, at 114-15. Mr. Reilly asserted, had counsel given him these records, he would have recommended [Treiber] undergo neuropsychological testing. *Id.*, at 116-18.

The PCRA court held counsel had a reasonable basis for not presenting mental-health testimony at the penalty phase, especially when considering Dr. Schwabenbauer's and Mr. Reilly's conclusions and the fact [Treiber] did not cooperate with counsel regarding the penalty phase. PCRA Court Opinion, 3/27/12, at 46. The court explained [Treiber] repeatedly advised counsel not to pursue penalty-phase evidence and refused to meet with a mental-health expert. It noted [Treiber] instructed counsel on several occasions to focus on the guilt phase and refused to spend time and money purely on the penalty phase. *Id.*, at 37. Specifically, the court highlighted a letter [Treiber] wrote to counsel January 14, 2002, stating: (1) he would commit suicide if he lost the guilt phase; (2) he wanted counsel to focus only on the guilt phase; (3) he did not wish to defend or spend funds on the penalty phase; (4) the only defense he wanted to present at the penalty phase was a brief argument, and his parents could speak if they wished; (5) not to bother his acquaintances about the penalty phase; and (6) he was of sound mind and would not change his view on the penalty phase. *See id.*, at 38 (quoting [Treiber's] letter to counsel in full). [Treiber] expressed the same views on three separate occasions from February to March, 2002, refusing to meet with a "head doctor" unless it helped the guilt phase and reiterating he would not participate in the penalty phase. *Id.*, at 39. [Treiber] never abandoned his position regarding the penalty phase; counsel convinced [Treiber] to allow Mr. Reilly to test him only because he told him it would help in the guilt phase. *See id.*, at 37-40; *see also* N.T. PCRA Hearing, 10/22/10, at 24, 122, 145, 157. After a meeting with Mr. Reilly, [Treiber] wrote counsel and told him Mr. Reilly was not helpful or worthwhile. PCRA Court Opinion, 3/27/12, at 43-44.

The court PCRA court also concluded [Treiber] failed to establish prejudice. *Id.*, at 51. It credited the Commonwealth's PCRA mental-health experts over [Treiber's] finding [Treiber's] expert neuropsychologist's conclusions were "convincingly contradicted." *Id.*, at 48-50. The Commonwealth's PCRA experts

evaluated [Treiber] and concluded he was not suffering from a mental disorder at the time of the offense, he was able to understand the criminality of his conduct and could conform to the law, and his flat affect was not related to his 1991 injury but was a characteristic since childhood and stemmed from his narcissistic and antisocial traits. *See id.*, at 49-50.

"The inquiry of whether trial counsel failed to investigate and present mitigating evidence turns upon various factors, including the reasonableness of counsel's investigation, the mitigation evidence that was actually presented, and the mitigation evidence that could have been presented." *Commonwealth v. Simpson*, 620 Pa. 60, 66 A.3d 253, 277 (2013) (citation omitted). The reasonable basis prong of an ineffectiveness claim does "'not question whether there were other more logical courses of action which counsel could have pursued; rather, we must examine whether counsel's decisions had any reasonable basis.'" *Chmiel*, at 1127 (citation omitted).

First, we note the PCRA court found counsel's testimony credible over Dr. Schwabenbauer's and Mr. Reilly's, and such credibility findings, if supported by the record, are binding on this Court. PCRA Court Opinion, 3/27/12, at 40-42; *see also Dennis*, at 305 (PCRA court's credibility findings, where supported by record, are binding on reviewing court). Accordingly, we are bound by the supported determination that [Attorney George] provided all medical records from 1991 to 2002, including the 1996 MRI records, to Dr. Schwabenbauer and Mr. Reilly. *See* N.T. PCRA Hearing, 10/22/10, at 91-100, 106, 170. Thus, [Treiber's] argument that Dr. Schwabenbauer and Mr. Reilly would have concluded he suffered cognitive and mental impairments had they been given his 1996 MRI records lacks arguable merit.

We agree with the PCRA court that counsel was reasonable in conducting his investigation by relying upon the experts' determinations and putting forth a mitigation defense. Counsel's investigation included compiling a social history from [Treiber] and his family, interviewing potential lay witnesses, and reviewing medical, juvenile, prison, and employment records. As recognized by the PCRA court, counsel retained two mental-health experts to evaluate [Treiber's] medical records—one of which examined [Treiber] in person on three separate occasions. We cautioned in *Lesko*, that in applying *Strickland* to mental-health mitigation cases, "courts must be careful not to conflate the roles and professional obligations of experts and lawyers." *Lesko*, at 382. Here, counsel consulted with those experts so that, as he hoped, he would be able to present evidence of mental impairment. Counsel met with Mr. Reilly because he would give him an accurate explanation as to whether [Treiber] indeed suffered mental defects, which would save counsel from expending his limited financial resources on fruitless mental-impairment claims. Counsel provided the experts with all of [Treiber's] medical records, and they did not request additional information to render their opinions. The experts concluded [Treiber] did not suffer mental or cognitive defects and his 1991 injury could not have been the cause of his flat affect or indifferent demeanor. [Treiber's] PCRA experts, who now dispute Dr. Schwabenbauer's and Mr. Reilly's

conclusions, might call into question their professional opinions; however, "that is not the same thing as providing a basis to fault [ ] counsel's legal performance." *Id.* Thus, based on [Dr. Schwabenbauer's and Mr. Reilly's] conclusions, it was reasonable for counsel to decide that presenting unsupported, weak mental-health evidence would be unsuccessful and could backfire and offend the jury by appearing to appeal to sympathy.

- - -

We also agree with the PCRA court's conclusion that [Treiber] failed to establish counsel was ineffective for failing to offer mitigating testimony supporting [Treiber's] good prison behavior. At the penalty phase, counsel submitted to the jury a prison-adjustment summary, which evinced [Treiber's] good prison behavior, and asked the jury to find [his] successful adaptation to prison as a mitigating circumstance under the catch-all mitigator. Counsel did not present testimony on this point because the court ruled if he made future dangerousness an issue, or argued that "life means life" or that [Treiber] would not be paroled, it would instruct the jury on the concepts of pardons and executive clemency. *See* Trial, 10/8/02, at 106-10; N.T. PCRA Hearing, 10/22/10, at 102-03; PCRA Court Opinion, 3/27/12, at 44, 89.

[Treiber] asserts only that counsel was ineffective in failing to present testimony of his good prison behavior. He fails to allege how such testimony would not merely be cumulative of the admitted prison-adjustment summary—evidence that established his good prison behavior. He also does not argue counsel lacked a reasonable basis for not presenting testimony or making future dangerousness an issue.

Alternatively, we see no error in the PCRA court's conclusion that [Treiber] has not established prejudice. At sentencing, counsel presented testimony from five lay witnesses and submitted four mitigating circumstances to the jury: (1) a positive work history; (2) successful adaptation to prison and cooperation with prison personnel; (3) a history of showing compassion and mercy to others; and (4) a history of neurological impairment and brain damage—all evidence that would fall within 42 Pa.C.S. § 9711(e)(8), the catch-all mitigator. Notably, although counsel did not present expert testimony, he still attempted to submit evidence to the jury of [Treiber's] brain injury and cognitive impairments, *i.e.*, his mother's testimony that he suffered a severe accident, which caused brain injury and long-term memory loss, impaired his cognitive abilities, changed his emotions, and flattened out his personality. PCRA Court Opinion, 3/27/12, at 85-87, 89. The jury found only [Treiber's] positive work history as a mitigating circumstance under the catch-all mitigator.

To establish prejudice, appellant must prove:

> "[T]here is a reasonable probability that, absent counsel's failure to present the mitigation evidence he currently proffers, [appellant] would have been able to prove at least one [more] mitigating circumstance by a preponderance of the evidence and that at least

114

one jury member would have concluded that the mitigating circumstance(s) outweighed the aggravating circumstance(s)."

*Philistin*, at 28 (quoting *Lesko*, at 383). A majority of this Court in *Commonwealth v. Tharp*, ⎯⎯ Pa. ⎯⎯, 101 A.3d 736 (2014), reasoned that the weighing of mitigating circumstances is qualitative, not quantitative, and thus a finding by the jury of the catch-all mitigator does not per se preclude this Court from deeming counsel ineffective because the jury may have given that factor more weight had counsel proffered additional mitigation evidence. *See id.*, at 775–77 (Castille, J., concurring); *id.*, at 777 (Saylor, J., concurring); *id.*, at 778 (Eakin, J., concurring); *see also Commonwealth v. Rivera*, ⎯⎯ Pa. ⎯⎯, 108 A.3d 779, 807 n. 18 (2014) (noting majority of this Court determined weighing of mitigating circumstances is qualitative, not quantitative).

Yet, not only does [Treiber] fail to acknowledge the jury found the catch-all mitigating circumstance, he also does not argue the evidence counsel failed to present would have caused at least one juror to add more weight to the catch-all mitigator. He only asserts a proper mental-health investigation "would have directly supported the neurological impairment and brain damage mitigating factor ... which w[as] submitted to the jury under [ ] § 9711(e)(8), but not found[.] Such expert testimony also could have supplied the basis for submitting additional mitigating circumstances to the jury[.]" [Treiber's] Brief, at 65. Specifically as to prejudice, [Treiber] merely claims that, based on the testimony offered by his PCRA experts, "confidence in the outcome of the penalty phase is undermined." *Id.*, at 69. We note the PCRA court did not find [Treiber's] PCRA experts credible, and such credibility findings, which are supported by the record, are binding on this Court. *See* PCRA Court Opinion, 3/27/12, at 47-51. Accordingly, [Treiber] has failed to demonstrate the requisite prejudice for relief on his mental-health mitigating evidence claim.

We also agree with the PCRA court's conclusion that [Treiber] failed to establish counsel was ineffective for failing to offer mitigating testimony supporting [Treiber's] good prison behavior. At the penalty phase, counsel submitted to the jury a prison-adjustment summary, which evinced [Treiber's] good prison behavior, and asked the jury to find [his] successful adaptation to prison as a mitigating circumstance under the catch-all mitigator. Counsel did not present testimony on this point because the court ruled if he made future dangerousness an issue, or argued that "life means life" or that [Treiber] would not be paroled, it would instruct the jury on the concepts of pardons and executive clemency. *See* Trial, 10/8/02, at 106-10; N.T. PCRA Hearing, 10/22/10, at 102-03; PCRA Court Opinion, 3/27/12, at 44, 89.

[Treiber] asserts only that counsel was ineffective in failing to present testimony of his good prison behavior. He fails to allege how such testimony would not merely be cumulative of the admitted prison-adjustment summary—evidence that established his good prison behavior. He also does not argue counsel lacked a reasonable basis for not presenting testimony or making future dangerousness an issue. And he does not explain how he was prejudiced by counsel's alleged

ineffectiveness, but merely contends counsel's ineffectiveness in presenting testimony of good prison behavior, coupled with his deficiencies in investigating mental health, undermined confidence in the penalty phase's outcome. *See* [Treiber] Brief, at 69. Accordingly, we conclude [Treiber] has failed to demonstrate he is entitled to relief.

*Id.* at 468-73 (footnotes omitted).

**Discussion**

Treiber is not entitled to relief on Claim XI because: (1) this Court, once again, must under § 2254(e)(1) accord deference to the findings of fact and credibility determinations made by the PCRA court when it denied this claim; and (2) Treiber has not shown that the Pennsylvania Supreme Court's adjudication of this claim cannot withstand review under AEDPA at § 2254(d).

As to the latter point, Treiber has not shown one of these three things. First, Treiber has not shown that the Pennsylvania Supreme Court applied "a rule that contradicts the governing law set forth in [Supreme Court] cases," *Williams*, 529 U.S. at 405, or "confront[ed] a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrive[d] at a result different from [Supreme Court] precedent," *id.* at 406. Thus, there is no basis for this Court to find that the Pennsylvania Supreme Court's adjudication of either of *Strickland's* prongs was "contrary to" *Strickland*, or any other relevant Supreme Court decision, under § 2254(d)(1).[61]

---

[61]    Treiber contends that the Pennsylvania Supreme Court applied a prejudice analysis that was "contrary to" *Strickland* because it allegedly misstated the weighing process of mitigating and aggravating circumstances. As discussed above, however, federal courts reviewing a state prisoner's habeas claim should not be too quick to assume that the state court applied the wrong law, even if the state court was imprecise in language it used in evaluating a claim. *Visciotti*, 537 U.S. at 23-24. This is particularly so when a commonly-applied and well-known inquiry such as the *Strickland* prejudice prong is at issue, *id.*, and also when the Third Circuit Court has in other cases stated the prejudice inquiry in a similar way. *Compare Treiber II*, 121 A.3d at 472 (explaining that to establish prejudice, Treiber had to prove that, but for counsel's alleged deficient performance in investigating and presenting mitigating evidence, there is a reasonable probability "that *at least one jury member would have concluded that the mitigating circumstance(s) outweighed the aggravating circumstance(s)*") (emphasis added) with *Lesko v. Sec'y Pennsylvania Dep't of Corr.*, 34 F.4th 211, 241 (3d Cir. 2022) ("Prejudice requires a showing of a reasonable probability that, had counsel performed properly, *at least one juror would have found the mitigating factors to outweigh the aggravating factors*.") (emphasis added).

Second, Treiber has not shown that the Pennsylvania Supreme Court's adjudication, with respect to either *Strickland*'s deficient performance prong or its prejudice prong was "an unreasonable application" of that law under § 2254(d)(1).[62] None of his arguments establish that the Pennsylvania Supreme Court's adjudication of Claim XI(a) "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. Thus, Treiber has not met the difficult burden of showing that the state court's adjudication of Claim XI was an "unreasonable application of" *Strickland* and other relevant Supreme Court law.

Third, and finally, to overcome the burden imposed on him by § 2254(d)(2), Treiber must show that the Pennsylvania Supreme Court's decision to deny Claim XI(a) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" under § 2254(d)(2). Treiber has not met this burden either. In one point in its decision, the Pennsylvania Supreme Court observed that "[c]ounsel's investigation included compiling a social history from [Treiber] and his family, interviewing potential lay witnesses, and reviewing medical, *juvenile*, prison and employment records." *Treiber II*, 121 A.3d at 471 (emphasis added). Treiber points out that Attorney George, during his PCRA hearing testimony, stated that he did not obtain Treiber's juvenile file.[63] (PCRA Hr'g Tr., 10/22/10, at pp. 64-69.) Therefore, the Pennsylvania Supreme Court's recitation was not entirely accurate. But this Court concludes that

---

[62]    As explained above, because the Pennsylvania Supreme Court held that Treiber did not show that trial counsel performed deficiently, this Court owes "double" deference to that prong of its *Strickland* analysis (the first prong). *Richter*, 562 U.S. at 105 ("[t]he standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so.") (cleaned up). That is, "the question" for this Court with respect to *Strickland's* first prong "is not whether [Attorney George's] actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.*

[63]    Attorney George also testified at length during the PCRA hearing as to why he made the strategic decision not to obtain Treiber's juvenile file. (PCRA Hr'g Tr., 10/22/10, at pp. 64-69.)

that one misstatement does not show that the Pennsylvania Supreme Court's adjudication of Claim XI, with respect to either of *Strickland's* prongs, "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" under § 2254(d)(2).

In conclusion, Claim XI is denied because the Pennsylvania Supreme Court's determination that Treiber failed to establish *Strickland's* prongs withstands review under AEDPA's standard of review at § 2254(d). Because jurists of reason would not find it debatable that this claim lacks merit, a certificate of appealability is denied.

## IV.    Conclusion

For all the reasons stated above, Treiber is not entitled to habeas relief on any of his claims. Therefore, the Court will deny the Petition. Treiber is granted a certificate of appealability only on Claim IV(c). A certificate of appealability is denied with respect to all other claims.

An appropriate order will be entered.

BY THE COURT:

*/s/Robert J. Colville*
Robert J. Colville
United States District Judge

DATED: September 4, 2025
cc: All counsel of record